Edward Normand (*pro hac vice*)
Amos Friedland (*pro hac vice*)
Nathan Holcomb (*pro hac vice*)
Kyle Roche (*pro hac vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Tel:  (914) 749-8200
Fax:  (914) 749-8300
Email: tnormand@bsfllp.com

Kevin Smith (*pro hac vice*)
Sapna Palla (*pro hac vice*)
Benjamin Diessel (*pro hac vice*)
**WIGGIN AND DANA LLP**
265 Church Street, P.O. Box 1832
New Haven, CT 06508
Tel:  (203) 498-4400
Fax:  (203) 782-2889
Email: ksmith@wiggin.com

Ethan A. Balogh (CSBN 172224)
**COLEMAN & BALOGH LLP**
235 Montgomery Street
Suite 1070
San Francisco, CA 94104
Tel:  (415) 391-0440
Fax:  (415) 373-3901

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| CHAZ REETZ-LAIOLO, KARI BERNARD, and KRISTIN KIESEL,<br><br>        Plaintiffs,<br><br>v.<br><br>EMMA CLINE and PENGUIN RANDOM HOUSE LLC,<br><br>        Defendants. | **CASE NO.:  3:17-cv-06867-WHO**<br><br>**FOURTH AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs Chaz Reetz-Laiolo, Kari Bernard, and Kristin Kiesel bring this action against Emma Cline and Penguin Random House LLC.  Plaintiffs allege upon personal knowledge as to their own acts and observations and otherwise upon information and belief as follows:

## **INTRODUCTION**

1. This case arises from Defendant Cline's unlawful invasion of the Plaintiffs' private email and other online accounts through her use of spyware, as well as her plagiarism of Plaintiff Reetz-Laiolo's writings, including from a manuscript that Cline stole out of his online accounts.

2. The story begins when Reetz-Laiolo and Cline, both writers, were romantically involved and living together in an apartment in Berkeley, California.  At the time, Cline's computer was an Apple laptop.  Reetz-Laiolo occasionally used the laptop to check his email, with Cline's knowledge and permission.

3. Unbeknownst to Reetz-Laiolo, Cline had installed a spyware program called the "Refog Keylogger" on the computer, which she used to record and observe his activity.  Using the spyware, she obtained his email password, which she then used to access and systematically surveil his private email obsessively over a period of years.  Cline also obtained Reetz-Laiolo's online banking credentials, and hacked into his bank account, methodically reviewing years of transactions.

4. Cline also used her spyware to illegally access the private emails of Plaintiff Bernard (who used Cline's computer to check her emails on a trip they took together to Italy) and Plaintiff Kiesel.  Cline used this secret access to stalk and monitor Bernard and Kiesel over a period of years, spying on their every email, from the most intimate and private to the daily and quotidian.

5. Cline eventually sold her computer to Reetz-Laiolo for $300, assuring him that she had "wiped" it.

6. Reetz-Laiolo first discovered the still-running spyware on his computer when the spyware's increasingly large archive of his activity began to affect the computer's performance.  To this

day he remains traumatized by Cline's systematic and ongoing intrusion into his privacy.

7. Over a period of years, Reetz-Laiolo has pieced together the shocking extent of Cline's illegal spying. In so doing, he uncovered records of her hacking of Bernard's and Kiesel's emails, and systematic stalking of their daily lives. When he informed Bernard and Kiesel, they were naturally disgusted and distressed.

8. The email correspondence and computer activity Cline hacked into included drafts of Reetz-Laiolo's writings, which she pillaged and incorporated into her own work. The manuscript of <u>The Girls</u> that she submitted through The Clegg Agency to Random House – and that garnered her an advance of at least $2 million as well as a movie deal with Scott Rudin Productions – contains essential material that she stole from Reetz-Laiolo. So does the final published version of the book.

9. When Reetz-Laiolo discovered Cline's spyware, he confronted her. Concerned that she had plagiarized his work in <u>The Girls</u>, he pressed her for answers. Cline and Random House conspired to cover-up her plagiarism and surreptitious theft of his unpublished manuscripts. Random House agreed to remove 35 passages from the version of <u>The Girls</u> that was ultimately published, but falsely represented to Reetz-Laiolo that this material had not been included in the manuscript Cline had submitted to Random House. For example, where he had authored the distinctive phrase "the uncertain shape of a sleepy girl," she used the exact same phrase in her manuscript.

10. Reetz-Laiolo did not threaten litigation or demand financial compensation. His sole concern was ensuring that his literary works, both public and private, were not infringed.

11. An attorney representing Cline and Random House even admitted that Cline had used spyware to spy on Reetz-Laiolo for "personal" reasons, but falsely represented that Cline had only briefly used the spyware and had not used the spyware to access his computer remotely. Reetz-Laiolo was pressured to execute an onerous non-disclosure agreement, restricting his ability to tell anyone about Cline's hacking of Plaintiffs' accounts or the theft and incorporation of his work, or the work of others, by Cline and Random House (including the

35 passages Random House had removed).  When he refused, counsel for Random House and Cline warned him against speaking out publicly, threatening him with a defamation claim that Cline and Random House "had resources" to vigorously prosecute, and advising him to "act responsibly."

12. Random House agreed to remove certain plagiarized material in the published version of <u>The Girls</u>, but there was no way to remove certain scenes that were essential to the book's narrative – and that Cline had plagiarized from a draft film script by Reetz-Laiolo, entitled <u>All Sea</u>, which she accessed by secretly hacking into Reetz-Laiolo's online accounts.  Cline's copying from <u>All Sea</u> is unmistakable.  For example, where in <u>All Sea</u> a male teen, at the behest of a friend group he wants acceptance from, agrees to commit a burglary and is caught and confronted by his single mother, in <u>The Girls</u>, a female teen, at the behest of a social group she wants acceptance from, is caught and confronted by her single mother.  In <u>All Sea</u> the male teen is remanded to the custody of a father figure, who picks the teen up and confronts him about stealing from people, saying, "Let's get this outta the way."  In <u>The Girls</u> the female teen's father picks her up and relaxes after confronting her about stealing from people "[l]ike he'd gotten something out of the way."  The comparisons between <u>The Girls</u> and Reetz-Laiolo's stolen script go on.

13. Published in 2016, <u>The Girls</u> has enjoyed both critical acclaim and popular success.  A review in the <u>New York Times</u> heralded <u>The Girls</u> as "a seductive and arresting coming-of-age story hinged on Charles Manson, told in sentences at times so finely wrought they could almost be worn as jewelry."  A feature in the <u>New Yorker</u> called Cline a "talented stylist" who has been "fast tracked by the muses."  <u>Wired</u> called her "a major up-and-comer," while noting that "just as often that we put young people – particularly women – on pedestals, we wait for them to fall."  Both the <u>Washington Post</u> and NPR named <u>The Girls</u> "one of the best books of the year," with the <u>Washington Post</u> praising Cline as a writer "with maturity . . . twice her age."  <u>Vogue</u>, Lena Dunham, and Jennifer Egan joined the chorus of enthusiastic champions.  The novel was short-listed for the National Book Critics Circle John Leonard

Prize Award Finalists and for the 2016 Center for Fiction First Novel Prize.  Internationally, The Girls was long-listed for the 2016 Prix Femina.  The novel was on numerous best-seller lists, including that of the New York Times, where it remained from July 3, 2016, through September 18, 2016, peaking as the number two hardcover fiction book multiple times.

14. The Girls has also been published internationally, including in Canada (Random House 2016) and the United Kingdom (Chatto & Windus 2016) and in translation, including in Spanish as Las chicas (Anagrama 2016); in French as Les noies (Anagrama 2016); in Danish as Pigerne (Lindhardt og Ringhof 2016); in Portuguese as As Raparigas (Porto Editora 2016); and in German (HörbucHHamburg HHV GmbH 2016).

15. On April 26, 2017, the British Literary Magazine Granta listed Cline in its Best of Young American Novelists, which honored 21 U.S. writers under the age of 40.

16. Due to the runaway commercial success of its initial release, Random House and Cline released The Girls in paperback on May 9, 2017.  The cover page of the paperback edition describes it as "THE WORLDWIDE BESTSELLER."

17. The paperback release was highly anticipated worldwide.  Cline had a United Kingdom tour scheduled (though apparently canceled for reasons unknown) to promote the paperback release.  Tickets to a London Elle UK Magazine event were touted as opportunities to "[c]ome hear the 27-year-old New Yorker discuss what it took to write The Girls."

18. Cline's reviewers, readers, and fans, of course, had no idea that Cline has built her success not only on her own talent as a writer, but on theft and plagiarism of essential material from others.

19. Cline's plagiarism of Reetz-Laiolo is not an isolated incident:  She even plagiarized the thesis upon which Columbia University awarded her a Master of Fine Arts degree.

20. The Girls has already made millions of dollars for Defendants Cline and Penguin Random House LLC.

21. All Plaintiffs bring this action to remedy Cline's malicious and criminal invasion of their privacy and other unlawful acts.  Plaintiff Reetz-Laiolo brings this action to also remedy the

Defendants' profiteering from his stolen intellectual property.

## PARTIES

22. Plaintiff Chaz Reetz-Laiolo is a resident of California.

23. Plaintiff Kari Bernard is a resident of New York.  Bernard was a resident of California during the period in which events giving rise to this lawsuit took place.

24. Plaintiff Kristin Kiesel is a resident of California.

25. Defendant Emma Cline is a resident of California or New York.  Cline was a resident of California during part of the period in which events giving rise to this lawsuit took place.

26. Defendant Penguin Random House LLC is a limited-liability company organized under the laws of Delaware with its principal place of business in New York.  Random House is an imprint and division of Penguin Random House LLC with its offices at 1745 Broadway, New York, NY 10019.  Plaintiffs refer interchangeably to Penguin Random House LLC and Random House as "Random House" when the distinction between the imprint and division and the legal entity in which it is housed is not at issue.

## JURISDICTION AND VENUE

27. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 15 U.S.C. § 1116, and 28 U.S.C. § 1367.

28. Venue lies within this District under 28 U.S.C. § 1397(b) because a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

30. Reetz-Laiolo's published works include, among many others, "The Love Act" (published in Raritan and republished in Best American Nonrequired Reading 2012), "How High the Moon" (available on Amazon.com), "Take Care" (in Salon), "I Will Fly to the Ball" (published by SB Nation Longform), "Animals" (in Ecotone), "Lady at Fordham RD" (in Harvard Review), "Elk Stalked in Snow" (in The Paris Review and a finalist for a Pushcart Prize), and "Oak" (in Corriere Della Sera).

31. Reetz-Laiolo received an MFA in Writing from The School of the Art Institute of Chicago in 2005.

32. In 2007, Reetz-Laiolo was hired as the Senior Editor of SOMA Magazine in San Francisco, CA.

33. In 2008, Reetz-Laiolo became Creator and Editor in Chief of Paper & Carriage in Chicago, IL.  Paper & Carriage was nominated in 2008 for Utne Reader's Best New Publication award.

34. From 2005 to 2013, Reetz-Laiolo was a freelance editor for private clientele.  His clients include authors published by Best American Poetry, Forbes Magazine, and Knopf Publishing Group.

35. In late 2008, Reetz-Laiolo was hired as a lecturer at the Academy of Art in San Francisco, California, where he continues to work.  He has also lectured at the University of California, Berkeley, and the School of the Art Institute of Chicago.

36. Since early 2016, Reetz-Laiolo has volunteered as a Creative Writing Instructor at the California Medical Facility, State Prison in Vacaville, California, where he explores decision-making and memoir through bi-weekly writing workshops for incarcerated adults.

37. Cline's published works include "Marion" (in the Paris Review), "Am I ready to be a stepmother at 21?" (in Salon), "Arcadia" (in Granta, reprinted in Best American Short Stories 2017) and The Girls (published by Random House).

38. Reetz-Laiolo and Cline met and became romantically involved in June 2009, after he responded to her Craigslist personals listing.  Though this was a loving relationship, it was not, from the beginning, a monogamous one on either party's behalf.

39. Cline moved into Reetz-Laiolo's apartment in Berkeley, California in the summer of 2010 and continued to live with him there through the fall of 2011.  Toward the end of their time living together, she published an article describing her affectionate relationship with him. She described him as a "good father" who "builds [his daughter] a bunk bed and a science lab" and "works at her school two days a week," and says that she "love[s] these things about

FOURTH AMENDED COMPLAINT AND JURY DEMAND

him, his tenderness and care, the shape of him and [his daughter] walking together, of them chattering in the early mornings."

40. In the article, Cline also speaks warmly of her relationship with Reetz-Laiolo:

> We spent our days so richly, the morning espresso we paid for in change, the white-papered charcuterie, the fancy knives we scrounged for at yard sales. [Chaz] brushes my hair. He pedals me to acting class on his bike, both of us lustily singing old mountain songs. We sneak into hotel pools and eavesdrop to get dialogue for our short stories, take the moped to the market and come home with so much fruit it molds before we can eat it all.

41. In the fall of 2011, Cline moved to New York City to enroll in the Columbia University School of Arts Writing Program.  She graduated from this program with an MFA degree in 2013.

42. Cline's romantic relationship with Reetz-Laiolo began to dissipate, ending in January 2012.  From this point on, Cline and Reetz-Laiolo each dated other people, though Cline continued to approach Reetz-Laiolo about getting back together.

43. After Cline moved to New York in the summer of 2012, her and Reetz-Laiolo continued to see and speak with each other periodically, and their relationship remained amicable.  He continued to be invited to her family dinners and parties as late as the spring of 2015.

**Bernard's History with Reetz-Laiolo and Cline**

44. During the summer of 2010 (from June to August), Bernard sublet a room in Reetz-Laiolo's apartment, during the time that Cline was also living there.

45. Bernard began studies at The Green String Institute in Sonoma, California, in September 2010, and was hired by Cline's parents in December 2010 as a farm manager at the Green String Farm in Petaluma, California, where she worked until November 2016.

46. In late August 2010, Cline and Reetz-Laiolo took a three-week trip to Italy.  Cline's family had asked that Cline and Reetz-Laiolo travel there to help decorate a villa they had purchased in Cortona and were remodeling, which was eventually used in the film Under the Tuscan Sun.  While in Italy, they stayed at this villa with Cline's sister, Hillary.

47. Bernard and her friend Juliette Hermant also traveled with Cline and Reetz-Laiolo for a brief period during their trip to Italy.

48. While abroad, Bernard periodically used Cline's computer to check her email.  Cline knew that Bernard used her computer during this trip and consented to this use.

49. During this trip, Hermant occasionally checked her email on Cline's computer, with Cline's knowledge and consent.

50. During this trip, and occasionally thereafter, Reetz-Laiolo also used Cline's computer to check his online accounts, again with her knowledge and consent.

**Kiesel's History with Reetz-Laiolo**

51. Reetz-Laiolo and Kiesel were romantically involved from 2007 through 2009.  After they ended their romantic relationship, they continued to maintain a close friendship, and were occasionally intimate.

52. Kiesel has a Ph.D. in Agricultural and Resource Economics from the University of California, Berkeley, and currently holds a tenure-track faculty position at the University of California, Davis, in the Department of Agriculture and Resource Economics.  She was previously a tenured professor in the Economics Department at California State University, Sacramento.  When she started at Davis, it was discussed that she would be eligible for tenure there on an accelerated schedule, and Kiesel expected to go up for tenure in 2018.

**Cline Secretly Installs Spyware on her Computer**

53. Unbeknownst to Reetz-Laiolo and Bernard, and as Plaintiffs would discover only much later, while in Berkeley, California, Cline downloaded a spyware program called "Refog" on her computer at some point prior to their trip to Italy.

54. The Refog spyware software, advertised and sold as a tool designed for parents who are concerned about their children's safety, has two main programs:  "Keylogger" and "Personal Monitor."

55. Refog's website describes the "Keylogger" as follows:

> Running unobtrusively and undetectable in the background of your PC,
> Refog Keylogger will store everything your kids, copy and paste on the

8

computer, capture periodic snapshots of the computer's screen, log chats and social networking conversations and keep track of all Web resources and applications used on that PC.

56. Refog's website also describes both the legal and illegal uses of the program:

**Is a Keylogger Legal?** The answer to this question is "yes" and "no" because it depends upon how it is being used. If you are using it to monitor your child's activity for the purpose of maintaining their safety online then it is legal. When it comes to employee monitoring as long as you are using it in a location where the laws permit this type of monitoring then it is legal.

**A Keylogger can be illegal if you are using it for criminal purposes such as stealing personal data and financial information.** It is also illegal if you are installing as malware on the person's PC without their knowledge.

57. Using Refog, Cline executed an elaborate and prolonged operation to secretly spy on Plaintiffs.

58. Cline downloaded the Refog Keylogger and used it to capture various private passwords associated with the online accounts of Reetz-Laiolo, Bernard, and Kiesel.

59. Cline then used the passwords captured by Refog to break into Reetz-Laiolo's, Bernard's, and Kiesel's various online accounts repeatedly over a period of years, without their knowledge or consent.

60. Cline used this access to secretly spy on their online activity and monitor their day-to-day lives.

61. From the point that Cline installed the Refog Keylogger spyware and after, the program also continuously captured and stored screenshots of all activity on the computer. These screen-capture files permitted her to view Reetz-Laiolo's and Bernard's activity on the computer. At the same time, the screen-capture files recorded Cline's own history of activity, unlawful and otherwise, on the computer. Because Refog was running continuously while Cline hacked into Plaintiffs' accounts, the spyware intercepted some of Plaintiffs' emails, chat messages, bank account data, usernames, passwords and other sensitive information submitted and received through websites by taking screenshots of these electronic

1   communications while they were in transit.  At times, Cline would use the screenshots to

2   revisit Plaintiffs' emails she had previously read while hacking their accounts directly.

3   **Cline Uses the Spyware to Secretly and Unlawfully Access Plaintiffs' Online Accounts**

4   62.  The Refog Keylogger captured all types of actions taken on the computer, including all "web

5   page visits," "text inputs," and "window activities."  For example, the below screenshot of

6   the open Refog application shows a typical log delineating the different metadata that the

7   spyware continuously collected while anyone used Cline's computer:



63.  Review of certain screenshot examples demonstrates the extent and sophistication of Cline's

spying campaign.

64.  Cline used the Refog Keylogger to obtain Reetz-Laiolo's password for his Gmail account.

As the following magnified image of the above Refog screenshot demonstrates, the Refog

spyware captured Reetz-Laiolo's "text input" of this password:

| Date | Event Type | Content | Document | Window |
|---|---|---|---|---|
| 10/10/10 | Web Page Visit... | | mail.googl...#search/jay | Gmail – Search results ... |
| 10/10/10 | Web Page Visit... | | mail.googl...484b15ef79 | Gmail – Emma SHIFT – ... |
| 10/10/10 | Web Page Visit... | | mail.googl...fb483c3837 | Gmail – Re: hi there.. – ... |
| 10/10/10 | Scheduled Scr... | | mail.googl...fb483c3837 | http://www.apple.com... |
| 10/10/10 | Text Input | ███████ blackpillroad | | |

65.  In the below screenshot of the Refog Keylogger log, Cline also used the spyware to obtain

Reetz-Laiolo's password for another Gmail account he used to coordinate custody and childcare-related issues with the mother of his daughter:



66. As the following magnified image of the above Refog screenshot demonstrates, the Refog spyware captured Reetz-Laiolo's "text input" of this password:

| Date | Event Type | Content | Document | Window |
|------|-----------|---------|----------|--------|
| 12/30/10 | Window Activa... | | | |
| 12/30/10 | Window Activa... | | | |
| 12/30/10 | Application La... | | | |
| 12/30/10 | Web Page Visit... | | | http://www.apple.com... |
| 12/30/10 | Window Activa... | | | |
| 12/30/10 | Web Page Visit... | | www.apple.../startpage/ | Apple – Start |
| 12/30/10 | Text Input | ondaatje | mail.googl...va=1#inbox | |
| 12/30/10 | Web Page Visit... | | www.googl...picache=2 | Gmail: Email from Google |

67. In the below screenshot of the Refog Keylogger log, Cline also used the Refog Keylogger to obtain Reetz-Laiolo's password for his Yahoo account:

FOURTH AMENDED COMPLAINT AND JURY DEMAND

1
2
3
4
5
6
7
8
9
10
11
12

68. As the following magnified image of the above Refog screenshot demonstrates, the Refog

13

spyware captured Reetz-Laiolo's "text input" of this password:

14



15
16
17

69. Cline also used the Refog Keylogger to obtain Reetz-Laiolo's password for his Wells Fargo

18
19

bank account.

20
21
22
23
24
25
26
27
28

70. In the below screenshot of the Refog Keylogger log, Cline also used the Refog Keylogger to obtain Bernard's password for her Gmail account:



71. As the following magnified image of the above Refog screenshot demonstrates, the Refog spyware captured Bernard's "text input" of this password:



72. From the point she obtained these passwords in or about August 2010 and forward, Cline frequently broke into Reetz-Laiolo's and Bernard's email and other online accounts, from Berkeley, California, including for years after she and Reetz-Laiolo had separated, and years after Bernard was no longer connected with Cline or in contact with her in any regular way. In her spying, Cline scoured through emails in Plaintiffs' online accounts dating from many years before she had met them. By breaking into Plaintiffs' online accounts, Cline also recorded, through Refog, some of Plaintiffs' live communications—including chat messages,

FOURTH AMENDED COMPLAINT AND JURY DEMAND

emails, and other data submitted and received through websites—contemporaneously with their transmission.

73. Cline also obtained Kiesel's Gmail passwords for two separate accounts (including one account she used to coordinate custody and childcare-related issues with the father of her child).   From that point forward, Cline regularly broke into Kiesel's email accounts.

74. Conscious of her culpability, Cline went to great lengths to attempt to cover her tracks.

75. For instance, when Cline hacked into Bernard's and Kiesel's email accounts, she frequently employed an online program called VTunnel commonly used by hackers to conceal their identity.

76. VTunnel is an IP address scrambler that conceals the origin of the computer used to log in to accounts such as Gmail.  The website www.vtunnel.com describes its service as:

> a free proxy that acts as a middleman between your computer and the Internet. It is also a web proxy and an anonymous proxy. It is a web proxy that concentrates on facilitating your access to the World Wide Web. It acts as an anonymous proxy, which attempts to make all online activities untraceable. It hides your personal information so you can browse the web anonymously and access sites that are restricted to your network or area.

77. Cline used this software to cloak her spying activity, so that Bernard and Kiesel would not discover she was breaking into their accounts or trace the origin of Cline's hacking back to her IP address.

78. As reflected in the screenshot below, Cline would navigate to vtunnel.com, then navigate to gmail.com in order to "protect her anonymity" and hide her illegal activity:



79. Because Cline and Reetz-Laiolo were living together, it was unnecessary for her to use an IP scrambler to mask her location.  Accordingly, when Cline accessed Reetz-Laiolo's email accounts, she rarely used the VTunnel program.

80. Unbeknownst to Kiesel and without her permission, Cline broke into Kiesel's email account and read thousands of her emails between December 2011 and August 2012, stalking and monitoring her daily life.

81. Unbeknownst to Bernard and without her permission, Cline broke into Bernard's email and read thousands of her emails between September 2010 and January 2013, stalking and monitoring her daily life.

82. Unbeknownst to Reetz-Laiolo and without his permission, Cline broke into Reetz-Laiolo's email accounts and read thousands of his emails between September 2010 and January 2012, stalking and monitoring his daily life.  Certain of the emails she read dated back to 2003 – years before she had met Reetz-Laiolo.  Because the Refog program was continuously running, Cline's unauthorized access to Reetz-Laiolo's account also captured the composition and transmission of chat messages and email messages between Reetz-Laiolo

15

1    and other individuals, as well as other information submitted and received through websites,

2    while these messages and data were in transit.

3  83.  For example, the Refog software that Cline installed recorded email communications drafted

4    by Reetz-Laiolo contemporaneously with their transmission:



16  84.  When she broke into Plaintiffs' email accounts, Cline scoured the various mailboxes, ran

17    keyword searches to locate specific emails, and read countless private and intimate chat

18    messages and emails dating back to years before she knew Plaintiffs. The content of many of

19    these messages and emails was highly personal, and included information regarding

20    Plaintiffs' finances, the medical condition and medical needs of Plaintiffs' family members,

21    personal hardships experienced by Plaintiffs and their friends or family, and intimate

22    thoughts and experiences related to Plaintiffs' personal and romantic relationships.

FOURTH AMENDED COMPLAINT AND JURY DEMAND

85. Cline regularly searched for "Chaz," for example, when she broke into Bernard's emails:



86. Cline regularly searched for "Emma" when she broke into Bernard's emails:



87.   Cline regularly searched for "Bobby" when she broke into Bernard's emails.  "Bobby" was

Bernard's boss, but had been close to the Cline family for years:



88.   Cline obsessively read Bernard's emails with her friend, celebrity chef David Tanis, who

Cline herself wished to befriend:



89.   Cline also obsessively consumed numerous intimate emails between Bernard and her long

term partner, with whom Bernard suffered a protracted breakup.  When breaking in and

reading these intimate communications, Cline highlighted and appears to have copied

portions of these private and intimate communication.

90.  At times, unbeknownst to Bernard, Cline would review and alter certain Gmail settings on

Bernard's account:



91.  Cline also searched for and read Reetz-Laiolo's email correspondence with his editors, such

as Davide Frattini, his editor at <u>Corriere della Sera</u>:



19

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

92.   Cline also searched Reetz-Laiolo's emails for emails from other editors, such as Maryse

Meijer:



93.   Cline regularly downloaded drafts of Reetz-Laiolo's work that he exchanged privately with

his editors:



FOURTH AMENDED COMPLAINT AND JURY DEMAND

94.  Cline would open these Word document drafts using Google Docs in order to surreptitiously
     read them:



95.  Cline would then download these drafts so that she could keep them on her computer and
     later use them in her own work:



96. When searching through Reetz-Laiolo's inboxes, Cline researched how to "recover deleted email(s)":



97. After Cline was finished reviewing Reetz-Laiolo's draft manuscripts and emails, she would delete her browser history:



98. Cline regularly searched Reetz-Laiolo's emails for words such as "mom":



99. Cline regularly searched Reetz-Laiolo's emails for sexually explicit words such as "pussy":



100. Cline regularly searched Reetz-Laiolo's emails for the word "ass":



101. Cline also searched Reetz-Laiolo's emails for communications regarding payment of his daughter's medical bills.

102. Cline also searched Reetz-Laiolo's emails for chats with his high school friend, Samuel:



103. Many months after she illegally obtained passwords to Reetz-Laiolo and Bernard's accounts, Cline obtained access to Kiesel's Gmail accounts, and from that point on hacked into her account repeatedly for years afterward.

104. Cline regularly searched for the word "Chaz" when she broke into Kiesel's emails:



105. Cline regularly searched for the word "Emma" when she broke into Kiesel's emails.



106. At points, Cline would highlight and copy text from the emails she read. She would then
forward some of these emails in their entirety to her own Outlook web account associated
with middlebury.edu, the web domain for the college Cline previously attended. Cline then
stored these copied emails in her own personal account so that she could go back and read
them at her leisure.

107. In opening the emails in Gmail and Yahoo! Mail, Cline caused the transmission of an electronic communication located on the Gmail or Yahoo! Mail primary server from the server to the computer she was using, creating a copy of the email on the Random Access Memory (RAM) of the computer, saved to a temporary location.

108. While Cline would later claim that she only accessed the accounts of Kiesel and Bernard to uncover information pertaining to her relationship with Reetz-Laiolo, this was not true. Many of the communications that Cline accessed had nothing to do with Reetz-Laiolo. Instead, much of Cline's conduct appears to have stemmed from her desire to consume and monitor every intimate and private detail about Plaintiffs' lives.

109. Cline also highlighted and appears to have copied private and intimate communications while accessing Kiesel's email.

110. Cline also read emails between Kiesel and her friends.

111. Cline actively monitored Reetz-Laiolo's, Kiesel's, and Bernard's email accounts through her hacking.  For example, Cline oftentimes logged into email accounts and reviewed only the email "previews" in those accounts' various mailboxes.

112. Gmail's inbox settings allow individuals to read a portion of their email messages without opening them by viewing a roughly 80-100 character "preview" of the email's text.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOURTH AMENDED COMPLAINT AND JURY DEMAND

113. For example, on August 22, 2012, Cline logged into Bernard's email account:



114. Cline then reviewed Bernard's inbox, reviewing the previews of numerous messages:



115. Cline then opened Bernard's outbox, reviewing the previews of her sent messages:



116. After reviewing theses message previews, Cline resumed browsing the internet:



117. Cline also broke into Reetz-Laiolo's Wells Fargo Bank Account:



118. While illegally accessing Reetz-Laiolo's Wells Fargo Bank Account, Cline accessed and

viewed details regarding his balance and purchases:



119. While illegally accessing Reetz-Laiolo's Wells Fargo Bank Account, Cline accessed and

viewed copies of checks that he wrote to other individuals:



120. While illegally accessing Reetz-Laiolo's Wells Fargo Bank Account, Cline reviewed the

details of multiple bank statements, some of which were over a year old:



121. While illegally accessing Reetz-Laiolo's Wells Fargo Bank Account, Cline ran a search for

"Rachel" in Reetz-Laiolo's bank account:



122. After Cline finished perusing years of Reetz-Laiolo's private financial documents, Cline

logged back into her own email account merely seconds later:



123. Days later, Cline used the Refog software to review the account details again, using the screenshots she had captured in her previous invasion:



**Cline's Long History of Breaking Into Other People's Online Accounts**

124. Cline's intrusions into Plaintiffs' online accounts were not the first instances in which she had broken into other people's online accounts. She has for a long time carried out a disturbing pattern and practice of breaking into (or attempting to break into) the private online accounts of numerous other people, without their knowledge or permission, and secretly spying on their lives.

125. As another example, during high school at Sonoma Academy, Cline regularly accessed her various classmates' "live journal" accounts, often using default passwords classmates had not changed or using information she knew about her classmates to guess their passwords. One of these classmates, Amy Berliner, was the eponymous "Amy" of her parents' company Amy's Kitchen, and Cline would laugh about how many private details she knew about Berliner, having secretly broken into and read many of Berliner's online high school journal entries.

1   126. Cline also figured out her parents' passwords and accessed their email accounts, monitoring

2       their intimate marital, professional, and social lives.

3   127. More recently, during the period between September 2010 and January 2013, Cline accessed

4       or attempted to access email and Facebook accounts for a number of additional non-parties,

5       including, for example, using Vtunnel IP Scrambler, William Worden:



16   128. As another example, and again using Vtunnel, Cline also attempted to access the Gmail of

17       Alexander Benaim:



129. As another example, Cline also attempted to access the Hotmail account of Juliette Hermant:



130. In short, Cline's surreptitious theft of Plaintiffs' passwords and invasion of their private email accounts was part of her decade-long pattern and practice of invading the privacy of dozens of people. To this day, the people whose private information she accessed and stole remain oblivious to her shocking and pervasive intrusions on their privacy.

**Cline Continues to Invade Plaintiffs' Privacy Using New Approaches**

131. In January 2013, Cline sold her computer to Reetz-Laiolo for $300.

132. Cline still had passwords for Bernard's and Kiesel's accounts, and continued to hack into these accounts remotely, masking this access with the VTunnel IP scrambling mechanism.

133. In fact, on January 1, 2013 – just days before she sold the computer to Reetz-Laiolo – she

accessed Bernard's account:



134. After entering Bernard's account, Cline continued to obsessively read and copy private

communications between Bernard and others:



135. Although she continued to break into Bernard's and Kiesel's email accounts, in early 2012

Cline lost access to Reetz-Laiolo's Gmail and Yahoo accounts. On October 21, 2012, just a

few months prior to the sale of the computer, Cline attempted to access Reetz-Laiolo's Gmail

account with the VTunnel scrambler and was denied entry:

FOURTH AMENDED COMPLAINT AND JURY DEMAND

136. On that same day – October 21, 2012 – Cline wrote in a document that appears to be a personal diary: "Reread some of chaz' old letters, they kill me. Wish we were moving in together out here.  But then of course the usual anger, the women, **the desire to wrench every hidden thing from him**" (emphasis added):



137. Cline clearly remained determined to regain access to Reetz-Laiolo's private communications and manuscripts.

138. After she lost access to Reetz-Laiolo's email accounts, Cline extensively researched the ability to have Refog run in "hidden mode":



139. At this time, Cline was no longer living with (or even in the same state as) Reetz-Laiolo. The screenshots do not reveal that she attempted to use Refog to gain access to the online accounts of any new unsuspecting parties. Despite this, Cline accessed and viewed the Refog Keylogger & Personal Monitor instruction user guide, indicating that she had other purposes for the Refog spyware:



38

140. Shortly before she sold her computer to Reetz-Laiolo for the well-below-market rate of $300, Cline investigated the Refog Personal Monitor – an upgrade to Refog's Keylogger program that permits remote access to activity on a computer.  Refog's website describes the "Personal Monitor" as a more advanced program, which enables "email delivery" of the content captured by the software and creates "[c]omprehensive reports [that] are available and delivered automatically to your email address."

141. Screenshots show that on August 17, 2012, Cline went at least so far so to review the end user license agreement for Refog:



142. Cline's investigation of Personal Monitor is further evidence of her strong interest in obtaining remote access to the computer files and activity of others.  As described below, Cline ultimately succeeded in obtaining manuscripts by Reetz-Laiolo that he had not shared with her.  Cline's investigation of Personal Monitor indicates that it may well have been the means Cline used to obtain access to Reetz-Laiolo's manuscripts after she lost access to his

email account.  Other possibilities are that she managed to regain access to his email, or that she gained access to his account with celtx.com, which was connected to his Yahoo! Account and provides Internet-based software that Reetz-Laiolo used for drafting film scripts.

143. At the time Cline sold the computer to Reetz-Laiolo, she misrepresented to him that she had "wiped" it.  This misrepresentation was intentionally false.

144. Cline had in fact left Refog running on the computer.

145. Reetz-Laiolo continued to use the computer with no knowledge that Cline had installed Refog, and with the reasonable understanding that he was conducting his online and other computer activity in privacy on a "wiped" computer.

146. Cline never corrected this misrepresentation.

**Gmail and Yahoo! Mail Stored Copies of Plaintiffs' Emails for Purposes of Backup**

147. Gmail is a web-based email service that Google has provided since 2004.  Yahoo! Mail is a web-based email service that Yahoo! has provided since 1997.

148. Gmail and Yahoo! Mail have always stored multiple copies of its users' emails, for the primary purposes of providing its users (a) access to their emails at any time through an internet browser and (b) storage of their emails for purposes of backup.  Plaintiffs used their Gmail and Yahoo! Mail accounts for these purposes.

149. Google and Yahoo! Mail make multiple copies of their users' emails, maintaining them on multiple servers for both temporary download and for backup.  (*See, e.g.*, http://www.cnn.com/2011/TECH/web/03/01/gmail.lost.found/index.html.)  The copies are kept on servers in separate data centers "all over the world so that if one of the data centers burns down or floods, there are plenty of copies in far-and-away locations that will be unaffected." (*Id.*)  Accordingly, any single email "may be hiding out in Asia, in Europe and on the east and west coasts of the United States." (*Id.*)

150. Google (at least) also stores emails on physical tapes, akin to cassettes. (*Id.*)  Google's use of tape, in addition to storage on servers across multiple data centers, protects its users'

emails in the event that an unusual software bug destroys the other digital copies it keeps.

(*Id.*)  These tapes are thus also kept for purposes of backup for the benefit of its users.

### Reetz-Laiolo First Learns of the Spyware on His Computer and Confronts Cline

151. In 2015, Reetz-Laiolo first learned that Cline had installed the Refog spyware program on the computer.  The computer had been running slowly, and he asked a friend who was a computer specialist to look at it and see what could be done to improve its performance.  Reetz-Laiolo's friend discovered the still-running Refog program on the computer, which Cline had left operating notwithstanding her assurances to Reetz-Laiolo that she had "wiped" the computer.

152. Reetz-Laiolo eventually learned that Cline had installed a spyware program on his computer and that the program had created a huge cache of screen-capture files.

153. Reetz-Laiolo was shocked and distressed by the discovery of the spyware program.  In an email to Cline, he wrote:  "I actually thought I would vomit when [my friend] started telling me what he was finding."  He demanded that she explain what she had done.

154. Over the following years, Reetz-Laiolo pieced together much of the shocking extent of Cline's intrusion into his private life, including recent discoveries with the assistance of computer forensic consultants.  Discovery, including third-party discovery, will ultimately help determine the full extent of Cline's intrusions.

155. Reetz-Laiolo's discovery of Cline's intrusion had a profound and negative impact on his well-being.  Since the discovery and to this day, he has no faith in his own privacy and often becomes paranoid when people sit down next to him at restaurants or on public transportation, and when he sees individuals whom he does not recognize near his house.  When he receives routine alerts from Gmail informing him that his account is open in more than one location, he has panic attacks and leaves whatever he is doing to ensure that his account has not somehow been compromised again by Cline.

156. As a result of Cline's invasion of his privacy, Reetz-Laiolo has developed a severe sleeping disorder.  He has had great difficulty completing a single writing project since the discovery.

To this day, he often breaks down crying, including in public, when memories of her invasion of his privacy are triggered.

157. In March 2016, Reetz-Laiolo shared with Bernard his recent discovery that Cline had broken into her email account and read her emails as well as his own. Until that point, Bernard had no idea that Cline had broken into her email account and read her private communications. She was stunned and upset at this news.

158. On October 15, 2016, Cline – who now knew that Bernard had discovered that Cline had broken into her email account – sent Bernard a text message, acknowledging her culpability in hacking Bernard's accounts. Bernard did not reply to Cline.

159. It was not until 2017 that Bernard finally viewed many of the screenshots that revealed Cline obsessively reading (and copying material from) hundreds of her most intimate and private emails. Bernard was shocked and distressed to discover the extent to which Cline had invaded her privacy.

160. In late 2016, Reetz-Laiolo shared with Kiesel his recent discovery that Cline had broken into her email accounts and read her emails. Until that point, Kiesel had no idea that Cline had broken into her email account and read her private communications. Like Bernard, Kiesel was stunned and upset at this news.

161. It was not until 2017 that Kiesel learned of the extent of Cline's intrusion into her private emails: Cline had accessed and monitored thousands of Kiesel's emails over a period of years, and copied and stolen many of them. Kiesel was shocked and distressed to discover the magnitude of Cline's intrusion.

**Cline Steals Reetz-Laiolo's Written Work and Incorporates It into The Girls**

162. Cline used her secret, unlawful access to Reetz-Laiolo's computer and email account to steal numerous distinctive passages and phrases, scenes and scenic elements, sentence structures, and other creative expressions from his published and unpublished written work. Those stolen creative expressions were included into the draft of The Girls she ultimately sold to Random House and Scott Rudin Productions. She plagiarized some of these passages from

42

writings that were publicly available or that he had shared with her.  But she perpetrated her most critical theft of his writing – three core, chronologically ordered scenes in the draft of The Girls that remain in the published version (with Random House's blessing) – by breaking into his Gmail and Yahoo accounts and/or remotely accessing his computer with the Refog spyware.  As detailed below, she and Random House stole and converted these central, interdependent scenes in The Girls from him.  This theft and incorporation was part of another of her long patterns and practices, in which she regularly stole the writing of other authors whose work she coveted and ultimately presented to others as her own – including in the MFA thesis she submitted to Columbia University.

**Cline and Clegg Sell The Girls to Random House and Scott Rudin Productions**

163. On August 27, 2013, Cline emailed Reetz-Laiolo to ask for his input on a number of ideas she was considering incorporating into a novel she planned to write.

164. In the summer of 2014, Cline engaged Bill Clegg of The Clegg Agency to represent her in the sale of a draft manuscript of The Girls.

165. On September 24, 2014, Bill Clegg emailed Kate Medina at Random House with an attached draft copy of Cline's "debut novel, THE GIRLS."

166. In the email, Clegg wrote:

> Occasionally a novel comes along that expands our collective understanding of a piece of history by pushing it into the realm of fiction. To name just a few: Phillip Roth's American Pastoral, Don DeLillo's Libra; and, more recently, Susan Choi's American Woman, and Mohsin Hamid's The Reluctant Fundamentalist.  Such novels find meaning in events that in their time can only be understood as meaningless tragedy or distant yet ubiquitous sensation.  Told slant, they cast a late light so that we may see more clearly not only the people involved and affected, but also something of ourselves.

> It is in this tradition that Emma Cline returns us to the combustable [sic] summer of 1969 and drops us onto the sun-scorched sidewalks of Marin County behind the bored and troubled eyes of 14-year-old Evie.  Stranded in the lonely gulf between recently divorced parents and filled with a desperate restlessness, Evie leans with obsessive abandon into an accidental friendship with an older and beguiling drifter named Suzanne. Wideeyed and smitten, Evie is easily towed into the turbulent waters of a soon-to-be-infamous commune, quickly finding herself under the sway of a madman and closer than she knows to unthinkable violence.

43

> Emma Cline's story of how a rudderless girl finds herself at the flashpoint of a stumbling counter-culture at decade's end delivers a hauntingly precise investigation into how power is lost when we look to find it in others, how frighteningly mutable the unformed, inchoate self can be, and just how far that self will go to be seen and named.

167. In October 2014, Random House bought the rights to publish <u>The Girls</u> from Cline for at least $2 million.  Around the same time, film producer Scott Rudin and Scott Rudin Productions purchased the rights to make a film based on the book for an undisclosed amount.

168. On November 28, 2014, Cline revealed to Reetz-Laiolo in a G-Chat that she had run <u>The Girls</u> through an online plagiarism application, stating "i will be exposed as a plagiarizer . . . paid 40 bucks to run novel through online plagiarism detector."

169. In December 2014, Reetz-Laiolo and Cline met for lunch in San Francisco.  At the lunch, she appeared upset.  She expressed concern that she had plagiarized significant parts and passages in <u>The Girls</u> from multiple sources, including notable published novels.  She informed him that she had hired her sister, Hillary Cline, to read the plagiarized novels in question and compare them to <u>The Girls</u>.  She asked him if he would read the novel and tell her if he had any concerns about any use she may have made of his work.  He wished to avoid further emotional entanglement with her and therefore declined to read the draft novel at that time.

170. In 2015, however, after Reetz-Laiolo discovered Cline's intrusions into his online accounts, he became concerned that she may have plagiarized his work.

171. Reetz-Laiolo requested that Cline send him a copy of the manuscript of <u>The Girls</u> that she had submitted to Random House so he could assess whether she had stolen and used excerpts of his work.  She refused to provide the manuscript in response to his request.  Instead, on March 3, 2015, she sent him a document that purported to collect eight excerpts from his published and unpublished work and asked him to consent to the inclusion of this material in <u>The Girls</u>.

172. The eight excerpts included in the document did in fact plagiarize from Reetz-Laiolo's work.  Due to the wide scope of Cline's intrusion, Reetz-Laiolo has, to date, been unable to identify

44

the source of two of these excerpts, which were likely taken from old drafts of his works, copies of which he no longer possesses, or from handwritten journals. The following table reveals evident similarities and blatant copying:

| Text from Document | Title of Reetz-Laiolo's Work | Text from Reetz-Laiolo's Work |
|---|---|---|
| "It would be worse to run. To be chased, to be caught from behind." | TENNIS, Draft | "We might not even try, it would be worse to get caught from behind, to be pulled down" |
| "An elderly woman who took fourteen pills a day, pills I crushed into a fine pink powder and stirred into vanilla pudding. The paraplegic lawyer who watched talk shows over my shoulder as I eased her sweatpants down on shower nights." | TAKE CARE, Salon.com | "He took 14 pills each night, crushed into a fine pink or white dust and administered with the stale applesauce I retrieved from the otherwise empty fridge. I fed it into his wet mouth, wiping a bit off his chin, then raised his straw to his puckered lips under his mustache." |
| "My mother spoke to Sal about body brushing, of the movement of energies around meridian points. The charts." | ANIMALS, Ecotone Magazine | "Laurel in the morning brushing her body on the patio with a body brush, slowly combing it up her legs towards her heart, up her arms towards her heart. Circling her belly. There was something totemic about her out in the sun." |
| "The way I'd once seen him look at me as we crossed a parking lot, the sun already disappeared and the air shimmery with rare light." | *Source of plagiarism not yet located* | N/A |
| "The uncertain shape of a sleepy girl" | ANIMALS, Ecotone Magazine | "uncertain shape of a sleepy girl" |
| "I'd last lived with someone years ago, a man who taught composition at a land-grab university that advertised on television. The students were | N/A | These were common phrases Reetz-Laiolo used to describe his occupation. |

45

| | | |
|---|---|---|
| mostly foreigners who wanted to design video games." | | |
| "I had once come across a deer taking tentative steps across a highway, the hooves sounding peculiar on asphalt" | HOW HIGH THE MOON, Amazon.com; Document 7 | "The empty county highway was in front of us. I sat motionless at the sight of a deer that clattered up onto the highway, stopped, looked at the sound and light of our car, then disappeared down into the ditch towards something." |
| "An apartment I'd once lived where houseplants grew even in the northern rooms." | *Source of plagiarism not yet located* | N/A |

173. Reetz-Laiolo told Cline that he objected to her including these passages in The Girls.  She telephoned him to discuss the material she had plagiarized.  On the call, she claimed:  "It's not verbatim.  I don't think anybody else would be able to tell."

174. On October 12, 2015, Reetz-Laiolo repeated his request that Cline send him a copy of the manuscript of The Girls that she had submitted to Random House and used to secure her book deal.  She continued to stonewall him in an effort to conceal the misappropriation of his work in the manuscript submitted to Random House.

175. In an email on October 13, 2015, Cline disingenuously stated:  "I am happy to send you any version that will help you, though I think the version that is slated to be published is the one that makes the most sense for you to look at.  If for some reason you'd rather an older draft, that is ok too, just let me know your preference."

176. By this time, Reetz-Laiolo had repeatedly and explicitly requested a copy of the manuscript Cline had submitted to Random House.  He responded to her email reiterating this request:  "This is the fourth email I've asked to read the same copy: the original which included my work in it. . . .  Just send the draft."

177. Still, Cline refused to provide Reetz-Laiolo with the manuscript she had submitted to Random House.  Instead, on October 14, 2015, she sent him a Word document version of a manuscript of The Girls that she created that very same day.  Certain sentences from his published work that she had included in the document she sent to him on March 3, 2015, had

46

1    been removed from this draft.  But the draft continued to include numerous sentences,

2    images, sequences, and scenes taken from his published and unpublished work.

3  178. On November 3, 2015, Reetz-Laiolo wrote to Cline:  "I would not publish this novel if I

4    were you.  It is vile how much of my work you have plagiarized in it."

5            **Random House Conceals and Abets Cline's Violations and Theft**

6  179. On January 6, 2016, Kate Medina, an Executive Vice President at Random House, wrote to

7    Reetz-Laiolo and informed him that Cline had "shared with us your suggestion that her book,

8    The Girls, may plagiarize phrases from some of your work."  Medina rejected his contention:

9    "We have carefully considered the information Ms. Cline has given us and do not believe

10    that any plagiarism has taken place."  Exhibit 1.

11  180. Two days later, on January 8, 2016, Carolyn Foley, Vice President & Associate General

12    Counsel for Penguin Random House LLC, sent a follow-up email to Kyle Medley, Reetz-

13    Laiolo's then-attorney.  Foley also disputed Reetz-Laiolo's claim that Cline had plagiarized

14    his work.  Foley said that Cline had been "puzzled" by Reetz-Laiolo's request for the

15    "earliest draft of the manuscript," but that Cline had "sen[t] him an early version of the draft

16    manuscript."  Without attaching any draft of the manuscript, Foley, in a standalone

17    paragraph, represented to Reetz-Laiolo:

18        You should be aware that Random House purchased the Book from Ms.
         Cline back in October of 2014 based on our consideration and appraisal of

19        the manuscript her agent provided to us before that date.  The snippets that
         Ms. Cline sent to your client in March of 2015 were added after the book

20        was acquired and played no role in our decision to buy the Book.

21    Exhibit 2 (emphasis added).

22  181. As would become clear only later, Foley's representation was false:  all of the so-called

23    "snippets" of Reetz-Laiolo's work were in the manuscript Clegg had sent to Random House,

24    which purchased the book rights; and to Scott Rudin Productions, which purchased the film

25    rights.  The table below identifies each excerpt and the page number in which the text

26    appears in the original draft submitted to Random House.

| Text from Snippets Cline Sent Reetz-Laiolo on March 3, 2015 | Page Cite in Original Manuscript Submitted to Random House (Exhibit 3) |
| --- | --- |

| | |
|---|---|
| "It would be worse to run. To be chased, to be caught from behind." | 9 |
| "An elderly woman who took fourteen pills a day, pills I crushed into a fine pink powder and stirred into vanilla pudding. The paraplegic lawyer who watched talk shows over my shoulder as I eased her sweatpants down on shower nights." | 116 |
| "My mother spoke to Sal about body brushing, of the movement of energies around meridian points. The charts." | 27 |
| "The way I'd once seen him look at me as we crossed a parking lot, the sun already disappeared and the air shimmery with rare light." | 120 |
| "The uncertain shape of a sleepy girl" | 122 |
| "I'd last lived with someone years ago, a man who taught composition at a land-grab university that advertised on television. The students were mostly foreigners who wanted to design video games." | 120 |
| "I had once come across a deer taking tentative steps across a highway, the hooves sounding peculiar on asphalt" | 295 |
| "An apartment I'd once lived where houseplants grew even in the northern rooms." | 303 |

182. Foley never corrected her misrepresentation regarding the presence of Reetz-Laiolo's work in the manuscript Random House and Scott Rudin Productions considered before entering their respective agreements with Cline.

183. On January 15, 2016, Reetz-Laiolo wrote to Cline and provided a list of thirty-six phrases, sentences, and scenes he had identified as plagiarizing his work through his review of the draft of The Girls that she had provided to him on October 14, 2015.  He requested that she revise The Girls to remove those instances of plagiarism.  He also provided a comparison of excerpts from the draft of The Girls and excerpts from his own work.  He again repeated his

48

request that she provide a copy of the original manuscript of <u>The Girls</u> that she had submitted to Random House.  Exhibit 4.

184. On January 27, 2016, Elizabeth McNamara, an attorney from Davis Wright Tremaine LLP ("DWT"), responded on behalf of her clients Cline and Random House to Reetz-Laiolo's January 15, 2016, letter.  McNamara declared that his "serious accusations about 'infringement' of his written work" were "premised on fantastical claims involving years of supposed spying by Ms. Cline via remote access to his computer all in an effort to obtain, and appropriate, Mr. Reetz-Laiolo's unpublished work."  Exhibit 5.

185. Yet in her letter McNamara admitted that Cline had installed spyware on her computer and specifically used this spyware to access Reetz-Laiolo's email account without his permission or knowledge.  Apparently unconcerned that Cline had committed numerous serious federal and state violations in undertaking these actions, McNamara sought to excuse them by stating that Cline had used the spyware in 2010 to confirm her suspicions that Reetz-Laiolo had had romantic involvements with Kiesel and "other women."

186. McNamara also represented to Reetz-Laiolo that "[i]t was only during this period and only for this personal reason that Ms. Cline used the 'spyware.'"  McNamara further represented that by the time Cline sold her computer to him, she had "long forgotten the brief use of the keystroke program" and that "in the intervening years she had no ability to, nor did she, access that computer remotely."

187. These representations that Cline had "long forgotten the brief use of the keystroke program" were therefore false, as was McNamara's claim that "in the intervening years she [Cline] had no ability to, nor did she, access that computer remotely" false, as Reetz-Laiolo would discover only in 2017 through ongoing review, including with the help of computer forensic specialists, of hundreds of thousands of images captured via the spyware.

188. Reetz-Laiolo did not discover until 2017 (and then only with the aid of computer forensic specialists) that Cline had remotely surveilled his computer activity during 2013-2015, through Refog Personal Monitor or other means.

189. McNamara's letter also purported to address Reetz-Laiolo's claims regarding work Cline had stolen from him and incorporated into <u>The Girls</u>.  Referring to the list of thirty-six phrases, sentences, and scenes included with Reetz-Laiolo's January 15, 2016, letter, McNamara stated:  "Except for a handful of snippets that had already been removed from [Cline's] Work, we are unable to find any comparable language in Mr. Reetz-Laiolo's work for the vast majority of items."

190. McNamara finally (and belatedly) attached with her letter the draft manuscript of <u>The Girls</u> that Cline had submitted to Random House and Scott Rudin Productions (Exhibit 3), securing her book and film rights deals.  As later review of this manuscript (a review that was not completed until 2017) would reveal, the "snippets" Cline had previously sent Reetz-Laiolo were <u>all</u> in this manuscript.

191. In subsequent communications between Kyle Medley, an attorney representing Reetz-Laiolo, and Cline, Medley explained to Cline the similarities between a scene in <u>The Girls</u> listed as number 36 in Reetz-Laiolo's January 15, 2016, letter and a script titled <u>All Sea</u> that Reetz-Laiolo had authored.

192. During a conversation between Medley and McNamara on April 1, 2016, McNamara revealed to Medley that Cline possessed a copy of <u>All Sea</u> and that Cline had provided this copy to McNamara, who had reviewed it herself.  McNamara requested that Medley provide her with the versions of the script that Reetz-Laiolo believed contained the infringed excerpts.

193. Reetz-Laiolo's manuscript for <u>All Sea</u> has never been published or made publicly available.  Nor has Reetz-Laiolo ever provided a copy of it to Cline.  (Reetz-Laiolo did send Cline a much-earlier version of the script, <u>Fadein</u>, but this version did not contain the infringed excerpts.)  Cline could only have accessed versions of the script by improper means, such as by breaking into Reetz-Laiolo's password-protected Gmail or Yahoo Mail! account, breaking into his password-protected Celtx account, or by remotely capturing screenshot images of the script through the Refog Personal Monitor software.  Medley explained to McNamara that

FOURTH AMENDED COMPLAINT AND JURY DEMAND

Cline could not have accessed the manuscript drafts of <u>All Sea</u> without breaking into Reetz-Laiolo's online accounts.  When Medley asked McNamara to send the draft of <u>All Sea</u> they had in their possession, McNamara refused to do so.

194. As evidence of Cline's extensive invasion, Medley provided Random House multiple screenshots demonstrating that not only did Cline use the spyware program to illegally access other copies of his work, but she also illegally accessed both Kiesel's and Bernard's email accounts for a period spanning multiple years.

195. After Random House and its attorneys were on clear notice that Random House and/or Cline were in possession of converted and stolen property, they made no effort to return Reetz-Laiolo's manuscripts to him, or to inform him of their and Cline's illegal possession of his property.  Instead, Random House and/or Cline retained these manuscripts and Random House conspired with Cline to conceal her and Random House's illegal conduct and to otherwise aid and abet her theft.

196. As would later become clear, Random House and/or Cline continued to maintain possession of this stolen and converted property and Random House used it in its publication of <u>The Girls</u>.

197. Anxious to bring <u>The Girls</u> to publication on schedule, and concerned over the negative publicity if Reetz-Laiolo disclosed Cline's hacking of Plaintiffs' accounts and theft of his unpublished work, Cline and Random House pressured him to enter into a settlement with an onerous non-disclosure requirement, which would require him to certify that he had kept silent and would forever continue keeping silent regarding anything to do with his claims.  As leverage, they threatened to make public certain facts about his sex life, and propagate a fiction about him being abusive, while making clear the financial resources they would enlist to fight any public claims he might make.

198. Reetz-Laiolo did not wish to be silenced regarding the many violations that he, Bernard, Kiesel, and others had suffered, and refused to execute the settlement.  McNamara responded to Reetz-Laiolo's lawyer that Cline "had resources" to commence and vigorously prosecute a

defamation action (however baseless) against Reetz-Laiolo if he dared speak publicly about what Cline had done, further threatened that Reetz-Laiolo would "suffer the consequences" if he said anything, and followed up in writing with an ominous warning against Reetz-Laiolo speaking out publicly: "I trust that Chaz will act responsibly regardless of an agreement."

**Random House Publishes The Girls With Stolen and Infringing Content**

199. After endeavoring to conceal Cline's infringement of Reetz-Laiolo's work and her theft and conversion of his draft scripts, Random House, intent on making its well-publicized release date, quickly proceeded to publish The Girls with the crucial stolen scenes included. In so doing, Cline and Random House were well aware that the version of The Girls they were publishing continued to contain multiple core scenes that derived from the draft screenplay materials Cline had stolen from Reetz-Laiolo.

200. Mr. Reetz-Laiolo discovered that the published version of The Girls retained the scenes stolen from his work when he purchased a copy of the published book in 2017.

201. The similarities between All Sea and The Girls are evidenced by numerous narrative overlaps, including plot, themes, dialogue, mood, setting, pace, characters, and sequence of events. Cline's taking of these elements has left All Sea unusable as a unique creation.

202. Reetz-Laiolo revised his draft manuscript for All Sea over time. There are obvious and undeniable overlaps between the published version of The Girls and Reetz-Laiolo's drafts of All Sea – overlaps that are so significant and detailed that they could not possibly be coincidental.

203. Cline copied heavily from a sequence of scenes in which the protagonist, a teenager named Gabe, interacts with his single mother when she comes home with her boyfriend, commits burglary at the behest of a friend from whom he wants acceptance, and, after he is caught, is sent away to live with a father figure character named Ray. A comparison of The Girls to Reetz-Laiolo's multiple drafts of All Sea reveals that Cline stole and copied material contained in at least two drafts of All Sea, dated June 17, 2013, and December 26, 2013, attached hereto as Exhibits 6 and 7. The following chart offers illustrative examples of

overlaps between <u>All Sea</u> and <u>The Girls</u>:

| **<u>All Sea Text</u>** | **<u>The Girls Text</u>** | **Notes** |
|---|---|---|
| We pass through a living room, down a hallway and finally into a bedroom where Gabe lies on his side, holding up a Club magazine so the centerfold is open. It is lurid; she has no pubic hair.<br>Gabe stows the Club under his sheets and watches the shadows under his door when he hears a man and his mother, Cathy, enter the house laughing. They are loud. It is late.<br><br>. . .<br><br>We hear her come close to the door. She is clumsy about it, giggling.<br><br>CATHY<br>(to man, OS)<br>Watch!  (beat, then calling to Gabe)<br>Baaaa-by?<br>(beat, easing the door open, speaking to man)<br>Stop! Listen.<br>(to Gabe)<br>Gaaa-by?  Marty is here to see you.<br><br>Cathy laughs.  She is dressed for dancing when she comes in.<br>GABE<br>I'm trying to sleep.<br>CATHY<br>Oh, so are we.<br><br>She flops down into bed next to him.<br><br>. . .<br><br>Cathy goes to fawn over Gabe's hair, but he pulls his | The clatter on the porch startled me, followed by the sound of my mother's dissolving laughter, Frank's heavy steps. I was in the living room, stretched out in my grandfather's chair and reading one of my mother's McCall's. Its pictures of genitally slick hams, wreathed with pineapple. Lauren Hutton lounging on a rocky cliff in her Bali brassieres. My mother and Frank were loud, coming into the living room, but stopped talking when they caught sight of me. Frank in his cowboy boots, my mother swallowing whatever she'd been saying. "Sweetheart." Her eyes were filmy, her body swaying just enough so I knew she was drunk and trying to hide it, though her neck—exposed in a chiffon shirt—would have given it away: it was pink. "Hi," I said. "Whatcha doing home, sweetheart?" My mother came over to wrap her arms around me, and I let her, despite the metallic smell of alcohol on her, the wilt of her perfume. "Is Connie sick?"<br>"Nah," I shrugged. Turning back to my magazine. The next page: a girl in a butter-yellow tunic, kneeling on a white box. An advertisement for Moon Drops.<br>"You're usually in and out so quick," she said.  "I just | • Both scenes open with a solitary teenager, seated, thumbing through a magazine. The teen boy in <u>All Sea</u> holds up the centerfold of a Club Magazine, focusing on the shaven genitals of the model; the teen girl in <u>The Girls</u> focuses on the "genitally slick hams" in a McCall's Magazine.<br>• In both works a single mother character arrives home "drunk," "loud," "giggling," "laughing" with a male date, disrupting the teen's reverie.<br>• In <u>All Sea</u> the mother is "dressed for dancing," her sexuality put on rank display to the teen when her underwear is exposed while the single mother's romantic interest is present; in <u>The Girls</u>, the mother's sexuality is distastefully displayed to the teen by her exposed pink neck in a chiffon shirt.<br>• In <u>All Sea</u> the mother "fawns over [the teen] Gabe's hair, but he pulls his head back"; in <u>The Girls</u> the mother wraps her arms around the teen, who turns back to her magazine while the mother smiles, smoothing the teen's hair.<br>• In subsequent scenes of <u>All Sea</u>, the mother will fawn over the teen saying, "Look at you, your hair's all wet. . . .  Come here. You're still so handsome."  In The Girls, the mother focuses on the teen's beauty as she smooths her hair, "Such a pretty girl, aren't you?  . . . |

53

| | | |
|---|---|---|
| head back<br><br>CATHY CONT.<br>Oh baby . . .<br><br>She props her legs up on the wall, so her long skirt falls around her waist<br><br>(Ex. 6 at 6-7) | felt like being home," I said. "Isn't it my house, too?"<br>My mother smiled, smoothing my hair. "Such a pretty girl, aren't you? Of course it's your house. Isn't she a pretty girl?" she said, turning to Frank. "Such a pretty girl," she repeated, to no one.  Frank smiled back but seemed restless.<br><br>(at 228-29) | Such a pretty girl." |
| *In the scenes following the above quote, the male teen will, at the behest of a friend he wants acceptance from, agree to commit a burglary. After the male teen is caught during the burglary, the single mother makes pained and baffled declarations*:<br><br>(Ex. 6 at 9-14) | *In the scenes following the above quote, the female teen will, at the behest of a social group she wants acceptance from, agree to commit a burglary. After the female teen is caught during the burglary, the single mother will make "pained and baffled declarations"*:<br><br>(at 241-51, 267-70) | |
| CATHY<br>"Do you think he's even listening to you?  Do you think he's listening now?"<br><br>. . .<br><br>They both ride in a silent tension.<br>CATHY<br>"You're going to my brother's for the summer."<br><br>(Ex. 6 at 14-15) | "'You think I haven't asked her? You think I haven't tried?'  Silence. 'Oh, sure, right, I bet. You want to try? And so I was sent to Palo Alto.'"<br><br>(at 270) | • The single mother in both works makes the sudden, single-sentence decision to remand the teen to the custody of the teen's father/father figure. In <u>All Sea</u>:  "You're going to my brother's for the summer." In <u>The Girls</u>:  "And so I was sent to Palo Alto." |
| *He is remanded into the* | *She is remanded into the custody of her father.*<br><br>*The father character will* | |

| | | |
|---|---|---|
| *custody of the father figure character.*<br><br>(Ex. 6 at 15-16)<br><br>*In a later draft of <u>All Sea</u>, the father character will pick him up and initiate the following conversation:*<br><br>(Ex. 7 at 20) | *pick her up and initiate the following conversation:* | |
| RAY:  We're not gonna have any stealing up here, eh?<br><br>Gabe glances at Ray but doesn't look at him directly in the eye.<br><br>RAY CONT: Let's get this outta the way.<br>You were stealing from people.<br><br>Gabe nods, apprehensive.<br><br>(Ex. 7 at 20) | "I don't have to lock you in your room, do I?" he said. His halting laugh. "No breaking in to anyone's house?"<br>When I nodded, he visibly relaxed. Like he'd gotten something out of the way.<br><br>(at 272). | • The opening line of dialogue from the father/father figure has the same purpose: to introduce, awkwardly, the grave subject of teen burglary<br>• Both sets of dialogue joke about whether or not the teen will continue their pattern of burglary in their new location.<br>• Neither teen answers verbally to a verbal request.<br>• Both teens "nod."<br>• Both scenes use the same idiosyncratic assessment of what is taking place: getting the topic of conversation, teen burglary, "out of the way" (<u>The Girls</u>) or "outta the way" (<u>All Sea</u>). |

204. Cline would later try to assert that the only copy of <u>All Sea</u> that she ever possessed was a much older draft of Reetz-Laiolo's, then titled "Fadein."  But as the following analysis demonstrates, "Fadein" was substantially different from <u>All Sea</u> and did not contain any of the scenes that Cline incorporated into <u>The Girls</u>:

| **<u>All Sea</u> Text** | **<u>The Girls</u> Text** | **"Fadein" Comparison** |
|---|---|---|
| We pass through a living room, down a hallway and finally into a bedroom where Gabe lies on his side, holding up a Club magazine so the centerfold is open. It is lurid; she has no pubic hair. | The clatter on the porch startled me, followed by the sound of my mother's dissolving laughter, Frank's heavy steps. I was in the living room, stretched out in my grandfather's chair and | *This scene **does not** appear in "Fadein."  The <u>All Sea</u> draft saved on Reetz-Laiolo's Yahoo account is the first time this scene appears in Reetz-Laiolo's writings.* |

55

Gabe stows the Club under his sheets and watches the shadows under his door when he hears a man and his mother, Cathy, enter the house laughing. They are loud. It is late.

. . .

We hear her come close to the door. She is clumsy about it, giggling.

CATHY
(to man, OS)
Watch!  (beat, then calling to Gabe)
Baaaa-by?
(beat, easing the door open, speaking to man)
Stop! Listen.
(to Gabe)
Gaaa-by?  Marty is here to see you.

Cathy laughs.  She is dressed for dancing when she comes in.
GABE
I'm trying to sleep.
CATHY
Oh, so are we.

She flops down into bed next to him.

. . .

Cathy goes to fawn over Gabe's hair, but he pulls his head back

CATHY CONT.
Oh baby . . .

She props her legs up on the wall, so her long skirt falls around her waist

(Ex. 6 at 6-7)

reading one of my mother's McCall's. Its pictures of genitally slick hams, wreathed with pineapple. Lauren Hutton lounging on a rocky cliff in her Bali brassieres. My mother and Frank were loud, coming into the living room, but stopped talking when they caught sight of me. Frank in his cowboy boots, my mother swallowing whatever she'd been saying.
"Sweetheart." Her eyes were filmy, her body swaying just enough so I knew she was drunk and trying to hide it, though her neck—exposed in a chiffon shirt—would have given it away: it was pink.
"Hi," I said.
"Whatcha doing home, sweetheart?" My mother came over to wrap her arms around me, and I let her, despite the metallic smell of alcohol on her, the wilt of her perfume. "Is Connie sick?"
"Nah," I shrugged. Turning back to my magazine. The next page: a girl in a butter-yellow tunic, kneeling on a white box. An advertisement for Moon Drops.
"You're usually in and out so quick," she said.  "I just felt like being home," I said. "Isn't it my house, too?"
My mother smiled, smoothing my hair. "Such a pretty girl, aren't you? Of course it's your house. Isn't she a pretty girl?" she said, turning to Frank.
"Such a pretty girl," she repeated, to no one.  Frank smiled back but seemed restless.

| | (at 228-29) | |
|---|---|---|
| *In the scenes following the above quote, the male teen will, at the behest of a friend he wants acceptance from, agree to commit a burglary. After the male teen is caught during the burglary, the single mother makes pained and baffled declarations:*<br><br>(Ex. 6 at 9-14) | *In the scenes following the above quote, the female teen will, at the behest of a social group she wants acceptance from, agree to commit a burglary. After the female teen is caught during the burglary, the single mother will make "pained and baffled declarations":*<br><br>(at 241-51, 267-70) | In "Fadein," there is no "social group" to encourage the teen to commit the burglaries. The teen is simply caught after numerous break-ins. |
| CATHY<br>"Do you think he's even listening to you?  Do you think he's listening now?"<br><br>. . .<br><br>They both ride in a silent tension.<br>CATHY<br>"You're going to my brother's for the summer."<br><br>(Ex. 6 at 14-15) | "'You think I haven't asked her? You think I haven't tried?'  Silence. 'Oh, sure, right, I bet. You want to try? And so I was sent to Palo Alto.'"<br><br>(at 270) | *The scene in "Fadein" lacks the idiosyncratic repetition on the mother's behalf of "You think" which appears in both* <u>All Sea</u> *and* <u>The Girls</u>:<br><br>CATHERINE<br>No, no you're right.  That will absolutely solve it.  Gee, how did I not see it all along?<br><br>How dare you bring me in here and treat me like some fool!  Like I told him, Go out, snoop around in other people's houses.  Of course, a man, that's what's really needed here. |
| *He is remanded into the custody of the father figure character.*<br><br>(Ex. 6 at 15-16)<br><br>*In a later draft of* <u>All Sea</u>*, the father character will pick him up and initiate the following conversation:*<br><br>(Ex. 7 at 20) | *She is remanded into the custody of her father.*<br><br>*The father character will pick her up and initiate the following conversation:* | *While the teen in both "Fadein" and* <u>All Sea</u> *is remanded into custody of the father figure, in "Fadein" they do not have the ensuing conversation until 13 scenes later, and the dialogue is distinctly different.* |

FOURTH AMENDED COMPLAINT AND JURY DEMAND

| | | |
|---|---|---|
| RAY:  We're not gonna have any stealing up here, eh?<br><br>Gabe glances at Ray but doesn't look at him directly in the eye.<br><br>RAY CONT: Let's get this outta the way.<br>You were stealing from people.<br><br>Gabe nods, apprehensive.<br><br>(Ex. 7 at 20) | "I don't have to lock you in your room, do I?" he said. His halting laugh. "No breaking in to anyone's house?"<br>When I nodded, he visibly relaxed. Like he'd gotten something out of the way.<br><br>(at 272). | RAY:  So you were stealing from people.<br><br>Gabe looks startled.<br><br>RAY:  Well?<br><br>GABE:  A little.<br><br>RAY:  A little's no different then a lot.  You were stealing from people?<br><br>GABE:  Yes.<br><br>RAY:  I'm not trying to jump on you.<br><br><ul><li>Unlike <u>All Sea</u> and <u>The Girls</u>, the matter is not joked about—the tone is much more serious in nature.</li><li>Unlike <u>All Sea</u> and <u>The Girls</u>, the teen responds verbally and does not nod.</li><li>Unlike <u>All Sea</u> and <u>The Girls</u>, the idiosyncratic phrase "out of the way" or "outta the way" does not appear in "Fadein."</li></ul> |

205. In addition to the stolen scenes from <u>All Sea</u>, there are numerous additional phrase- and sentence-level instances of plagiarism in the original draft that Cline and Clegg submitted to Random House.  These instances of plagiarism evidence Cline's habit of copying from Reetz-Laiolo's work.  For example:

| Title of Reetz-Laiolo's work | Quote from Reetz-Laiolo's Work | Text in Original **The Girls** Manuscript (Exhibit 3) |
|---|---|---|
| ANIMALS, draft | "There was so much that first night." | "There was so much, that first night." |
| ANIMALS, Ecotone Magazine | "his bunched penis" | "His penis bunched" |

| ANIMALS, Ecotone Magazine | "Ford and Darly lay there together, began incanting bits of dreams they'd had towards the ceiling." | "Russell incanting parts of his plan for Mitch up at the ceiling" |
|---|---|---|
| ANIMALS, Ecotone Magazine; Document 7 | "uncertain shape of a sleepy girl" | "uncertain shape of a sleepy girl" |
| ANOTHER JOHN, Draft | "He [the cuckold] was attentive to every change in her face and happy and sick with it." | "So watchful of every tint in her face that I was sick with it, but happy, too, like a cuckolded husband." |
| ANOTHER JOHN, Draft | "I sniffed in the driver seat, adjusted the mirror, giving him time to say something to her that I didn't hear." | "Guy sniffing in the driver's seat, adjusting the mirrors. Helen said something I didn't hear." |
| ANOTHER JOHN, Draft | "He was fully aware of the way desire could humiliate you." | "He knew it too, the way your desire could humiliate you" |
| DRAFT, PACIFIC NORTHWEST NOTES | "bundled in the passenger seat." | "bundled in the passenger side" |
| ELK STALLED IN SNOW, The Paris Review | "I saw this girl in the window of that wedding cake house. Trying on summer clothes in her mirror."<br><br>"The wedding cake house is in cold motion with a man outside scraping frost from the window of a truck." | "An old wooden house, like a sodden wedding cake" |
| MONSTROUS, 5_Trope | "where I sit on the floor with my daughter looking at how different the perspective is from there, how everything looms." | "His room was odd, as seen from the floor, the loom of the dresser, the angled doorway" |
| NOTEBOOK ENTRY, 2011 | "We were a family that was both nearer than most, affectionate, and unknown to each other." | "My father was both nearer to me than he had ever been, more legible, and at the same more distant" |
| OAK, Corriere dela Sera | "Her heavy rear" | "her heavy rear" |
| Santa BARBARA, Draft | "a paraplegic attorney she bathed in his all-plastic bathroom that sometimes" | "a paraplegic attorney with an all-plastic bathroom" |
| TAKE CARE, | "I pulled down his damp sweatpants | "The paraplegic lawyer who called |

FOURTH AMENDED COMPLAINT AND JURY DEMAND

| | | |
|---|---|---|
| Salon.com | as he jerked to raise his hips up"<br><br>"Then, if it was shower night, I undressed him out in the living room where he watched the Oakland Athletics over my shoulder and his chair creaked as I lifted his humid body so small and vulnerable but with a grown man's hair matted to his pale skin, into his plastic shower chair." | her adult daughter a pig slut on the phone. Who would watch a talk show over my shoulder as I eased her sweatpants down her twitchy hips on shower night." |
| TAKE CARE, Salon.com | "He took 14 pills each night, crushed into a fine pink or white dust and administered with the stale applesauce I retrieved from the otherwise empty fridge. I fed it into his wet mouth, wiping a bit off his chin, then raised his straw to his puckered lips under his mustache." | "lawyer took eleven pills every night, pills I crushed into a fine pink dust and stirred into applesauce. Her tongue roving for the spoon each time I placed a bite in her mouth." |
| TENNIS, Draft | "We might not even try, it would be worse to get caught from behind, to be pulled down." | "I wouldn't try to escape. It would be worse to run. To be chased, to be caught from behind." |

206. With Random House aware of Cline's hacking and plagiarism, Random House and Cline worked to remove or revise the stolen passages described above. However, because of the critical nature of the scenes stolen from All Sea to the narrative of The Girls, and because Random House was under time pressure to publish The Girls and release it on the schedule set by extensive and much-hyped pre-publication publicity, they chose to leave these stolen scenes intact. In fact, The Girls cannot be conceived without these stolen scenes.

207. When Random House became aware that Cline had illegally accessed the accounts of Reetz-Laiolo, Bernard, and Kiesel, it worked with Cline to try to remove certain traces of this illegal activity revealed in the draft manuscript before publication, conspiring with her to conceal her pervasive invasion of Plaintiff's emails and theft of material from same.

208. Although Random House had therefore become aware of Cline's illegal access of Plaintiffs' online accounts and her theft of material from them to incorporate into The Girls, neither Random House nor Cline, through their attorneys or otherwise, ever revealed to Reetz-Laiolo or Bernard this discovery of Cline's criminal activity. Instead, Random House conspired

1   with Cline and aided and abetted her criminal conduct by concealing it from Plaintiffs.

2   **The Screenshots Reveal a Pattern of Theft and Plagiarism**

3   209. As Reetz-Laiolo would come to discover, Cline's rampant theft and plagiarism of Reetz-

4   Laiolo's written work in <u>The Girls</u> was part of a long and systematic pattern in which she

5   copied significant portions of other authors' published works and incorporated these directly

6   into written work she held out as her own.

7   210. On May 26, 2012, for example, Cline visited a webpage with a published story, "A Small

8   Country," written by Lauren Pretnar, a previous romantic partner of Reetz-Laiolo:



211. The next day, on May 27, 2012, Cline downloaded "A Small Country" to her computer:



212. Cline then copied excerpts from "A Small Country" into a Microsoft Word document:



FOURTH AMENDED COMPLAINT AND JURY DEMAND

213. Cline then revised and added writing to the excerpt she had stolen.

214. Cline then saved this document under the title of "Wedding2," and later re-saved it under the title "Another Country":



215. While plagiarizing Pretnar's work, Cline messaged Reetz-Laiolo on G-chat, reveling in how "creepy" and "sick" it was that she was "writing . . . a rewrite of lauren pretnars story," then characterizing Pretnar as a "boring writer":



216. A comparison between the two works reveals myriad evident similarities.[1]

217. Cline may have submitted "Another Country" for an assignment during her Masters in Fine Arts at Columbia University.

218. In another example, on May 9, 2012, Cline ran a search for "maile meloy Red From Green i want it":



---

[1] The setting in both works is a wedding at a ranch house. The narrator in "Small Country" is a close friend of the bride while the narrator in "Another Country" is a sister of the bride. There are also many instances of copying in the text, including, for example:

- "Small Country": "'I'm getting married,' she says, as if this just occurred to her, as if the words fell strange from the sky. She steers me outside to a concrete bench, laughing like a person in shock. 'Married,' she says. We sit down. Her laughter has me worried."
- "Another Country": "'I'm getting married,' Lydia said, reaching out for Isabel's shoulders. 'I'm getting married,' she repeated, laughing, her face wondering, and that's when Isabel started to worry."

FOURTH AMENDED COMPLAINT AND JURY DEMAND

219. Cline then opened "Red from Green" on the New Yorker website:



220. Cline then read a review of "Red from Green" on the Escape blog:



221. Cline then created a Microsoft Word document she saved under the title

"MELOYREWRITE.doc":



222. During the following hours, Cline added over 5,000 additional words into that document:



223. On May 16, 2012, Cline resaved "MELOYREWRITE" under the title "IslandDraft1.docx":



224. Cline also stole from Reetz-Laiolo in drafting her thesis.  On May 5, 2013, Cline sent Reetz-Laiolo a draft of her story "Arcadia," a short story that was ultimately included in her thesis, and eventually published in Granta Magazine, and recently included in <u>Best American Short Stories 2017</u>.  In the email that attached the draft copy, Cline wrote "finished story. hope you like it-keep an eye out for an AMAZING line by an up and coming writer out of [B]erkeley."

225. After reading the story, and becoming upset at the fact that the draft included much of his work, Reetz-Laiolo responded on May 7, 2013, on Google Chat "I read the story – [j]ust haven't edited the last ten pages (where lines of mine seem to appear at an[]increasing regularity)."  Cline replied "dont remember those last ten pages . . . an angel wrote them." Reetz-Laiolo wrote back, protesting that "you shouldn't they're mine!"

226. On or around April 2013, Cline submitted her draft thesis to satisfy the requirements of her MFA degree program at Columbia University School of Arts Writing Program.  This thesis,

1  entitled <u>Marion and Other Stories</u>, was printed in October 2013 by the School of the Arts at

2  Columbia University.  It is publicly available in the Rare Book & Manuscript Library at

3  Columbia University.  A true and correct copy of the thesis is attached as Exhibit 8.

4  227. The thesis Cline submitted consisted of nine stories.  She included the stories "Island" and

5  "Arcadia" as two of these nine stories in the thesis she submitted.

6  228. Cline did not include any attribution to Meloy or Reetz-Laiolo or any acknowledgement that

7  she had incorporated Meloy's or Reetz-Laiolo's writing into her thesis, even though

8  Columbia University defines "Plagiarism" to include, <u>inter alia</u>, "Copying select phrases

9  without acknowledgement – using your own words to pad the selectively copied words of

10  others" and "Paraphrasing text without acknowledgement – rewriting text in your own

11  words, but using the idea or argument as your own."

12  229. Cline's decade-long pattern of illegal intrusions on personal privacy and plagiarism has

13  culminated in the shocking events that give rise to Plaintiffs' claims in this action.

14
15  **Random House and Cline Threaten Plaintiffs and Inject**
   **Personal and Sexual Topics into the Settlement Discussions and Litigation**

16  230. In February 2017, all three Plaintiffs retained Boies Schiller Flexner LLP ("BSF") and

17  Wiggin and Dana LLP ("Wiggin") to represent them in the settlement negotiations and in

18  any litigation to follow in the event that the parties could not agree on an out-of-court

19  settlement.  On February 21, 2017, BSF sent a letter to Defendants' lawyers at DWT

20  outlining Plaintiffs' claims.  The letter explained, in the following verbatim language, that

21  those claims were based on Cline's:

22  • use of spyware to steal passwords associated with our clients' email and other accounts;

23  • use of stolen passwords to gain access to our clients' email and other accounts from at

24  least 2010 to 2015;

25  • use of stolen passwords to download or view private manuscripts from Mr. Reetz-

26  Laiolo's documents attached to his private email messages and to open these documents;

27  • use of the stolen manuscripts in submission of a draft of her novel, The Girls, to Random

28  House and to Scott Rudin Productions; and

- use of other protected work owned by Mr. Reetz-Laiolo in submission of a draft of The Girls to Random House and Scott Rudin Productions.

231. The letter set forth in detail the evidence – including numerous screenshots of Cline's computer activity – supporting the claims.   The screenshots attached to the letter, for example, showed the extent of Cline's invasion of the most private elements of Plaintiffs' correspondence by "running search terms to identify and read emails from these accounts (for example, searching Ms. Bernard's email for 'Chaz' and for 'Emma'; searching Mr. Reetz-Laiolo's emails for work-related terms such as 'Davide' [Frattini - editor at Corriere della Sera] and 'sabenjamenta@yahoo.com' [Maryse Meijer - editor]; and sexually explicit terms such as 'pussy' and 'ass')."  Plaintiffs obviously could not illustrate the full extent of Cline's invasion of privacy without citing the sexually explicit terms that <u>Cline herself</u> had decided to use in searching these emails.

232. Similarly, in support of the copyright claims, the letter set forth numerous examples of Cline copying and pasting published work from the Internet into Word documents and incorporating it into her own work.  Cline copied from at least eight of Reetz-Laiolo's published and unpublished written works, "Small Country" by Lauren Pretner, Maile Meloy's "Red from Green," and numerous stories posted on the "Literotica" website.

233. In this letter, to be clear, Plaintiffs did not make <u>any</u> allegations relating to Cline's or Plaintiffs' sexual histories.  At the time, Plaintiffs had no reason to believe that the sexual histories of the litigants were relevant to their anticipated hacking and copyright claims, nor any reason to believe that Defendants would take the position that anyone's sexual history somehow had any bearing on those claims.

234. Defendants and their attorneys, however, decided to inject those issues directly into the case when, on February 23, 2017, DWT sent a tolling agreement with proposed edits to a prior draft that BSF had circulated.  The redline included, among other new language, the following language in bold:

> WHEREAS, Potential Defendant Cline informed Potential Plaintiff Reetz Laiolo that she intends to assert counterclaims arising out of, among other things (i) Reetz Laiolo's

1

2

unauthorized access to and dissemination of Cline's personal information stored on the laptop that she provided to Reetz Laiolo; (ii) **Reetz Laiolo's sexual intercourse with Cline knowing himself to be infected with a venereal disease and cover up** . . . .

3   235. Plaintiffs objected to Defendants' attempt to inject sexual history of the parties into the case

4        and, for that reason, the parties ultimately signed a tolling agreement on February 23, 2017,

5        without any language specifying the underlying claims of either party.

6   236. On March 24, 2017, Bernard received a hand-written letter from Bobby Cannard, who had

7        been her supervisor and mentor at the Green String Farm in Petaluma, California. Cannard is

8        a well-known, experienced farmer, who has supplied produce to influential restaurants,

9        including Chez Panisse. In the letter, Cannard expressed distress regarding Bernard's

10       prospective legal claims against Cline, explaining that it "cause[d] separation grief with my

11       friendship business semi family partners." Indicating that Cline and her family had

12       threatened Cannard, he went on to state that "its all on the block for me[.] Do you really

13       want to injure that which you have grown from[?]" In fact, the Clines did lay off many of

14       Bernard's former colleagues who had worked with her and Cannard a short while later, just

15       as they had apparently threatened to do.

16  237. In the letter, moreover, Cannard made clear that the threats he received from Cline and her

17       family would mean both the end of his and Bernard's professional relationship and their

18       friendship, asking Bernard whether her "injury [was] of greater importance than our

19       supportive friendships." This loss harmed Bernard, as it prevented her from continuing to

20       receive Cannard's guidance and advice when she bought and began to run her own farm in

21       upstate New York.

22  238. On March 30, 2017, once the tolling agreement was in place, BSF sent a letter to DWT,

23       reiterating that confidentiality and privilege should apply to all settlement negotiations, once

24       again proposing mediation, and attaching a draft complaint. Although Cline and Random

25       House had previously inserted language regarding the parties' personal and sexual histories

26       into drafts of the tolling agreement, consistent with Plaintiffs' earlier explanation of their

27       claims, the draft complaint did not address these topics.

28

239. On April 21, 2017, Cline and Random House responded.  While admitting that Cline surreptitiously read Plaintiffs' private emails, they expanded on their prior attempt to inject the sexual histories of the parties into the case.

240. Defendants suggested, for example, that Reetz-Laiolo was flirtatious with Bernard, and that as a result Cline "naturally . . . believed" they were sleeping together.

241. Defendants likewise alleged that Kiesel was sleeping with Reetz-Laiolo "throughout" Cline and Reetz-Laiolo's relationship.  Defendants further averred that "**[f]or her part, Ms. Kiesel knowingly engaged in sexual relations with Mr. Reetz-Laiolo, despite knowing that he was in a serious relationship with Ms. Cline, and she was responsible for transmitting an STD to Ms. Cline through Mr. Reetz-Laiolo.**"  (Emphasis added.)

242. Defendants alleged that Reetz-Laiolo was "regularly unfaithful," that "women would routinely knock on the door of their apartment unannounced," and that he refused to use condoms.  The letter threatened claims against Reetz-Laiolo based on allegations of physical abuse, notwithstanding that even if these allegations were true – which Reetz-Laiolo firmly denies – any claim arising from the incident would be long-since time-barred.

243. Without even attempting to argue that any law from any jurisdiction recognized any such allegations as a defense to Plaintiffs' asserted claims for violations of the applicable hacking statutes and federal copyright law, Defendants attempted to justify bringing allegations about Plaintiffs' sex lives into the litigation on the basis that Cline was easily manipulated because she "was still a very young woman and in her first serious relationship, whereas Mr. Reetz-Laiolo was a thirty-six year old man," claiming that "Mr. Reetz-Laiolo leveraged his age and experience to control and exploit Ms. Cline," and stating that "Ms. Cline was twenty-one years old. She was isolated from her friends and family, and struggling to distinguish the truth from Mr. Reetz-Laiolo's constant lies."  Consistent with Plaintiffs' understanding of them, Cline's *own* description of the meaning and significance of these assertions, as she said in subsequent emails to Bernard and Kiesel, was that "I was young and naïve," and "didn't have the perspective to understand what was happening or what part I played."

244. Cline and Random House suggested that her illegal cyber-surveillance was somehow justified as protection against infidelity, stating: "The only reason Ms. Cline installed and used the Refog program was to have a means to ferret out the truth behind Mr. Reetz-Laiolo's deceptions, particularly to protect herself from health concerns associated with his affairs with other women, including Ms. Kiesel, and to confirm and protect herself from Mr. Reetz-Laiolo's ongoing access and misuse of her personal documents."

245. In sum, without even purporting to ground their arguments in any relevant law responsive to Plaintiffs' claims, Random House and Cline contended that as a supposedly natural and justifiable consequence of Cline's suspicions about the sexual habits of the Plaintiffs, Plaintiffs deserved to have their privacy and sense of security violated, even when they were no longer in contact with Cline, or working for the Cline family, or (in the case of Kiesel) had never even met her.

246. Compounding their threat to bring the parties' sexual histories into the litigation if Plaintiffs pursued their claims, Defendants further asserted that all Plaintiffs "face significant liability themselves, as their actions toward Ms. Cline already give rise to a host of significant claims that she has against them." The letter continued: "We trust you will convey to your clients the serious risk of financial loss, in addition to reputational injury, that all of them should run should they choose to continue down this malicious path." (Emphasis added.) And when they knew or should have known that such assertions lacked any basis in law or fact, Cline and Random House repeatedly claimed that Bernard and Kiesel were not asserting and did not possess any legal claims in good faith – as if these women somehow had no basis in statutory or common law to remedy the self-evident emotional distress that Cline's years of illegal hacking into their personal emails had caused – but rather were participating solely in a "campaign of extortion" in acting as prospective co-plaintiffs (or "co-conspirators" as Random House and Cline denominated them) with Reetz-Laiolo for "the obvious sole purpose of making his shameful effort appear more credible and enhance its perceived nuisance value. Asserting in a different way that none of the Plaintiffs possessed any good-

faith basis for bringing any claim for Cline's multi-year campaign of misconduct, Cline and
Random House threatened all of the Plaintiffs with claims "for malicious prosecution, given
their knowledge that their claims were meritless and motivated by apparent ill will toward
Ms. Cline."

247. On May 26, 2017, BSF responded by reiterating the substantive merit of Plaintiffs' claims.
In the letter, directed solely to Defendants' counsel and not made public or given to third
parties by Plaintiffs or their counsel, BSF explained that while the sexual history of the
parties was not relevant to Plaintiffs' claims, "[t]he theory of this case set forth in
[Defendants'] Letter, however, has placed Ms. Cline's sexual conduct directly at issue."

248. In response to Defendants' assertion that Cline's illegal hacking ought to be excused because
she was young and naïve, and "control[led] and exploit[ed]" by Mr. Reetz-Laiolo due in
large part to the age difference between the two, Plaintiffs presented evidence – again, solely
to Defendants' counsel – of Cline's history of sexual relationships with older men.  The
nature of these relationships undercut Defendants' characterization of Cline's experience
with such relationships, as well as their suggestion that she was especially ill-equipped to
negotiate such relationships.  In addition, the fact that these relationships continued
throughout the period that Cline had engaged in illegal cyber-surveillance of Plaintiffs
undercut Defendants' contention that Cline's cyber-surveillance was motived by a concern to
ensure that her relationship with Reetz-Laiolo was monogamous.

249. Plaintiffs' letter to Defendants' counsel further rebutted Cline's claims of physical abuse
with (1) evidence that Cline and Reetz-Laiolo had had a loving relationship; and (2) the full
transcript of a G-chat that Defendants had excerpted in their own April 21, 2017, letter.  The
G-chat made no reference to an act of choking that Cline alleged, showed Ms. Cline saying
that she was "not really . . . hurt" by whatever may have happened, and quickly proceeds to
other topics.   The letter also explained that under controlling case law, Cline's sexual history
was directly relevant to her threatened claim based on infection with HPV.  Because HPV
occurs in a majority of sexually active adults and is often asymptomatic, courts have

recognized that "[m]ultiple sex partners are a major factor in determining whether a person becomes infected with HPV." Eugene L. v. Belgum, No. B199200, 2008 WL 4838468, at *2 (Cal. Ct. App. Nov. 10, 2008). BSF further explained that, under Eugene, a party who commences an action alleging that she was infected with HPV by an ex-partner may be exposed to a malicious prosecution claim where prior exposure to multiple other partners makes it impossible to establish the facts necessary to prove her claim.

250. In addition to the letter, BSF attached a revised draft complaint that included additional factual allegations about and evidence of the sexual history of the parties that Defendants had put at issue, through their door-opening assertions regarding Cline's supposed character and state of mind (under the Federal Rules of Evidence, in the trial that the parties were presupposing), so as to demonstrate that Defendants' theory of the case articulated in their April 21, 2017, letter, and their threatened claims, were not tenable, and could be pre-emptively rebutted in Plaintiffs' own complaint.

251. Over the next few months, the parties engaged in further discussions through counsel, but were unable to come to an agreement, despite the exchange of several more letters, phone calls and an in-person meeting among the parties' various counsel.

252. Throughout, Plaintiffs encouraged Defendants to participate in mediation with an experienced mediator. Defendants refused, belittling Reetz-Laiolo's claims and all but ignoring those of Bernard and Kiesel, stating – in a painfully ironic dismissal of the privacy rights of these women, given how Defendants have sought to cast this dispute publicly – that "their claims play a small role in the dispute. This is a dispute between Chaz and Emma."

253. Plaintiffs repeatedly emphasized that the introduction of Cline's sexual history into the discussions was an issue of Cline's and Random House's own making, and that this evidence would remain relevant if and only if Cline and Random House persisted in their framing of her purported defenses, as initially set forth in their April 21, 2017, letter. Then, in an attempt to reach an agreement to focus discussions on the essential issues in the case – Cline's campaign of cyber-stalking and plagiarism supported and protected by Random

House – Plaintiffs sent Defendants another letter and a revised draft complaint on October 31, 2017.  The letter reiterated that the only reason Plaintiffs ever made any allegations about Cline's sex life was to rebut Defendants' door-opening theory of the case and threatened claims.  As a gesture of good faith and to give Defendants a chance to allow Plaintiffs' claims to proceed in the absence of the frivolous supposed defenses that Defendants had raised, Plaintiffs eliminated all allegations related to sex from the draft complaint, but at the same time explained that if Defendants again put such behavior at issue, the evidence they had previously presented would again be plainly relevant.

254. While settlement negotiations were ongoing, Cline sent multiple emails directly to Kiesel and Bernard, and warned that should they fail to settle quickly on her proposed terms, litigation "would include all our sexual histories."  Soon thereafter, settlement negotiations reached an impasse.

255. Shortly before the parties' tolling agreement expired, Kiesel proposed to Defendants that she would accept Cline's last (and only) settlement offer on the condition that she would not be involved in the litigation and that she not be subjected to probing and publicizing of her private life.  Defendants refused to settle independently with Kiesel on these terms, insisting that they would indeed pursue their threatened course of public probing and exposure of Kiesel's private life unless all Plaintiffs agreed to surrender their claims.

256. On November 29, 2017, Plaintiffs filed their Complaint.  Defendants filed a competing Complaint that same night.  Plaintiffs' Complaint contained no allegations regarding the sexual or personal details of the lives of any of the parties.  Defendants' Complaint, however, carried through with their threat to publicize allegations about the Plaintiffs' sex lives. Random House and Cline alleged, for example, that "[i]n the summer of 2010, six months after moving in with Reetz-Laiolo, Cline discovered that he had been informed months earlier by his 'ex'-lover Ms. K that she had tested positive for an STD."  Random House and Cline further alleged that "Reetz-Laiolo continued to have sex with Ms. K during his relationship with Cline."  Random House and Cline used the moniker "Ms. K" as an obvious

reference to Kiesel, knowing that Kiesel was joining in filing a competing complaint that would identify her (and notwithstanding that, even on the assumption that they had a legitimate need to refer to Kiesel in this context at all, they easily could have referred to her anonymously as "Ms. Doe" or as a "romantic partner of Reetz-Laiolo").  Further, Random House and Cline persisted in referring to an "STD" generally rather than the ubiquitous HPV virus specifically, so as to maximize the embarrassment they caused to Kiesel.  Random House and Cline made these allegations without Cline bringing the actual claims alleging HPV infection they previously threatened – aware, no doubt, that under the <u>Eugene</u> case she would expose herself to a malicious prosecution claim if she did so.

257. In the days before the parties filed their complaints, Cline and Random House also reached out to Sheelah Kolhatkar of <u>The New Yorker</u> and, on information and belief, shared portions of the parties' confidential settlement communications with her.  (Cline had previously worked at <u>The New Yorker</u>, and Kolhatkar had recently published her first book with Random House.)

258. The day after the complaints were filed, Kolhatkar published an article that – consistent with the themes pressed by Random House and Cline, which essentially disregarded Bernard's and Kiesel's privacy rights – characterized the dispute as solely between Cline and Reetz-Laiolo.  Referring to Bernard and Kiesel (inaccurately) as "two of the former couple's female friends," she characterized Cline's years of illegal cyber-surveillance of these women (again inaccurately) as mere "snooping" – thus equating years of pouring over nearly 20,000 of these Plaintiffs' emails with peeking over someone's shoulder to see what she is reading.

259. All three Plaintiffs have suffered severe emotional distress as a consequence of Defendants' baseless allegations and their threats to publicize allegations about Plaintiffs' personal and sex lives if they pursued their claims, as well as by Defendants' subsequent executions on those threats.  This distress has, predictably, interfered with their professional lives.  Kiesel, for example, valuing her privacy, has had to delay her tenure calendar in order to deal with the emotional distress of the Defendants' threats and the attention Random House and Cline

have focused on allegations about her having an "STD," compounding the privacy violations that formed the basis of her original claims.  Random House and Cline have continued to press these allegations in an effort to embarrass Kiesel, even though they full well know that HPV affects a majority of sexually active adults and that any allegations Cline contracted HPV through Kiesel or Reetz-Laiolo are unsubstantiated.

260. Plaintiffs would have preferred for litigation among the parties to be focused on the claims for invasion of privacy and copyright that they originally brought to Defendants' attention and attempted to settle out of court.  They further believe that none of the parties' sexual histories need have any bearing on these claims.  However, to the extent that Defendants have invoked the parties' sexual histories in support of purported defenses that open the door to such topics, and to the extent that their claims arising from the parties' settlement correspondence are viable, Plaintiffs have analogous claims against Defendants.

**Plaintiffs Discover that Cline and Random House Continue to Possess Refog Records Containing their Computer and Personal Email Activity**

261. Throughout this litigation, Plaintiffs believed that Cline and Random House no longer possessed the Refog records containing their computer and personal email activity.  Plaintiffs believed that Cline lost access to these records after she sold her computer to Reetz-Laiolo.

262. Representations made by counsel for Random House and Cline reaffirmed this belief.  For example, McNamara's representation in 2016 that Cline had "long forgotten the brief use of the keystroke program" led Reetz-Laiolo to believe that neither Cline nor Random House possessed the Refog records containing Plaintiffs' computer and personal email activity.

263. Additionally, during a pre-litigation settlement meeting between counsel for Plaintiffs and counsel for Defendants, counsel for Cline and Random House represented that Plaintiffs were overstating the extent and period of time over which Cline's invasion into Plaintiffs' personal email account occurred.

264. However, on August 24, 2018, Plaintiffs and Defendants engaged in a mutual exchange of discovery in response to pre-mediation discovery requests.  To Plaintiffs' surprise, this discovery revealed that not only were Defendants in possession of all of the Refog records

containing their computer and personal email activity up until the point that Cline sold her computer to Reetz-Laiolo, but that they were also in possession of Refog records beyond that date which contained further personal email activity belonging to Bernard.

265. This revelation shocked Reetz-Laiolo, Bernard, and Kiesel. Not only had their private lives been consumed by Cline for years, but the records of such activity were kept by Cline and shared with Random House.

**CLAIMS FOR RELIEF**

**COUNT I – FEDERAL STORED COMMUNICATIONS ACT**

**(By all Plaintiffs Against Defendant Cline)**

266. Plaintiffs incorporate all prior paragraphs.

267. In relevant part, the Federal Stored Communications Act ("SCA") imposes liability on "whoever (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility, and thereby obtains . . . access to a . . . electronic communication while it is in electronic storage in such system." 18 U.S.C. § 2701(a)(1).

268. Under the SCA, an "'electronic communication service' means any service which provides to users thereof the ability to send or receive . . . electronic communications." *Id.* § 2510(15). An "'electronic communication' means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, electromagnetic, photoelectric or photo-optical system that affects interstate or foreign commerce." *Id.* § 2510(1).

269. Gmail and Yahoo! Mail are electronic communication services under the SCA, as these services provide users the ability to send or receive electronic communications within the meaning of the SCA.

270. In using Defendants' stolen account information and passwords, and through the installation and operation of Refog, Cline intentionally accessed without authorization, or in excess of any authorization, Gmail and Yahoo! Mail.

271. Under the SCA, "'electronic storage' means (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." *Id.* § 2510(17).

272. In opening without authorization, or in excess of any authorization, emails on Gmail and Yahoo! Mail, Cline obtained access to electronic communications in electronic storage.

273. In opening the emails in Gmail and Yahoo! Mail, Cline gained access to electronic communications that are stored not only on Gmail and Yahoo! Mail primary servers, but are also stored on Gmail and Yahoo! Mail backup servers and/or physical tapes for purposes of backup protection of such communications.  Accordingly, when Cline opened any given email and caused the transmission of that electronic communication located on the Gmail or Yahoo! Mail primary server from the server to the computer she was using, she was accessing electronic communications in electronic storage.

274. In accessing without authorization unread emails on Gmail and Yahoo! Mail, Cline obtained access to electronic communications in electronic storage in that unread emails are the "temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof."

275. Cline read many thousands of Defendants' read and unread emails on Gmail and Yahoo! Mail, and committed a violation of § 2701 each time she opened or viewed any such read or unread email, including any preview thereof.

276. Under § 2707, Plaintiffs are entitled to:

    a.   Minimum statutory damages of $1,000 per violation;

    b.   Actual damages, including damages for emotional distress and mental suffering;

    c.   Punitive damages;

    d.   Costs; and

    e.   Reasonable attorneys' fees.

## COUNT II – FEDERAL WIRETAP ACT

### (By all Plaintiffs Against Defendant Cline)

277. Plaintiffs incorporate all prior paragraphs.

278. Plaintiffs are "persons" as defined under § 2510(6) of the Federal Wiretap Act, Title I of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.

279. Refog is a "device" for purposes of the Wiretap Act because it is software used to intercept electronic communication.

280. Cline, through her knowing and intentional installation and operation of Refog on Reetz-Laiolo's computer, intentionally intercepted and endeavored to intercept electronic communications as described herein, in violation of 18 U.S.C. § 2511(1)(a).  This interception was acquired during transmission, as Refog acquired the content of Plaintiffs' electronic communications as they were being transmitted and/or received.

281. The contents of the electronic communications intercepted include emails and their attachments, chat messages, bank account information, usernames, passwords, and the contents of, and information submitted or received through, websites.

282. Plaintiffs' electronic communications were intercepted without their consent.  Cline was not the intended recipient of Plaintiffs' electronic communications.

283. Cline's interception of these electronic communications using Refog was performed with reckless disregard for severe and negative impact that Refog had on the security of their personal accounts and/or computers, and on the performance of Reetz-Lialo's computer.

284. Cline also intentionally disclosed, or endeavored to disclose, to other persons the contents of Reetz-Laiolo's electronic communication, knowing or having reason to know that the information was obtained through interception, in violation of 18 U.S.C. § 2511(1)(c).

285. For instance, Cline disclosed Reetz-Lialo's writings, obtained by intentionally intercepting Plaintiffs' electronic communications, to Random House and Scott Rudin Productions in the manuscripts Cline submitted to them.

286. Cline also disclosed, and continue to disclose, those writings millions of times over through the bestselling book, <u>The Girls</u>.

287. As a result, Plaintiffs have suffered harm and injury, including due to the interception and transmission of private and personal, confidential, and sensitive communications, content, and data.

288. Plaintiffs have been damaged by the interception and disclosure of their communications in violation of the Federal Wiretap Act, as described herein, and are thus entitled to preliminary, equitable, or declaratory relief; statutory and punitive damages; and reasonable attorney's fees and litigation costs reasonably incurred.  18 U.S.C. § 2520(b).

**COUNT III – CALIFORNIA INVASION OF PRIVACY ACT**

**(By Bernard and Kiesel Against Defendant Cline)**

289. Plaintiffs incorporate all prior paragraphs.

290. Cline violated California's Invasion of Privacy Act, Cal. Penal Code § 630 <u>et seq.</u> ("CIPA") intentionally, willfully, and without consent through the installation and operation of Refog on Reetz-Laiolo's computer.

291. Each screenshot taken by Refog and each instance in which keystrokes were logged constitutes an instance in which an unauthorized connection to Reetz-Lialo's computer was made by Cline in order to read or attempt to read, or to learn the contests or meaning of, Plaintiffs' communications while they were in transit or passing over a wire, line or cable, or was being sent from, or received at any place within California, in violation of Cal. Penal Code § 631(a).

292. Each screenshot taken by Refog and each instance in which keystrokes were logged also constitutes an instance in which Defendants either read or attempted to read, or to learn the contents or meaning of, Plaintiffs' communications while they were in transit or passing over a wire, line or cable, or was being sent from, or received at any place within California, in violation of Cal. Penal Code § 631(a).

293. In addition to the violations confirmed by Refog screenshot evidence, Plaintiffs are entitled to additional damages pursuant to California Penal Code § 637.2 for violations committed by Cline but not captured by the Refog screenshot evidence.

294. As an actual and proximate result of the above actions, Plaintiffs have been injured and suffered actual damages in an amount to be determined at trial.

295. For each of Cline's violations of CIPA, Plaintiffs are entitled to:

    a.    damages against Cline pursuant to California Penal Code § 637.2 of $5,000 per violation or three times the amount of their actual damages (at their election); and

    b.    injunctive relief.

### COUNT IV – CALIFORNIA COMPUTER CRIME LAW

### (By all Plaintiffs Against Defendant Cline)

296. Plaintiffs incorporate all prior paragraphs.

297. California Computer Crime Law, Cal. Penal Code § 502, prohibits knowing and unauthorized access to computers.

298. Refog is a "computer program or software" and "computer contaminant" under Cal. Penal Code §§ 502(b)(3) and (12).

299. Through installation and operation of Refog, and by using stolen account information and passwords, Cline had "access" to Plaintiffs' computers, computer systems, and/or computer networks under Cal. Penal Code §§ 502(b)(1).

300. Reetz-Laiolo's computer, and Plaintiffs' various email and other accounts that Cline accessed constitute computers, computer systems, and/or computer networks under Cal. Penal Code § 502(b)(2) and (5).

301. Through installation and operation of Refog, and by using stolen account information and passwords, Cline collected "data" from Plaintiffs' computers under Cal. Penal Code § 502(b)(8).

302. Cline's use of the computing resources of Reetz-Laiolo's computer, including data processing, storage functions, internet and other uses, constitute "computer services" under Cal. Penal Code § 502(b)(4).

303. Cline acted "without permission" under Cal. Penal Code 502 because Plaintiffs did not choose to have Refog installed or operated on Reetz-Laiolo's computer, to have it monitor their computer use, to have their information accessed using stolen account information and passwords, or to have data reflecting such unauthorized access deleted and destroyed.

304. Through the installation and operation of Refog, by knowingly and without permission accessing Plaintiffs' information using Refog and by using stolen account information and passwords, and through subsequent deletion of data evidencing the same, Cline has violated the following provisions of the California Computer Crime Law:

   a. Cline knowingly accessed and without permission used Plaintiffs' data from a computer, computer system, or computer network to devise or execute a scheme to defraud, deceive or extort, or to wrongfully control or obtain their property and data, in violation of Cal. Penal Code § 502(c)(1).  The fraudulent and deceptive scheme was intended to misappropriate, and did misappropriate, Reetz-Lialo's writings and Plaintiffs' personal communications for use in various drafts and the published version of The Girls.

   b. Cline knowingly accessed and without permission took, copied, and made use of Plaintiffs' data from a computer, computer system, or computer network, including by misappropriating Reetz-Laiolo's writings and Plaintiffs' personal communications in various drafts and the published version of The Girls, in violation of Cal. Penal Code § 502(c)(2).

   c. Through installation and operation of Refog, Cline knowingly and without permission used computer services associated with Reetz-Laiolo's computer, in violation of Cal. Penal Code § 502(c)(3).

d.   Cline knowingly accessed and without permission "delete[d]" or "destroy[ed]" data residing on Plaintiffs' computer, computer system, or computer network, including by destroying data documenting Cline's repeated unauthorized access, in violation of Cal. Penal Code § 502(c)(4).

e.   Through installation and operation of Refog, Cline knowingly and without permission disrupted or caused the disruption of computer services associated with Reetz-Laiolo's computer, in violation of Cal. Penal Code § 502(c)(5).

f.   Cline knowingly and without permission accessed Plaintiffs' computer programs, computer systems and computer networks, in violation of Cal. Penal Code § 502(c)(7).

g.   Through installation and operation of Refog, Cline knowingly introduced a computer contaminant onto Reetz-Laiolo's computer, in violation of Cal. Penal Code § 502(c)(8).

305. As an actual and proximate result of Defendant Cline's unlawful conduct under the California Computer Crime Law, Plaintiffs have been damaged in an amount to be determined at trial.  Plaintiffs are entitled to compensatory damages, injunctive and other equitable relief, and attorney fees under Cal. Penal Code § 502(e)(1) and (2).  Additionally, because Cline willfully violated this statute with oppression, fraud, or malice under Cal. Civil Code § 3294, Plaintiffs seek punitive and exemplary damages pursuant to Cal. Penal Code § 502(e)(4).

**COUNT V – CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 1**

**(By all Plaintiffs Against Defendant Cline)**

306. Plaintiffs incorporate all prior paragraphs.

307. Article I, Section 1 of the California Constitution provides that "All people are by nature free and independent and have inalienable rights.  Among these are enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety, happiness, and privacy."

308. The California Supreme Court has recognized a private right of action for monetary damages and injunctive relief against non-governmental defendants for violations of the constitutional right to privacy.

309. Plaintiffs have a legally protected interest in their private electronic communications, electronically stored or transmitted information, and private use of a computer.

310. Plaintiffs reasonably expect that their private electronic communications, electronically stored or transmitted information, and private use of a computer are private, and do not expect Defendant to intercept, review, copy, disclose and distribute for profit their communications and information without their consent.

311. Cline has committed egregious breaches of social norms by intercepting, reviewing, copying, disclosing and distributing for profit Plaintiffs' communications and information without their consent.

312. Cline's acts in violation of the California Constitution occurred in the State of California because those acts resulted from conduct and decisions in California that are unlawful and constitute criminal conduct.

313. Cline profited from her conduct in the State of California. Cline also intercepted, reviewed, copied, disclosed and/or distributed some of Plaintiffs' communications and information in California and used at least some devices located in California.

**COUNT VI – INTRUSION UPON SECLUSION**

**(By all Plaintiffs Against Defendant Cline)**

314. Plaintiffs incorporate all prior paragraphs.

315. Plaintiffs have a legally protected privacy interest in their private electronic communications, electronically stored or transmitted information, and private use of a computer.

316. Plaintiffs had an actual, subjective expectation that their private electronic communications, electronically stored or transmitted information, and private use of a computer were private, and did not expect Cline to intercept, review, copy, disclose, or distribute for profit their communications and information without their consent.

317. Plaintiffs' expectations of privacy were objectively reasonable.

318. Cline intentionally intruded upon Plaintiffs' private electronic communications, electronically stored or transmitted information, and private use of a computer by deliberately installing and operating Refog, and by using stolen account information and passwords.

319. Plaintiffs have been injured by said violations and are entitled to damages and injunctive relief under law.

### COUNT VII – CONVERSION

### (By Plaintiff Reetz-Laiolo Against All Defendants)

320. Plaintiffs incorporate all prior paragraphs.

321. Reetz-Laiolo had a right to exclusively possess all digital content he created on his computer, including, but not limited to, his private manuscripts, email communications, and ideas he stored on the computer that Cline sold to him.

322. Cline intentionally and substantially interfered with Reetz-Laiolo's property by taking possession of digital screenshots that captured Reetz-Laiolo's activity on his personal computer from January 2013 through February 2015.

323. Cline intentionally and substantially interfered with Reetz-Laiolo's property by illegally breaking into his Gmail account and taking possession of his draft manuscripts, email communications, and ideas that he stored on his Gmail account.

324. Cline intentionally and substantially interfered with Reetz-Laiolo's property by incorporating the content of his draft manuscripts, email communications, and ideas into manuscripts of her book The Girls.

325. Random House intentionally and substantially interfered with Reetz-Laiolo's property by taking possession of his draft manuscripts, email communications, and ideas by way of its purchase of The Girls manuscript and subsequent publishing of The Girls for sale and distribution, as well as through its possession and holding of Reetz-Laiolo's draft manuscript

<u>All Sea</u>, which Random House and its attorneys knew was stolen by Cline from Reetz-Laiolo's email and/or computer activity.

326. Reetz-Laiolo did not consent to this use of his property.

327. Reetz-Laiolo has suffered emotional distress and other damages, including the cost of psychological and medical care, as the result of the conversion of his private draft manuscripts.

328. Reetz-Laiolo is entitled to the disgorgement of all profits Defendants derived from Cline's use of the converted manuscripts, including, but not limited to, profits related to the publication of <u>The Girls</u>.

**COUNT VIII – TRESPASS TO CHATTELS**

**(By Plaintiff Reetz-Laiolo Against Defendant Cline)**

329. Plaintiffs incorporate all prior paragraphs.

330. From the time that Cline sold the computer to Reetz-Laiolo, he maintained actual or constructive possession of his computer at all times when Refog was being operated.

331. Cline intentionally interfered with Reetz-Laiolo's use of his computer by operating Refog.

332. Reetz-Laiolo did not consent to this interference.

333. This interference was the actual and proximate cause of injury to Reetz-Laiolo because it actually and substantially harmed the functioning of his computer and impaired the computers' condition, quality, and value.  This interference also actually and proximately injured Reetz-Laiolo because it exposed his private data to privacy violations and security breaches, and resulted proximately in misappropriation of his valuable works of authorship.

334. Reetz-Laiolo is entitled to recover the actual damages he suffered as a result of Cline's interference with his computer, as well as damages for his emotional distress, in an amount to be determined at trial.

**COUNT IX – CIVIL THEFT**

**(By Plaintiff Reetz-Laiolo Against Defendants Cline and Random House)**

335. Plaintiffs incorporate all prior paragraphs.

87

FOURTH AMENDED COMPLAINT AND JURY DEMAND

336. Reetz-Laiolo had a right to exclusively possess all digital content he created on his computer, including, but not limited to, his private manuscripts, email communications, and ideas he stored on the computer that Cline sold to him.

337. Cline intentionally and substantially interfered with Reetz-Laiolo's property by illegally breaking into his Gmail account and taking possession of his draft manuscripts, email communications, and ideas that he stored on his Gmail account.

338. Reetz-Laiolo's draft manuscripts, email communications, and ideas constitute property under Cal. Penal Code § 496(a).

339. Cline committed actual theft of this property by accessing and incorporating the content of his draft manuscripts, email communications, and ideas into manuscripts of her book The Girls.

340. Random House intentionally and substantially interfered with Reetz-Laiolo's property by taking possession of his draft manuscripts, email communications, and ideas by way of its purchase of The Girls manuscript and subsequent publishing of The Girls for sale and distribution, as well as through its possession and holding of Reetz-Laiolo's draft manuscript All Sea, which Random House and its attorneys knew was stolen by Cline from Reetz-Laiolo's email and/or computer activity.

341. Random House aided in concealing, selling, and withholding this property from Reetz-Laiolo in violation of Cal. Penal Code § 496(a).

342. Reetz-Laiolo did not consent to this use of his property.

343. Reetz-Laiolo is entitled to three times the amount of actual damages, costs of suit, and reasonable attorney's fees pursuant to Cal. Penal Code § 496(c).

344. Reetz-Laiolo has suffered emotional distress and other damages, including the cost of psychological and medical care, as the result of the conversion of his private draft manuscripts.

345. Reetz-Laiolo is entitled to the disgorgement of all profits Defendants derived from Cline's of the converted manuscripts, including, but not limited to, profits related to the publication of The Girls.

## COUNT X – INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff Reetz-Laiolo Against Defendants Cline and Random House)

346. Plaintiffs incorporate all prior paragraphs.

347. In invading Reetz-Laiolo's online accounts, reading his intimate emails and private communications, and stealing and converting his written work and holding it out as her own, Cline acted in an extreme and outrageous manner that exceeds all bounds usually tolerated by a civilized community.

348. In violating Reetz-Laiolo directly in these ways over a period of many years, Cline acted with reckless disregard for the fact that her actions would surely cause Reetz-Laiolo very serious harm once he discovered them.

349. Additionally, Defendants' conduct threatening Reetz-Laiolo with baseless claims and reputational harm if he continued to pursue his legitimate claims against Cline based on her pervasive intrusions into his privacy, and publicly humiliating Reetz-Laiolo by asserting a domestic violence claim that they knew was time-barred, was extreme and outrageous and exceeded all bounds of civility.

350. Defendants' conduct caused Reetz-Laiolo to suffer severe and extreme emotional distress.  In fact, Reetz-Laiolo's suffering continues to this day, including through chronic sleeplessness and insomnia; paranoia that he is being spied on or secretly surveilled; and bouts of crying in public when memories of Cline's conduct toward him are triggered.

## COUNT XI – INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff Kiesel Against Defendants Cline and Random House)

351. Plaintiffs incorporate all prior Paragraphs.

89

352. In invading Kiesel's online accounts and reading her intimate emails and private communications, Cline acted in an extreme and outrageous manner that exceeds all bounds usually tolerated by a civilized community.

353. In violating Kiesel directly in these ways over a period of many years, Cline acted with reckless disregard for the fact that her actions would surely cause Kiesel very serious harm once she discovered them.

354. Additionally, Defendants' conduct threatening Kiesel with baseless claims and reputational harm if she continued to pursue her legitimate claims against Cline based on her pervasive intrusions into her privacy, and publicly humiliating her with allegations about infection with an STD, was extreme and outrageous and exceeded all bounds of civility.

355. Defendants' conduct caused Kiesel to suffer severe emotional distress.  Defendants' conduct has also impaired Kiesel's ability to focus in her job and fulfill certain benchmarks necessary to earn tenure at the university at which she teaches. As a result of the extreme emotional distress that she has suffered, Kiesel has had to defer the process of applying for tenure.

## COUNT XII – INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff Bernard Against Defendants Cline and Random House)

356. Plaintiffs incorporate all prior Paragraphs.

357. In invading Bernard's online accounts and reading her intimate emails and private communications, Cline acted in an extreme and outrageous manner that exceeds all bounds usually tolerated by a civilized community.

358. In violating Bernard directly in these ways over a period of many years, Cline acted with reckless disregard for the fact that her actions would surely cause Bernard very serious harm once she discovered them.

359. Additionally, Defendants' conduct threatening Bernard with baseless claims and reputational harm if she continued to pursue her legitimate claims against Cline based on her pervasive intrusions into her privacy, including allegations about her sex life, was extreme and outrageous and exceeded all bounds of civility.

360. Defendants' conduct caused Bernard to suffer severe emotional distress.

## COUNT XIII – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (By Plaintiff Kiesel Against Defendants Cline and Random House)

361. Plaintiffs incorporate all prior Paragraphs.

362. Kiesel holds a tenure-track faculty position at the University of California, Davis.  According to a scheduled timeline, Kiesel was expected to be up for tenure in 2018.

363. Upon information and belief, Defendants are aware of Kiesel's employment at the University of California, Davis.  Not only is this public information available on the university's website, Defendant Cline has engaged in cyber-surveillance of Kiesel for years.

364. Defendants' conduct threatening Kiesel, through counsel, with baseless claims and reputational harm if she continued to pursue her legitimate claims against Cline based on her pervasive intrusions into her privacy, and publicly humiliating her with allegations about infection with an STD, has interfered with Kiesel's progress toward tenure at her university.  Kiesel's emotional distress has interfered with her work.  In addition, she has had to devote attention to protecting her reputation among her academic colleagues and her students, at the expense of her attention to her work.

365. Prior to Defendants' actions, Kiesel was meeting her benchmarks, but as a direct result of Defendants' actions, she has not been able to meet remaining benchmarks, and has had to defer the tenure process by a year.

## COUNT XIV – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (By Plaintiff Bernard Against Defendant Cline)

366. Plaintiffs incorporate all prior Paragraphs.

367. Cline is aware of Bernard's career as a farmer and of her relationship with Cannard.

368. Cline tortiously interfered with this relationship, for the sole purpose of inflicting harm upon Bernard's career, and using dishonest, unfair, wrongful, and improper means, by threating Cannard as a means of intimidating Bernard from bringing claims against Cline.

369. Cline's conduct damaged Bernard's career.  Among other things, Cline's conduct has directly and proximately ended Cannard's mentorship of Bernard, which has significantly affected Bernard's ability to succeed in her pursuit of owning and operating her own farm.

### COUNT XV – COPYRIGHT INFRINGEMENT

**(By Plaintiff Reetz-Laiolo Against Defendant Cline – Intermediate Infringement)**

370. Plaintiffs incorporate all prior paragraphs.

371. Reetz-Laiolo is the sole author of the unpublished screenplay <u>All Sea</u>.  Reetz-Laiolo owns the rights and title to the copyright in the unpublished screenplay <u>All Sea</u>, and has received registration from the United States Copyright Office for four separate drafts of <u>All Sea</u>.

372. Cline infringed Reetz-Laiolo's copyrights in his draft manuscripts for <u>All Sea</u>, including at least the drafts dated June 17, 2013, and December 26, 2013, when she illegally downloaded digital copies of these drafts in violation of 17 U.S.C. §§ 106(1), 501(a).

373. Cline used the illegally obtained copies of All Sea to write and develop a substantial portion of her novel, <u>The Girls</u>.

374. Reetz-Laiolo is entitled to disgorgement of Cline's profits directly and indirectly attributable to Cline's infringement of <u>All Sea</u>, including, but not limited to, profits from the sale of <u>The Girls</u>.

375. Due to Cline's copyright infringement, Random House has obtained direct and indirect profits they would otherwise not have realized but for Cline's infringement of the <u>All Sea</u>. Accordingly, Reetz-Laiolo is entitled to disgorgement, by Cline, of Random House's profits directly and indirectly attributable to Cline's infringement of <u>All Sea</u>, including, but not limited to, the profits Random House received from the sale of <u>The Girls</u>.

### COUNT XVI – COPYRIGHT INFRINGEMENT

**(By Plaintiff Reetz-Laiolo Against Random House – Vicarious Copyright Infringement)**

376. Plaintiffs incorporate all prior paragraphs.

377. Reetz-Laiolo is the sole author of the unpublished screenplay <u>All Sea</u>. Reetz-Laiolo owns the rights and title to the copyright in the unpublished screenplay <u>All Sea</u>, and has received registration from the United States Copyright Office for four separate drafts of <u>All Sea</u>.

378. Random House is vicariously liable for Cline's infringement of Reetz-Laiolo's copyrights of the <u>All Sea</u> manuscripts because they had the right and ability to supervise the use of scenes that were developed by Cline's infringement of <u>All Sea</u>. Random House was on notice that Cline obtained Reetz-Laiolo's manuscripts through the use of illegal spyware and that she used copies of these manuscripts to write and develop crucial scenes that are featured in the published version of <u>The Girls</u>.

379. Random House refused to remove the scenes developed through Cline's infringing conduct from the published version of <u>The Girls</u>.

380. Random House had a direct financial interest in keeping the scenes developed through Cline's infringing conduct in the published version of <u>The Girls</u>.

381. Due to Random House's vicarious copyright infringement, Random House has obtained direct and indirect profits they would otherwise not have realized but for Cline's infringement of the <u>All Sea</u>. Accordingly, Reetz-Laiolo is entitled to disgorgement of Random House's profits directly and indirectly attributable to Cline's infringement of <u>All Sea</u>, including, but not limited to, profits from the sale of <u>The Girls</u>.

### COUNT XIV – UNJUST ENRICHMENT

**(By Plaintiff Reetz-Laiolo Against Defendants Cline and Random House)**

382. Plaintiffs incorporate all prior paragraphs.

383. Reetz-Laiolo had an exclusive right to possess all digital content he created on his computer, including, but not limited to, his private manuscripts, email communications, and ideas he stored on the computer that Cline sold to him.

384. Cline intentionally and substantially interfered with Reetz-Laiolo's property by illegally breaking into his Gmail account and taking possession of his draft manuscripts, email communications, and ideas that he stored on his Gmail account.

385. Cline illegally interfered with Reetz-Laiolo's property by incorporating the content of his draft manuscripts, email communications, and ideas into manuscripts of her book <u>The Girls</u>.

386. Random House intentionally and substantially interfered with Reetz-Laiolo's property by taking possession of his draft manuscripts, email communications, and ideas by way of its purchase of <u>The Girls</u> manuscript and subsequent publishing of <u>The Girls</u> for sale and distribution, as well as through its possession and holding of Reetz-Laiolo's draft manuscript <u>All Sea</u>, which Random House and its attorneys knew was stolen by Cline from Reetz-Laiolo's email and/or computer activity.

387. As a result of the foregoing, Defendants knowingly enriched themselves, at Reetz-Laiolo's expense, by virtue of actions that constitute conversion, trespass, and civil theft, and accordingly, it is against equity and good conscience to permit Defendants to retain such enrichment.

388. Equity and good conscience requires Defendants to disgorge the profits they have made from Cline's illegal conduct, including, but not limited to, profits from the sale of <u>The Girls</u>.

**COUNT XV – CONVERSION**

**(By All Plaintiffs Against Defendants Cline and Random House)**

389. Plaintiffs incorporate all prior paragraphs.

390. The Refog software that Defendant Cline installed, as detailed above, created records of Plaintiffs' computer and personal email activity.

391. The Refog records of Plaintiffs' computer and personal email activity are Plaintiffs' property, which Cline and Random House have converted by receiving, retaining, and maintaining those records without any right to do so.

392. Unbeknownst to Plaintiffs until very recently, Cline has retained the Refog records of Plaintiffs' computer and personal email activity for many years, up to the present, and she has shared those records with and delivered them to Random House.

393. Unbeknownst to Plaintiffs until very recently, Cline and Random House's receipt, retention, and maintenance of Refog records includes records of Plaintiff Kari Bernard's computer and

94

FOURTH AMENDED COMPLAINT AND JURY DEMAND

personal email activity for many months after Cline sold her computer to Plaintiff Reetz-Laiolo.

394. Cline and Random House's receipt, retention, and maintenance of the Refog records of Plaintiffs' computer and personal email activity are wrongful.

395. Cline and Random House's conversion has caused Plaintiffs damages, including emotional distress and invasion of their privacy.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.    Enter judgment in favor of Plaintiffs against Defendants;

b.    Award to Plaintiffs the actual, statutory, treble, and punitive damages;

c.    Disgorge Defendants of their ill-gotten gains;

d.    Enjoin Defendants' unlawful conduct;

e.    Enjoin Defendant Random House from any further printing or distribution of The Girls; and

f.    Grant pre- and post-judgment interest, reasonable attorneys' fees and costs, and such other and further relief as this case may require and the Court may deem just and proper.

1    Dated:  September 18, 2018

2    Respectfully submitted,

3                                              **BOIES SCHILLER FLEXNER LLP**

4

5                                      By: /s/ *Edward Normand*
                                              Edward Normand (*pro hac vice*)
6                                             Amos Friedland (*pro hac vice*)
                                              Nathan Holcomb (*pro hac vice*)
7                                             Kyle Roche (*pro hac vice*)
                                              **BOIES SCHILLER FLEXNER LLP**
8                                             333 Main Street
                                              Armonk, NY 10504
9                                             Tel:  (914) 749-8200
                                              Fax:  (914) 749-8300
10                                            Email: tnormand@bsfllp.com

11                                            Kevin Smith (*pro hac vice*)
                                              Sapna Palla (*pro hac vice*)
12                                            Benjamin Diessel (*pro hac vice*)
                                              **WIGGIN AND DANA LLP**
13                                            265 Church Street, P.O. Box 1832
                                              New Haven, CT 06508
14                                            Tel:  (203) 498-4400
                                              Fax:  (203) 782-2889
15                                            Email: ksmith@wiggin.com

16                                            Ethan A. Balogh (CSBN 172224)
                                              **COLEMAN & BALOGH LLP**
17                                            235 Montgomery Street
                                              Suite 1070
18                                            San Francisco, CA 94104
                                              Tel:  (415) 391-0440
                                              Fax:  (415) 373-3901

19                                            Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

FOURTH AMENDED COMPLAINT AND JURY DEMAND