1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    EMMA CLINE, et al.,                     **ORDER ON MOTIONS TO DISMISS
                                             AND MOTIONS TO SEAL**
                    Plaintiffs,
8

9         v.                                 Case No.  3:17-cv-06866-WHO

10   CHAZ REETZ-LAIOLO,                       Re: Dkt. Nos. 74, 75

                    Defendant.
11

12   CHAZ REETZ-LAIOLO, et al.,              Case No.  3:17-cv-06867-WHO

                    Plaintiffs,
13                                           Re: Dkt. Nos. 67, 98

14        v.

15   EMMA CLINE, et al.,

     Defendants.
16

17

18                                **INTRODUCTION**

19          This litigation involves allegations of domestic violence, revenge porn, stealing of

20   copyrighted work, and highly intrusive invasions into three people's privacy—all stemming from

21   the toxic relationship between Emma Cline, author of the 2016 best-selling novel *The Girls*, and

22   writer Chaz Reetz-Laiolo.  In round-two motions to dismiss, both sides assert new facts in support

23   of claims I previously dismissed and take another stab at arguments I previously rejected.  I will

24   grant in part and deny in part the parties' motions and grant leave to amend on one narrow claim.

25   This case will move forward.

26

27

28

United States District Court
Northern District of California

# BACKGROUND

## I. FACTUAL BACKGROUND

### A. The Relationship and the Dispute[1]

In June 2009, Cline was a 20-year-old college student when she met 33-year-old Reetz-Laiolo, a writer and lecturer at the Academy of Art University in San Francisco. Cline First Amended Complaint ("Cline FAC") ¶ 57 (Dkt. No. 73); Reetz-Laiolo Fourth Amended Complaint ("Reetz-Laiolo 4AC") ¶¶ 32–35, 38 (Dkt. No. 93). Prior to that, Cline had published short stories in various publications, including *Tin House*, *Post Road* Magazine, and *The Paris Review*. Cline FAC ¶ 59; Reetz-Laiolo 4AC ¶ 37. Reetz-Laiolo had also published works in publications, including *The Paris Review*. Cline FAC ¶ 27; Reetz-Laiolo 4AC ¶ 30. The two soon became romantically involved; she thereafter withdrew from college and moved in with Reetz-Laiolo in December 2009. Cline FAC ¶ 61; Reetz-Laiolo 4AC ¶¶ 2, 38–39. Cline lived with Reetz-Laiolo in Berkeley until the fall of 2011, when she moved to New York to begin a Masters in Fine Arts program at Columbia University. Cline FAC ¶¶ 57, 73; Reetz-Laiolo 4AC ¶ 41. The relationship continued off and on until February 2012, after which the two remained in contact. Cline FAC ¶¶ 57, 78; Reetz-Laiolo 4AC ¶¶ 42–43.[2] They shared drafts of their writing both during and after the relationship. Cline FAC ¶¶ 20, 27.

By September 2014, Cline had completed a draft of *The Girls*. Cline FAC ¶ 20; Reetz-Laiolo 4AC ¶¶ 164–65. She had repeatedly asked Reetz-Laiolo to read her drafts, "both because she wanted his input and so he would be aware that certain facts from his life and their shared life had been included." Cline FAC ¶ 20; *see* Reetz-Laiolo 4AC ¶ 169 (explaining that he initially declined to read the draft novel because "[h]e wished to avoid further emotional entanglement with her").

On October 3, 2014, Penguin Random House LLC ("Random House") bought the rights to publish *The Girls* for $2 million. Cline FAC ¶ 22; Reetz-Laiolo 4AC ¶ 167. Cline called Reetz-

---

[1] Most of the factual allegations in this section are common to both complaints.

[2] Reetz-Laiolo indicates the relationship ended in January 2012. Reetz-Laiolo 4AC ¶ 42.

United States District Court
Northern District of California

Laiolo shortly after to tell him her novel had sold.  Cline FAC ¶ 22.  According to Reetz-Laiolo,

Cline sent him a G-chat message on November 28, 2014, stating "i [sic] will be exposed as a

plagiarizer … paid 40 bucks to run novel through online plagiarism detector."  Reetz-Laiolo 4AC

¶ 168.

On February 24, 2015, Reetz-Laiolo finally agreed to read the manuscript, but days later

changed his mind and asked Cline to "send him any passages she thought might concern him[.]"

Cline FAC ¶ 28.  *But see* Reetz-Laiolo 4AC ¶ 171 (indicating that Cline refused to send the

manuscript and instead sent a document with excerpts).  On March 3, 2015, she sent him "eight

brief phrases and snippets from her draft novel, then 355-pages, that she thought he should know

about."  Cline FAC ¶ 29; Reetz-Laiolo 4AC ¶ 171; *see also* Reetz-Laiolo 4AC ¶¶ 171–73

(outlining alleged similarities and copying).

On October 12, 2015, Reetz-Laiolo requested a draft of *The Girls* manuscript that was sold

to Random House.[3]  Cline FAC ¶ 30; Reetz-Laiolo 4AC ¶¶ 171, 174.  Cline informed him that the

earlier version had been edited and revised over the intervening months, but he demanded to see

the version sold to Random House.  Cline FAC ¶ 31.  On October 14, 2015, she sent him this

version.  *Id.*; *see* Reetz-Laiolo 4AC ¶ 177 (noting that she sent a version of the manuscript "that

she created that very same day[,]" and that certain sentences included in the document she had

previously sent had been removed from this version of the draft).  On November 3, 2015, Reetz-

Laiolo wrote to Cline, "I would not publish this novel if I were you.  It is vile how much of my

work you have plagiarized in it."  Reetz-Laiolo 4AC ¶ 178.

On January 15, 2016, Reetz-Laiolo sent Cline a demand letter, itemizing 36 instances of

"infringement."  Cline FAC ¶ 34; Reetz-Laiolo 4AC ¶¶ 9, 183, 189, 191.[4]  Cline agreed to remove

the identified snippets.[5]  Cline FAC ¶ 37.  Reetz-Laiolo later identified a draft screenplay entitled

---

[3] Reetz-Laiolo indicates that he became concerned that Cline may have plagiarized his work after
he discovered her intrusions into his online accounts.  Reetz-Laiolo FAC ¶ 170; *see infra* sections
I.D.2, His Version – The Spyware and The Coverup and I.D.4, His Version – The Copying.

[4] Reetz-Laiolo's complaint references 35 passages in some paragraphs, *see* Reetz-Laiolo 4AC ¶¶
9, 11, and 36 in another.  *See id.* ¶ 191.

[5] She alleges that she made this "concession . . . purely in the interest of resolving the dispute, and

3

United States District Court
Northern District of California

1   *All Sea* as the source of the material he claims was copied.  *Id.* ¶ 40.  Reetz-Laiolo had emailed her

2   a copy of this draft screenplay under the file name "Fadin.doc" on September 4, 2011.  *Id.*

3           On June 14, 2016, *The Girls* was published in hardcover to widespread acclaim.  Cline

4   FAC ¶ 42.  It debuted at number three on *The New York Times* Hardcover Fiction Bestseller list

5   and remained on the list for 12 weeks.  *Id.*

6           On February 21, 2017, Reetz-Laiolo's new (current) counsel sent Cline and Random

7   House a demand letter setting forth two theories of copyright infringement.  Cline FAC ¶¶ 44–46.

8   On February 23, 2017, the parties entered into a tolling agreement.  Reetz-Laiolo 4AC ¶ 235.  On

9   March 30, 2017, Reetz-Laiolo's counsel followed up with a draft complaint (the "First Draft

10   Complaint").[6]  Cline FAC ¶ 99; Reetz-Laiolo 4AC ¶ 238.

11           On May 26, 2017, Reetz-Laiolo's counsel provided Cline with five separate drafts of *All*

12   *Sea*, but they later claimed that portions of the challenged passages originated from only one of the

13   five drafts, dated June 17, 2013.  Cline FAC ¶ 49; *see* Cline Complaint, Ex. A (6/17/13 *All Sea*

14   Draft) [17-cv-6866 Dkt. No. 1-3].  According to Cline, Reetz-Laiolo's counsel indicated that the

15   remainder originated from two later drafts, dated December 26, 2013 and June 24, 2014,

16   respectively.  Cline FAC ¶ 49; *see* Cline Compl., Ex. B (2/26/13 *All Sea* Draft), Ex. C (6/24/14 *All*

17   *Sea* Draft) [17-cv-6866 Dkt. Nos. 1-4, 1-5].  These versions were provided to Cline and Random

18   House for the first time on July 28, 2017.  Cline FAC ¶ 49.

19   **B. The Works**

20           **1. Cline's *The Girls***

21           In 2008, Cline composed three short stories that "contained the conceptual seeds . . . that

22   would develop over the years into *The Girls*."  Cline FAC ¶¶ 16–17.  Those seeds were "the close,

23   formative relationship between adolescent girls, the setting of a Sonoma County commune in the

24   1960s, and the dark underbelly of violence reflected in the Manson Family story[.]"  *Id.* ¶ 17.  She

25   _____

26   neither Random House nor Cline at any point accepted that Reetz-Laiolo held prior rights to the
     material, or that there was in fact any actionable similarity between his and Cline's work."  Cline

27   FAC ¶ 38.

28   [6] *See infra* section I.C.4, Her Story – After the Book Deal, for additional allegations regarding the
     First Draft Complaint.

also incorporated factual details from her life, including information she learned while dating

Reetz-Laiolo. *Id.* ¶ 19.  She completed a draft manuscript of *The Girls* in September 2014.  *Id.* ¶

20.  That same month, Cline's literary agency (The Clegg Agency) sent the manuscript to

publishers, and included the following description of the novel:

> . . . Emma Cline returns us to the combustable [sic] summer of 1969 and drops us onto the sun-scorched sidewalks of Marin County behind the bored and troubled eyes of 14-year-old Evie. Stranded in the lonely gulf between recently divorced parents and filled with a desperate restlessness, Evie leans with obsessive abandon into an accidental friendship with an older and beguiling drifter named Suzanne. Wide-eyed and smitten, Evie is easily towed into the turbulent waters of a soon-to-be-infamous commune, quickly finding herself under the sway of a madman and closer than she knows to unthinkable violence.  Emma Cline's story of how a rudderless girl finds herself at the flashpoint of a stumbling counter-culture at decade's end delivers a hauntingly precise investigation into how power is lost when we look to find it in others, how frighteningly mutable the unformed, inchoate self can be, and just how far that self will go to be seen and named.

*Id.* ¶ 21; *see also* Reetz-Laiolo 4AC ¶ 166.

### 2. Reetz-Laiolo's Works

Reetz-Laiolo alleges that Cline stole "numerous narrative overlaps" from his *All Sea*

manuscript.  Reetz-Laiolo 4AC ¶ 201.  He focuses on "a sequence of scenes in which the

protagonist, a teenager named Gabe, interacts with his single mother when she comes home with

her boyfriend, commits burglary at the behest of a friend from whom he wants acceptance, and,

after he is caught, is sent away to live with a father figure character named Ray."  *Id.* ¶ 203.

He also includes several "phrase- and sentence-level instances of plagiarism in the original

draft that Cline and Clegg submitted to Random House."  *Id.* ¶ 205.

Reetz-Laiolo outlines scenes from *All Sea*—not included in "Fadein.doc"—that he

suggests Cline incorporated into *The Girls*.  *Id.* ¶ 204.  According to him, Cline could only have

obtained a copy of *All Sea* from her unauthorized intrusions into his Yahoo account.  *See infra*

section I.D.2, His Version – The Spyware and The Coverup.

## C. Her Version

### 1. The Infidelity

Cline indicates that Reetz-Laiolo was "habitually unfaithful" to her.  Cline FAC ¶ 62.

5

1     Over the course of the relationship, Reetz-Laiolo's behavior turned violent and abusive.  *Id.*  He

2     routinely read her email, text messages, Facebook messages, and personal journal.  *Id.* ¶ 63.  On at

3     least two occasions, he emailed himself "the entirety of Cline's private journal."  *Id.* ¶ 65.  When

4     she attempted to stand up for herself, he would threaten to humiliate her by revealing private facts

5     to her family and friends.  *Id.* ¶ 63.

6            In March 2010, she discovered that he had been sleeping with "Ms. K," his ex-girlfriend.

7     *Id.* ¶ 61.  In the summer of 2010, Cline learned that Ms. K had informed Reetz-Laiolo months

8     earlier that Ms. K had tested positive for a sexually transmitted disease, and "she had noticed him

9     showing symptoms . . . and urged him to tell Cline of her possible exposure."  *Id.* ¶ 67.  Reetz-

10    Laiolo did not tell Cline; rather, he continued to have unprotected sex with her.  *Id.*  When Cline

11    confronted him, he denied that he was still seeing Ms. K.  *Id.* ¶ 68.

12            **2. The Keylogger Software**

13           In September 2010, "in an attempt to protect herself from Reetz-Laiolo's prying into her

14    personal documents, the possibility of future sexual transmission of disease, and any other

15    deceptions," Cline installed on her computer a free keylogger program from a company called

16    "Refog."  Cline Compl. ¶ 70.  The keylogger program recorded keystrokes and collected

17    screenshots on Cline's computer, including the two instances where Reetz-Laiolo emailed himself

18    a copy of Cline's personal journal.  *Id.* ¶¶ 71–72, 75.

19           In February 2011, Reetz-Laiolo promised to stop seeing other women, and Cline decided

20    to uninstall the Refog software and stop accessing his email.  Cline Compl. ¶ 72.  On February 10,

21    she told him that she had gained access to his email and that he should change his password.  *Id.*

22    In December 2011, as she was planning to return to Berkeley for winter break, Reetz-Laiolo told

23    her that he had been suffering from symptoms associated with STDs.  *Id.* ¶ 74.  When she arrived

24    in Berkeley, she downloaded on her computer a free three-day trial version of Refog's "Personal

25    Monitor" software, which had enhanced functionality.  *Id.*

26           In February 2012, Cline reviewed the activity captured by the Refog software and

27    discovered that Reetz-Laiolo had stolen her personal journal.  *Id.* ¶ 76.  When she confronted him,

28    he assured her he would delete the journal, but he still possesses it.  *Id.*  When he asked how she

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1  could have known about what he did, she explained the keylogger software to him.  *Id.*  The

2  relationship ended soon after, but they remained in contact.  *Id.* ¶¶ 57, 78.

3        **3. After the Break-Up**

4        In July 2012, Cline visited Reetz-Laiolo in Berkeley while on summer break from

5  Columbia.  Cline FAC ¶ 79.  He looked through her text messages as she was sleeping, and

6  became so incensed at what he perceived as flirtatious that he deleted the message, held her down

7  on the bed and choked her so violently that she could not breathe.  *Id.*  When she said she would

8  call the police, he again threatened to humiliate her by exposing highly personal information to

9  family members.  *Id.*  He threw all of her possessions into the street.  *Id.*

10       In December 2012, Reetz-Laiolo asked Cline to sell him her two-year-old laptop for a

11  fraction of its value because he could not afford a new computer.  *Id.* ¶ 87.  Cline finally agreed,

12  but indicated that she would wipe the hard drive first.  *Id.*  Reetz-Laiolo asked that she leave the

13  computer's applications intact so that he could use her licensed copy of Microsoft Word without

14  paying for a license for himself.  *Id.*

15       In January 2013, Cline brought the computer to a tech professional to have all her personal

16  files transferred to her new computer and deleted from the old one.  *Id.* ¶ 88.  While she asked the

17  tech professional to leave the applications, "[s]he reasonably understood that the professional

18  would delete *all* personal data from the computer.  *Id.*  Instead, and unbeknownst to Cline,[7] the

19  Refog files remained on the computer along with the Refog application.  *Id.*  These files, which

20  were not intended to be part of the sale, included her activity during the periods from September

21  2010 to February 2011 and from December 2011 until January 2013.  *Id.* ¶ 89.  The records

22  included private correspondence, journal entries, intimate web browsing history, and photographs.

23  *Id.* ¶ 92.  Cline has made repeated requests that Reetz-Laiolo "return to her the records of her

24  personal computer activity, which do not belong to him."  *Id.* ¶ 111.

25

26

27  ───────────────
[7] Cline asserts that "because the Refog application was designed to be difficult to find," its

28  presence and the presence of the files was "not evident to a regular user of the computer (or even, apparently, a trained tech professional)."  Cline FAC ¶¶ 88, 90.

1

### 4. After the Book Deal

On October 22, 2014, shortly after Cline had informed Reetz-Laiolo that Random House had purchased rights to *The Girls*, the two met for lunch in San Francisco. Cline FAC ¶ 83. He responded that perhaps people would be interested in nude photographs of her given her newfound literary fame. *Id.* He also told her that he had been contacted by a magazine to write a tell-all article about her, and he planned to do it. *Id.* After "he had reduced Cline to sobbing in public," he told her he was just joking.[8] *Id.*

In February 2015, Reetz-Laiolo informed Cline that the Refog software and the associated data were still on the computer she had sold him. *Id.* ¶ 91. He asked her if she had been remotely accessing the computer, and she informed him she had no way of doing that. *Id.*

In October 2015, after Reetz-Laiolo read the outdated version of the manuscript, he accused Cline of "vile" plagiarism and told her "I wouldn't publish this book if I were you." *Id.* ¶ 32. Cline informed her literary agent Bill Clegg, and Clegg informed Cline's editor at Random House. *Id.* ¶ 33.

On April 1, 2016, Reetz-Laiolo "abruptly abandoned" his copyright claims against Cline and Random House and instead turned to the Refog files. *Id.* ¶¶ 93–95. Realizing "he could exploit this trove of Cline's most personal information," Reetz-Laiolo "hatched a plan . . . to extract a financial windfall from Cline and Random House." *Id.* ¶¶ 93–94. Part of this plan included a theory that Cline accessed the computer remotely, even though Reetz-Laiolo knew or should have known that the Refog software on his computer did not provide that functionality. *Id.* ¶ 96. The "remote access theory" was necessary because any claims Reetz-Laiolo may have had based on Cline's actual access to his email account were time barred. *Id.* ¶ 98. The theory was eventually incorporated into the First Draft Complaint, as well as Reetz-Laiolo's complaint in this action. *See infra* section I.D.4, His Story – The Copying.

---

[8] Also in 2014, Reetz-Laiolo informed Cline that he had obtained an unregistered firearm and that he had previously pushed his roommate's boyfriend down a flight of stairs during a fight. *Id.* ¶ 82. He sent her a document entitled "KILL WHITE BITCHES.DOC." *Id.* ¶ 84. In 2015, he attempted to publish an essay about her "hardcore" porn habits and revealed her identity as the subject of the essay. *Id.* ¶ 85.

1    Reetz-Laiolo also included accusations that Cline had plagiarized other writers during her

2    coursework in the MFA program at Columbia.  *Id.* ¶ 101.  He knew that "neither of these instances

3    arose to anything illegal or improper on Cline's part," but "also knew that the accusations would

4    smear Cline's reputation at a pivotal point in her career."  *Id.* ¶ 102.

5    In the First Draft Complaint, Reetz-Laiolo and his counsel included screenshots of Cline

6    highlighting and copying erotic literature from the internet into a document as examples of her

7    plagiarism.  Cline FAC ¶ 104.  But because the First Draft Complaint did not identify any

8    corresponding passages in Cline's work, she asserts that the allegations were only included to

9    humiliate and bully her.  *Id.*

10    Months later, Reetz-Laiolo sent a revised draft complaint (the "May 26 Draft Complaint"),

11    which "incorporated over ten pages of screenshots of Cline's most sexually explicit chat messages

12    (along with the full names of individuals she chatted with, calculated to identify those most likely

13    to have recognizable names), and records of intimate details of her sexual fantasy life."  Cline

14    FAC ¶ 105.  The complaint further attempted to humiliate and bully Cline by revealing her as the

15    author of an erotic online story, accusing her of being an escort, and sexualizing her platonic

16    relationship with a benefactor.  *Id.*

17    The May 26 Draft Complaint also included a nude image of Cline obscured with a black

18    box.  *Id.* ¶ 106.  Reetz-Laiolo knew that the photograph was sent in the context of a private

19    conversation in which Cline did not use her real name.  *Id.*  He nonetheless provided it to his

20    counsel and co-plaintiffs.  *Id.*  In short, the draft complaint "followed an age-old playbook:  it

21    invoked the specter of sexual shame to threaten a woman into silence and acquiescence."  *Id.* ¶

22    107.

23    **5. The Fall Out**

24    Since this ordeal began, Cline has suffered substantial personal and professional injury,

25    including physical symptoms such as significant weight loss and insomnia.  Cline FAC ¶ 116.  She

26    has been forced to seek medical and psychological care, and has been prescribed medication.  *Id.*

27    She has also had to cancel an international book tour and numerous other public appearances, paid

28    speaking engagements, residencies, and travel plans.  *Id.* ¶¶ 114–15.  Despite one initial film

United States District Court
Northern District of California

9

option and great interest from other people in the film industry, Cline also had to pass on opportunities to sell or option the film rights to *The Girls*. *Id.* ¶¶ 119–20. She has also been unable to focus on creating new work. *Id.* ¶¶ 117–18.

**D. His Version**

      **1. The Loving Relationship, the Roommate, and the Close Friend[9]**

      Reetz-Laiolo describes the relationship as loving, although "not, from the beginning, a monogamous one on either party's behalf." Reetz-Laiolo 4AC ¶ 38. Cline herself spoke of her affectionate relationship with Reetz-Laiolo in a published article. *Id.* ¶¶ 39–40. After the relationship ended in January 2012, "Cline continued to approach Reetz-Laiolo about getting back together." *Id.* ¶ 42. He continued to be invited to her family dinners and parties as late as the spring of 2015. *Id.* ¶ 43.

      During the summer of 2010, plaintiff Kari Bernard sublet a room in Reetz-Laiolo's Berkeley apartment, while Cline was also living there. *Id.* ¶ 44. In September 2010, Cline's parents hired Bernard as a farm manager at the Green String Farm in Petaluma, California, where she worked until November 2016. *Id.* ¶ 45. Bobby Cannard, a well-known and experienced farmer, was her supervisor and mentor during her time there. *Id.* ¶ 236.

      In August 2010, Cline and Reetz-Laiolo took a three-week trip to Italy to help Cline's parents decorate a villa they had purchased in Cortona. *Id.* ¶ 46. Bernard and another friend traveled with them for a brief time during this trip. *Id.* ¶ 47. While abroad, Bernard occasionally used Cline's computer with her knowledge and consent. *Id.* ¶ 48.

      Plaintiff Kristin Kiesel has a Ph.D. and currently holds a tenure-track faculty position at the University of California, Davis. Reetz-Laiolo 4AC ¶ 52. She was romantically involved with Reetz-Laiolo from 2007 through 2009. *Id.* ¶ 51. After the relationship ended, they remained close friends, and were occasionally intimate. *Id.*

---

[9] Throughout this Order, I refer to Reetz-Laiolo, Bernard, and Kiesel as "the Reetz-Laiolo plaintiffs" when Reetz-Laiolo, Bernard, and Kiesel are alleging claims concerning the same cause of action.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2. The Spyware and the Coverup

At some point prior to the 2010 trip to Italy, Cline installed the Refog software on her computer as part of "an elaborate and prolonged operation to secretly spy on [p]laintiffs." Reetz-Laiolo 4AC ¶¶ 53, 57. The Refog software, marketed as a tool for parents concerned about their children's safety, describes the "Keylogger" program as follows:

> Running unobtrusively and undetectable in the background of your PC, Refog Keylogger will store everything your kids, copy and paste on the computer, capture periodic snapshots of the computer's screen, log chats and social networking conversations and keep track of all Web resources and applications used on that PC.

*Id.* ¶ 54. Refog's website indicates that the legality of the Keylogger program "depends upon how it is being used," and it "can be illegal if you are using it for criminal purposes such as stealing personal data and financial information." *Id.* ¶ 56.

Cline used the Keylogger program to capture passwords for various online accounts of Reetz-Laiolo, Bernard, and Kiesel and then used those passwords to access the accounts without their knowledge or consent. *Id.*¶¶ 57–58. Refog ran continuously on Cline's computer and "intercepted some of [p]laintiffs' emails, chat messages, bank account data, usernames, passwords[,] and other sensitive information submitted and received through websites by taking screenshots of these electronic communications while they were in transit." *Id.* ¶ 61; *see also id.* ¶¶ 117–21 (describing and documenting Cline's access into Reetz-Laiolo's online Wells Fargo account).

Cline used the passwords to access the Reetz-Laiolo plaintiffs' online accounts after she and Reetz-Laiolo had separated, and years after she and Bernard ceased regular contact. *Id.* ¶ 72. She also "scoured through emails ... dating from many years before she had met them[,]" and "recorded ... some of [p]laintiffs' live communications—including chat messages, emails, and other data submitted and received through websites—contemporaneously with their transmission." *Id.*; *see also id.* ¶ 83 (screenshot of email communication "contemporaneous[]" with its transmission); *id.* ¶¶ 84–87, 98–105 (describing Cline's process of keyword searches). She read thousands of emails in the Reetz-Laiolo plaintiffs' email accounts, and altered certain settings in Bernard's Gmail account. *Id.* ¶¶ 80–82, 88–95.

11

When Cline hacked into Bernard's and Kiesel's email accounts, she frequently used an online program called VTunnel, an IP address scrambler that conceals the origin of the computer used to log into accounts, so that they would not discover or trace her hacking. *Id.* ¶¶ 74–77. VTunnel's website describes it as:

> a free proxy that acts as a middleman between your computer and the Internet. It is also a web proxy and an anonymous proxy. It is a web proxy that concentrates on facilitating your access to the World Wide Web. It acts as an anonymous proxy, which attempts to make all online activities untraceable. It hides your personal information so you can browse the web anonymously and access sites that are restricted to your network or area.

*Id.* ¶ 76. She rarely used the program when accessing Reetz-Laiolo's email accounts because they were living together and it was unnecessary for her to mask her location. *Id.* ¶ 79.

Cline's hacking of Bernard's and Kiesel's email accounts was not limited to their ties to Reetz-Laiolo; rather, she frequently reviewed communications that had nothing to do with him. *Id.* ¶¶ 108–10. She also looked at the "previews" of messages, without opening them. *Id.* ¶¶ 111–14. She accessed Kiesel's account through August 2012, and Bernard's account until January 2013, just days before she sold the computer to Reetz-Laiolo. *Id.* ¶¶ 80–81, 131.

Shortly before the sale, Cline researched an upgraded version of Refog's Keylogger program called the "Personal Monitor," which permits remote access to activity on a computer.[10] *Id.* ¶ 140. At the time of the sale, Cline "intentionally" misrepresented that she had wiped the computer, but "in fact left Refog running on the computer." *Id.* ¶¶ 143–44.

In 2017, through the aid of computer forensic specialists, Reetz-Laiolo discovered that "Cline had remotely surveilled his computer activity during 2013–2015, through Refog Personal Monitory or other means." *Id.* ¶ 188.

**3. The Discovery**

In 2015, Reetz-Laiolo discovered the Refog software and "huge cache of screen-capture files" after he asked a friend who was a computer specialist to determine why the computer was

---

[10] According to the fourth amended complaint, this research shows that Personal Monitor "may well have been the means Cline used to obtain access to [his] manuscripts after she lost access to his account." Reetz-Laiolo 4AC ¶ 142. It is also possible she regained access to his email or gained access to his celtx.com account, where he drafted film scripts. *Id.*

United States District Court
Northern District of California

running so slowly. Reetz-Laiolo 4AC ¶¶ 151–52. In the years since, he has "pieced together much of the shocking extent of Cline's intrusion into his private life[.]" *Id.* ¶ 154. The discovery "had a profound and negative impact on his well-being[,]" and lead him to experience paranoia, panic attacks, and a severe sleeping disorder. *Id.* ¶¶ 155–56.

In March 2016, Reetz-Laiolo told Bernard, who was "stunned and upset" at the news, and later "was shocked and distressed" after viewing the screenshots and realizing the extent to which Cline had invaded her privacy. *Id.* ¶¶ 157, 159. In late 2016, Reetz-Laiolo told Kiesel, who was "stunned and upset[,]" and later "shocked and distressed to discover the magnitude of Cline's intrusion." *Id.* ¶¶ 160–61.

**4. The Copying**

The Refog software captured Cline searching for messages between Reetz-Laiolo and his editors, downloading drafts of his work, opening them using Google Docs, and keeping them on her computer to use in her own work. *Id.* ¶¶ 91–95. After this activity, she would delete her browsing history. *Id.* ¶ 97. The software also captured Cline's pattern of "cop[ying] significant portions of other authors' published works and incorporat[ing] these directly into written work she held out as her own." *Id.* ¶ 203; *see id.* ¶¶ 209–228 (providing several examples, including work submitted as part of Cline's thesis for her MFA program at Columbia).

Cline secretly accessed "Reetz-Laiolo's computer and email account to steal numerous distinctive passages and phrases, scenes and scenic elements, sentence structures, and other creative expressions from his published and unpublished written work." *Id.* ¶ 162. Her "most critical theft of his writing—three core, chronologically ordered scenes" in *The Girls*—took place by breaking into his email accounts "and/or remotely accessing his computer with the Refog spyware." *Id.*; *see also id.* ¶ 193 (explaining that Cline could only have accessed versions of the script by breaking into his online accounts). A comparison of the works "reveals that Cline stole and copied material in at least two drafts of *All Sea*." *Id.* ¶ 203; *see id.* (illustrating examples of stolen scenes); *id.* ¶ 205 (illustrating examples of "phrase- and sentence-level instances of plagiarism"); Reetz-Laiolo Amended Complaint, Ex. 6 (6/17/13 *All Sea* draft), Ex. 7 (12/26/13 *All Sea* Draft) [17-cv-6867 Dkt. Nos. 33-6, 33-7].

In April 2016, counsel for Cline revealed to Reetz-Laiolo's counsel that Cline possessed a copy of Reetz-Laiolo's manuscript for *All Sea*, even though the manuscript "has never been published or made publicly available[, n]or has Reetz-Laiolo ever provided a copy of it to Cline." *Id*. ¶¶ 192–93.[11]

**5. Random House's Role**

According to Reetz-Laiolo, Random House falsely represented that the eight snippets Cline sent to him in March 2015 were "added [to the draft manuscript] after the book was acquired and played no role in [Random House's] decision to buy the Book."  Reetz-Laiolo 4AC ¶¶ 180–82; *see id*. ¶ 181 (identifying where the snippets appeared in the original manuscript submitted to Random House).  After Random House was put on notice that Cline possessed Reetz-Laiolo's manuscripts without his consent, it made no effort to return them; rather, it retained them and "conspired with Cline to conceal her and Random House's illegal conduct . . . ."  *Id*. ¶¶ 195, 206–08.

Cline and Random House became concerned over negative publicity and pressured Reetz-Laiolo to enter a non-disclosure agreement.  *Id*. ¶ 197.  "As leverage, they threatened to make public certain facts about his sex life, and propagate a fiction about him being abusive, while making clear the financial resources they would enlist to fight any public claims he might make."  *Id*.  He declined to enter a nondisclosure agreement.  *Id*. ¶ 198.

Random House proceeded to publish *The Girls* "with the crucial stolen scenes included."  *Id*. ¶¶ 199–201.

**6. The Fall Out**

On April 21, 2017, counsel for Cline and Random House responded to a draft complaint from Reetz-Laiolo's counsel.  Reetz-Laiolo 4AC ¶¶ 238–39.  They "expanded on [a] prior attempt to inject the sexual histories of the parties into the case," including by suggesting that both Bernard and Kiesel had slept with Reetz-Laiolo while he was in a relationship with Cline.  *Id*. ¶¶ 239–41.  The letter also asserted that "Ms. Kiesel was responsible for transmitting an STD to Ms.

---

[11] Reetz-Laiolo indicates that he had sent Cline "a much-earlier version of the script, Fadein.doc, but this version did not contain the infringed excerpts."  Reetz-Laiolo Am. Compl. ¶ 187.

14

Cline through Mr. Reetz-Laiolo." *Id.* ¶ 241.  The letter outlined possible legal claims Cline would have against Reetz-Laiolo, Bernard, and Kiesel and suggested they would run a "serious risk of financial loss, in addition to reputational injury" if they pursued their own claims. *Id.* ¶ 246.

In March 2017, Bernard received a letter from Cannard, who had been her mentor from the Green String Farm until the previous November.  4AC ¶¶ 45, 236.  He wrote that he had received threats from Cline's family and that those threats "would mean the end of his and Bernard's professional relationship and their friendship." *Id.* ¶ 237.  When Bernard bought and began to run her own farm in upstate New York, she was unable to rely on Cannard's guidance and advice. *Id.* Prior to this ordeal, Kiesel expected to go up for tenure at Davis in 2018. *Id.* ¶ 52.  The actions of Cline and Random House have "impaired [her] ability to focus in her job and fulfill certain benchmarks necessary to earn tenure." *Id.* ¶ 355.  She has had to delay her pursuit of tenure by one year. *Id.* ¶¶ 259, 365.

## II. PROCEDURAL HISTORY

On November 29, 2017, Cline, the Clegg Agency, and Random House filed a complaint against Reetz-Laiolo (17-cv-6866, Dkt. No. 1), and Reetz-Laiolo, Bernard, and Kiesel filed a complaint against Cline, Random House, and Scott Rudin Productions, Inc. (17-cv-6867, Dkt. No. 1.).  On December 13, 2017, the cases were related (17-cv-6866, Dkt. No. 15; 17-cv-6867, Dkt. No. 7), and on December 15, 2017, they were assigned to me (17-cv-6866, Dkt. No. 20; 17-cv-6867, Dkt. No. 12).  On December 22, 2017, Reetz-Laiolo filed a notice of voluntary dismissal, dismissing all claims against Scott Rudin Productions, Inc.  (17-cv-6867, Dkt. No. 24).

On April 11, 2018, I heard argument on motions to dismiss in both cases.[12]  (17-cv-6866, Dkt. No. 61; 17-cv-6867, Dkt. No. 63).  On June 28, 2018, I granted in part and denied in part the motions.  Order (17-cv-6866, Dkt. No. 63; 17-cv-6867, Dkt. No. 74).  On August 6, 2018, I granted both parties leave to file amended complaints (17-cv-6866, Dkt. No. 67; 17-cv-6867, Dkt. No. 80), and on September 20, 2018 I granted the Reetz-Laiolo plaintiffs leave to file a fourth

---

[12] Cline and Random House moved to dismiss the amended complaint filed by the Reetz-Laiolo plaintiffs on February 20, 2018.  Cline MTD (17-cv-6867, Dkt. No. 38).  The Reetz-Laiolo plaintiffs moved for leave to file a second amended complaint on April 23, 2018.  Reetz-Laiolo MTD (17-cv-6867 Dkt. No. 68).

United States District Court
Northern District of California

1   amended complaint.  (17-cv-6867 Dkt. No. 92).  The operative complaints are the first amended

2   complaint brought by Cline, The Clegg Agency, and Random House (17-cv-6866, Dkt. No. 73),

3   and the fourth amended complaint brought by Reetz-Laiolo, Bernard, and Kiesel (17-cv-6867,

4   Dkt. No. 93).

5          The first amended complaint seeks (1) declaratory judgment that *The Girls* does not

6   infringe any work by Reetz-Laiolo, along with attorney fees and costs, (2) declaratory judgment

7   that any claims by Reetz-Laiolo related to Cline's use of the Refog software and access to his

8   email are time-barred, (3) conversion, (4) domestic violence in violation of Cal. Civ. Code §

9   1708.6, (5) intentional or reckless infliction of emotional distress, (6) tortious interference with

10  prospective economic advantage, and (7) distribution of sexually explicit materials in violation of

11  Cal. Civ. Code § 1708.85.

12         The fourth amended complaint brings claims for  (1) violation of the Stored

13  Communications Act ("SCA"), 18 U.S.C. § 2701 *et seq.*, (2) violation of the Federal Wiretap Act,

14  18 U.S.C. § 2510 et seq., (3) violation of the California Invasion of Privacy Act ("CIPA"), Cal.

15  Penal Code § 630 et seq., (4) violation of the California Computer Crime Law, Cal. Penal Code §

16  502, (5) invasion of the right to privacy embodied in the California Constitution, Article I, Section

17  1, (6) intrusion upon seclusion, (7) conversion, (8) trespass to chattels, (9) civil theft,  (10)

18  intentional or reckless infliction of emotional distress, (11) tortious interference with prospective

19  economic advantage, (12) intermediate copyright infringement under 17 U.S.C. §§ 106(3),

20  501(13), (9) vicarious copyright infringement, and (14) unjust enrichment.

21         On September 21, 2018, the Reetz-Laiolo plaintiffs filed a motion to dismiss the amended

22  complaint and a motion to strike.  Reetz-Laiolo MTD (17-cv-6866, Dkt. No. 74); Reetz-Laiolo

23  Motion to Strike (17-cv-6866, Dkt. No. 75).  On October 4, 2018, Cline and Random House filed

24  a motion to dismiss the fourth amended complaint.  Cline MTD (17-cv-6867, Dkt. No. 98).  I

25  heard argument on the motions on November 14, 2018.

26                                **LEGAL STANDARD**

27         Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint

28  if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

United States District Court
Northern District of California

1   dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its

2   face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible

3   when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the

4   defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

5   (citation omitted).  There must be "more than a sheer possibility that a defendant has acted

6   unlawfully." *Id.*  While courts do not require "heightened fact pleading of specifics," a plaintiff

7   must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*,

8   550 U.S. at 555, 570.

9        In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

10   Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

11   plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

12   is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

13   fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

14   2008).

15        If the court dismisses the complaint, it "should grant leave to amend even if no request to

16   amend the pleading was made, unless it determines that the pleading could not possibly be cured

17   by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In

18   making this determination, the court should consider factors such as "the presence or absence of

19   undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous

20   amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See*

21   *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

22                                         **DISCUSSION**

23   **I. REETZ-LAIOLO'S MOTION**

24        Reetz-Laiolo argues that Cline fails to state a claim for domestic violence.  He also asserts

25   that Cline's claim for distribution of sexually explicit materials must fail for two reasons.  First,

26   California's anti-SLAPP law bars the claim, and the litigation privilege protects his prelitigation

27   activities from liability.  Second, Cline does not properly allege distribution or reasonable

28   expectation that the material would remain private.  As explained below, I grant Reetz-Laiolo's

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1   motion for dismiss the domestic violence claim because the only allegations falling within the

2   statutory period fail to state a claim for domestic violence.  I deny his motion to dismiss the

3   distribution of sexually explicit materials claim because she states a claim, the claim does not

4   constitute a SLAPP, and it is premature to determine whether the litigation privilege protects his

5   conduct from liability.

6   **A. Whether Cline Has Stated a Claim for Domestic Violence**

7          In the prior Order, I dismissed Cline's domestic abuse claim because she had alleged no

8   tortious acts that occurred during the three-year statutory period.  Even if she had, I found that she

9   would not be able to recover for earlier incidents because the facts alleged could not amount to

10  "continual domestic abuse."  Order at 28–29.  In her amended complaint, Cline raises several new

11  incidents and asserts that "the more recent acts of emotional abuse, harassment, and disturbing the

12  peace were not unrelated, discrete acts, but part of one continuing course of abusive conduct

13  designed to humiliate, intimidate, and control Cline."  Opp'n at 10.  Reetz-Laiolo argues that

14  Cline's amended domestic violence claim suffers from the same defects as the one I dismissed.

15  *See* Reetz-Laiolo MTD at 6.

16         In California, "[a] person is liable for the tort of domestic violence if the plaintiff proves

17  both of the following elements: (1) [t]he infliction of injury upon the plaintiff resulting from

18  abuse, as defined in subdivision (a) of Section 13700 of the Penal Code[,]" and "(2) [t]he abuse

19  was committed by the defendant, a person having a relationship with the plaintiff as defined in

20  subdivision (b) of Section 13700 of the Penal Code[,]" which includes cohabitants.  CAL. CIV.

21  CODE § 1708.6; *see* CAL. PENAL CODE § 13700(b).  Section 13700 of the penal code defines abuse

22  as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another

23  person in reasonable apprehension of imminent serious bodily injury to himself or herself, or

24  another."  CAL. PENAL CODE § 13700(a).

25         Cline's amended claim fails because none of the incidents she newly alleges could possibly

26  constitute a tortious act within the limitations period.  Even if one of the newer incidents did state

27  a claim for domestic abuse, the older incidents would not be actionable because she has not

28  pleaded a "continuing course of abusive conduct."

18

**1. No New Allegations Fall within Statutory Period**

In the first amended complaint, Cline details new allegations about her abusive relationship with Reetz-Laiolo, which she argues extended into the three-year statutory period. According to Cline, in February 2013, Reetz-Laiolo threatened her former romantic partner. FAC ¶ 81. In 2014, he recounted to her that he had obtained an unregistered firearm and that he had previously pushed his roommate's boyfriend down a flight of stairs during a fight. *Id.* ¶ 82. In November 2014, he sent her a document entitled "KILL WHITE BITCHES.DOC." *Id.* ¶ 84. In 2015, he attempted to publish an essay about her "hardcore" porn habits and revealed her identity as the subject of the essay. *Id.* ¶ 85.

Absent a delayed discovery of injury, "[i]n any civil action for recovery of damages suffered as a result of domestic violence, the time for commencement of the action shall be … [w]ithin three years from the date of the last act of domestic violence by the defendant against the plaintiff." CAL. CIV. PROC. CODE § 340.15(a). Under this section, "'domestic violence' has the same meaning as defined in Section 6211 of the Family Code." CAL. CIV. PROC. CODE § 340.15(b). And section 6211 of the Family Code defines "domestic violence" as abuse perpetrated against a specified list of persons, including a cohabitant or former cohabitant. CAL. FAM. CODE § 6211.

The more recent incidents Cline alleges fall within the three years prior to the parties' February 2017 tolling agreement, but none of them state a claim for domestic violence. Cline argues they fit into the Civil Code's definition of abuse because, in the context of Reetz-Laiolo's prior violent acts toward Cline, they "put her in reasonable apprehension of [bodily injury]." Opp'n at 8. But few of these incidents actually involved Cline, and as Reetz-Laiolo points out, she was living across the country in New York during the time that they allegedly occurred. Reetz-Laiolo MTD at 5–6. The allegation that comes closest to stating a claim—Reetz-Laiolo informing Cline that he had obtained an unregistered gun—could not have put her in reasonable apprehension of bodily injury because of the thousands of miles between the two.

Cline also reasserts a theory I rejected by arguing that the acts "fit[] the broader definition

of 'abuse' in the Family Code" because they "threatened, harassed, and disturbed [her] peace."[13]
Opp'n at 9.  I wrote:

> Under Cline's theory then, the statute of limitations for the "tort of domestic
> violence" under section 1708.6 is calculated from the date of the last act by a
> defendant that could have been enjoined under section 6320, regardless of whether
> an act of "domestic violence" occurred during the limitations period.  This could
> not have been the legislature's intent.

Order at 29.  None of Cline's new allegations constitutes an act of domestic violence, and none of
the incidents that constitute domestic violence fall within the three-year period prior to the parties'
tolling agreement.  *See* Order at 27 (noting that Reetz-Laiolo "concede[d] that the allegations
concerning their period of cohabitation fall within the statutory definition of 'domestic
violence'").

### 2. The Allegations Do Not Establish a Continuing Course of Abusive Conduct

Cline reasserts another theory I rejected in my prior Order.  She argues that the earlier acts
of domestic violence are actionable because together with the more recent acts, they create "one
continuing course of abusive conduct designed to humiliate, intimidate, and control [her]."  Opp'n
at 10.  She again relies on *Pugliese*, which I addressed in detail in my prior Order.  *See* Order at
27–29; *Pugliese v. Superior Court*, 146 Cal. App. 4th 1444, 1453–54 (2007).  The case stands for
the proposition that "a plaintiff is entitled to recover damages for acts of domestic violence
occurring prior to the limitations period, given continual domestic abuse and a tortious act within
the statutory period."  Order at 29; *see Pugliese*, 146 Cal. App. 4th at 1454.

Even if the more recent acts that Cline alleges did constitute domestic violence, Cline
would not be able to recover for the incidents that occurred prior to the statutory period.  Far from
alleging "continual" domestic abuse, Cline strings together isolated events that occurred months
and years apart and during a time when she lived thousands of miles away from Reetz-Laiolo.

---

[13] The cases Cline cites involve interpretations of Family Code section 6320 for the purpose of
reviewing restraining orders issued pursuant to the Domestic Violence Prevention Act.  *See Vafai
v. Weissman*, No. D064014, 2014 WL 2736087, at *4 (Cal. Ct. App. June 17, 2014); *Encarnacion
v. Seaton*, No. D054002, 2010 WL 1441497, at *2 (Cal. Ct. App. Mar. 16, 2010); *Polakoff v.
Polakoff*, No. B246029, 2013 WL 5477463, at *4 (Cal. Ct. App. Oct. 2, 2013).

United States District Court
Northern District of California

1    Accordingly, Cline's domestic violence claim is DISMISSED WITH PREJUDICE.

2    **B. Cline's Claim for Distribution of Sexually Explicit Materials**

3           Cline claims that Reetz-Laiolo violated California Civil Code section 1708.85 by

4    distributing nude photograph(s) of her to his lawyers and his co-plaintiffs.  Cline FAC ¶¶ 166–70.

5    Reetz-Laiolo argues that I should strike and/or dismiss Cline's claim on three grounds.  First, he

6    contends that California's anti-SLAPP law applies and that the claim constitutes a SLAPP.  Reetz-

7    Laiolo MTD at 8–10.  Second, he contends that California's litigation privilege applies and

8    immunizes his conduct.  *Id.* at 10–12.  Third, he asserts that Cline fails to state a claim.  *Id.* at 13–

9    14.

10          Consistent with my prior Order, I find that there are compelling reasons to apply New

11   York law in lieu of California law.  Accordingly, I will again deny Reetz-Laiolo's motion to

12   strike.  I also conclude that it is premature to determine whether Reetz-Laiolo's actions fall within

13   the scope of New York's litigation privilege.  Finally, Cline properly pleads the elements of her

14   claim.

15          **1. Whether Claim Constitutes a Strategic Lawsuit Against Public Policy (SLAPP)**

16          Engaging in California's three-step governmental interest analysis, I found "compelling

17   reasons to displace California's anti-SLAPP regime" in favor of New York's.  Order at 22–23.

18   "Even though Cline's suit was filed in California against a California speaker . . . the acts

19   underlying her claims and the resulting harm largely occurred in New York."  *Id.*  Because New

20   York's law does not apply to prelitigation conduct, I denied Reetz-Laiolo's motion to strike.

21          Reetz-Laiolo renews his arguments on the grounds that Cline's "newly alleged facts differ

22   critically from the ones she alleged before."  Reetz-Laiolo MTD at 9.  He cites two paragraphs

23   from the amended complaint.  *Id.*  The first states that Reetz-Laiolo resides in California.  FAC ¶

24   15.  The second states that Reetz-Laiolo discovered the nude photograph of her on his computer.

25   FAC ¶ 106.  Reetz-Laiolo asserts that with these paragraphs, "[Cline] has alleged that a California

26   resident violated California statutory law by providing to counsel certain images from his personal

27   computer in California."  Reetz-Laiolo MTD at 9.

28          The only "new" fact here is Cline's acknowledgment that Reetz-Laiolo likely sent the nude

United States District Court
Northern District of California

21

photograph from California, where he resides.  This fact was implicit in the prior complaint because Cline has at all times acknowledged that Reetz-Laiolo is a resident of California. Although this event occurred in California, the remaining events, along with all of the alleged harms, occurred in New York.  *See* Order at 23–24.  Reetz-Laiolo's arguments are insufficient to alter my conclusion that New York's anti-SLAPP law applies.  Because this law does not apply to prelitigation conduct, *Gilman v. Spitzer*, 902 F. Supp. 2d 389, 398 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d Cir. 2013), Reetz-Laiolo's motion to strike is DENIED.

### 2. Whether the Litigation Privilege Provides Absolute Immunity

Reetz-Laiolo reasserts his arguments that California's litigation privilege applies and bars Cline's distribution of sexually explicit materials claim.  Reetz-Laiolo MTD at 10.  He argues that in order to comply with the Federal Rules of Civil Procedure, which "impose a duty on counsel to coordinate their clients' discovery efforts and to assist with the preservation of potential discoverable evidence," his lawyers had to take possession of the screenshots, including the nude photograph(s).  *Id.* at 11–12.

Again here, Reetz-Laiolo fails to provide any reasons why I should apply California's litigation privilege instead of New York's, as I did in my prior Order.  I again conclude that New York law applies.

New York's litigation privilege extends to the prelitigation stage, but it only applies "to statements pertinent to a good faith anticipated litigation."  *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 720 (2015).  The "privilege does not protect attorneys who are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims, unsupported in law and fact, in violation of counsel's ethical obligations." *Id.*

Reetz-Laiolo fails to give any reasons why I should deviate from my prior conclusion that "the applicability of New York's qualified privilege protecting prelitigation communications presents a question of fact better left for resolution at a later stage of the proceedings."  Order at 26.  I made that determination because New York law distinguishes between "statements pertinent to a good faith anticipated litigation" and actions by attorneys "who are seeking to bully, harass, or

22

intimidate their client's adversaries." *See Front*, 24 N.Y.3d at 720.  Given the allegations in this case, it is not possible or appropriate to define the line between the two at this early stage.

### 3. Whether Cline States a Claim

Section 1708.85 creates a private cause of action against someone who "intentionally distributes by any means" sexually explicit materials if the person "knew that the other person had a reasonable expectation that the material would remain private."  CAL. CIV. CODE § 1708.85. Cline asserts that Reetz-Laiolo violated this section when he distributed nude photograph(s) of her to his counsel and co-plaintiffs.  Reetz-Laiolo argues that I should dismiss Cline's claim because she does not properly allege either distribution of the nude images or reasonable expectation of privacy in them.  Reetz-Laiolo MTD at 12–14.  Because she properly alleges both elements, I will deny his motion.

#### a. Distributes

Section 1708.85 creates a cause of action against an individual who "intentionally distributes [specified materials] by any means[.]"  CAL. CIV. CODE § 1708.85(a).  Reetz-Laiolo first asserts that I should not read the statute as encompassing his conduct because doing so would infringe on the attorney-client privilege.  Reetz-Laiolo MTD at 12–13.  The statute "must be read in the context of the greater body of statutory law" including the litigation privilege.  *Id.* at 12.  He argues that both states' litigation privileges would immunize his conduct.  Reply at 11.

As I noted above and in my prior Order, it is premature to decide whether New York's litigation privilege applies to Reetz-Laiolo's provision of these photograph(s) to his attorneys and co-plaintiffs.  Its application will depend on the resolution of a factual question:  whether Reetz-Laiolo provided his lawyers and co-plaintiffs with the screenshots in good faith preparation for litigation—as he puts it, "to comply with discovery obligations" and "to *prevent* further disclosure"—or whether he and his attorneys were mounting an effort to "bully, harass, or intimidate" Cline.  *See* Order at 25; Reetz-Laiolo MTD at 13; *Front*, 24 N.Y.3d at 720.  If the privilege applies, it will protect Reetz-Laiolo's conduct as the legislature intended, without the need for me to construe the statute more narrowly.  At this stage, it is not appropriate to dismiss Cline's claim on this ground.

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1    Second, Reetz-Laiolo asserts that statute's legislative history shows its purpose is to

2  "create liability for 'posting' or otherwise distributing [the materials] publicly."  Reetz-Laiolo

3  MTD at 13.  The plain meaning of the statute, which references distribution "by any means," does

4  not support this reading.  *See* CAL. CIV. CODE § 1708.85(a).  As Cline points out, the language of

5  other public distribution statutes shows that the legislature knows how to use limiting language

6  and chose not to do so here.  Opp'n at 22; *see* CAL. GOV'T CODE § 6254.21 (creating civil and

7  criminal liability for "publicly post[ing] or publicly display[ing] on the Internet" certain personal

8  information).

9                    **b. Reasonable Expectation of Privacy**

10    Section 1708.85 only imposes liability if the person bringing suit "had a reasonable

11  expectation that the material would remain private."  CAL. CIV. CODE § 1708.85(a).  Reetz-Laiolo

12  relies on Fourth Amendment factors to argue that Cline "relinquished any expectation of privacy"

13  when she sold him a computer that contained the screenshots at issue.  Reetz-Laiolo MTD at 13–

14  14.  Neither party cites case law arising under section 1708.85.

15    The parties raise facts that weigh for and against the reasonableness of Cline's expectation

16  of privacy.  Cline suggests that her expectation was reasonable because she asked a tech

17  professional to wipe the computer and did not know the screenshots remained when she sold it to

18  Reetz-Laiolo.  *See* Cline FAC ¶¶ 88–90.  These allegations are sufficient for her claim to survive.

19  Especially without factually similar case law, it would be premature to dismiss on these grounds.

20  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 844

21  (N.D. Cal. 2016) (declining to dismiss "given the highly fact-intensive . . . test" and "absent

22  factually similar case law to the contrary"), *aff'd,* 890 F.3d 828 (9th Cir. 2018), *amended,* 897

23  F.3d 1224 (9th Cir. 2018), and *aff'd,* 735 F. App'x 241 (9th Cir. 2018).

24  **II. CLINE AND RANDOM HOUSE'S MOTION**

25    Cline and Random House moves to dismiss Reetz-Laiolo's claim for intermediate

26  infringement along with his claims for conversion, civil theft, and unjust enrichment related to the

27  *All Sea* manuscripts.  They also move to dismiss all three plaintiffs' claims for conversion related

28  to the screenshots, Bernard and Kiesel's claims for interference with prospective economic

24

1   advantage, and Bernard and Kiesel's claims for intentional infliction of emotional distress

2   ("IIED") related to prelitigation communications.  Finally, Cline moves to dismiss all three

3   plaintiffs' claims under subsection (B) of the SCA.  I grant the motions with respect to all the

4   claims and allow plaintiffs to amend only the claims arising under subsection (B) of the SCA.

5   **A. Intermediate Copying**

6       Cline and Random House move to dismiss Reetz-Laiolo's claims for intermediate

7   copyright infringement, arguing that he has not plausibly alleged that Cline had access to relevant

8   drafts of *All Sea* and that he improperly alleges infringement only as to her final work, *The Girls*.

9   Cline MTD at 8–14.  Reetz-Laiolo's claim fails for both reasons.

10      **1. Whether Cline Had Access to *All Sea***

11      My prior Order addressed the intermediate copying arguments Reetz-Laiolo had raised at

12  the hearing on the parties' motions to dismiss.  Order at 33–35.  I found that the first amended

13  complaint failed to clearly allege the theory because it did not focus on Cline's "possession of the

14  literal copy of the *All Sea* manuscript."  Order at 34.  I concluded, "To the extent that Reetz-Laiolo

15  can plausibly allege a claim of copyright infringement based on Cline's allegedly improper

16  download of his manuscript, he may do so in a further amended complaint."[14]  Order at 35.

17      The fourth amended complaint fails to plead facts to plausibly show that Cline had access

18  to or possessed the *All Sea* draft that she allegedly copied.  Reetz-Laiolo asserts, without factual

19  support, that Cline illegally downloaded drafts dated June 17, 2013 and December 26, 2013.

20  Reetz-Laiolo 4AC ¶ 372.  Yet the fourth amended complaint also pleads that Cline had lost access

21  to Reetz-Laiolo's email accounts by October 21, 2012 and sold him the computer with the Refog

22  software in January 2013.  *Id.* ¶ 135; *see* Cline FAC ¶ 91.  In spite of these facts, Reetz-Laiolo

23  asserts that it is "reasonable to infer that Cline continued to access his accounts" because she

24

25  ─────────────────────────

    [14] In contrast with that language, Reetz-Laiolo argued at the November 14, 2018 hearing that I

26  resolved this question on page 55 of my prior Order.  Not so.  There, analyzing Reetz-Laiolo's
    computer fraud and abuse claims, I concluded that he sufficiently alleged that Cline had

27  unauthorized access to the computer after selling it to him.  Order at 55.  I found access to the
    computer to be a close question, and here it would require yet another inferential leap to conclude

28  that Cline in fact used that alleged access in the way Reetz-Laiolo suggests, namely to download a
    literal copy of the later drafts of *All Sea*.

United States District Court
Northern District of California

1    researched a more sophisticated spyware tool before selling the computer, he used an online

2    software tool to draft screenplays, and she had generally invaded into his privacy in the past.

3    Opp'n at 9–10.  But these bald assertions do not save Reetz-Laiolo because he does not plead, for

4    example, that Cline actually downloaded or used the spyware tool or that his online drafting

5    account became compromised at any point.

6         Reetz-Laiolo does allege that counsel for Cline and Random House informed his counsel

7    that Cline possessed a copy of *All Sea*.  Reetz-Laiolo 4AC ¶ 192.  Cline and Random House

8    counter that counsel was referring to the earlier draft of *All Sea* entitled Fadein.doc, which Reetz-

9    Laiolo acknowledges was "a much-earlier version" of the same work.  Cline MTD at 17.  Without

10   any other facts, Reetz-Laiolo pleads no more than a "sheer possibility" that Cline downloaded a

11   literal copy of the *All Sea* manuscript.  *See Iqbal*, 556 U.S. at 678.  These claims fail to rise above

12   the speculative level.[15]

13              **2. Whether a Claim Could be Based on the Published Copy of *The Girls***

14        As I noted in my prior Order, the Ninth Circuit has held that the language of section 106 of

15   the Copyright Code "unambiguously encompasses and proscribes" intermediate copying.  *Sega*

16   *Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992), as amended (Jan. 6,

17   1993); (quoting *Walker v. Univ. Books, Inc.*, 602 F.2d 859, 863 (9th Cir. 1979).  This is so because

18   under Section 106, the copyright owner has "exclusive rights" to reproduce the work and prepare

19   derivative works based on it.  *See id.*  In *Sega*, the Ninth Circuit rejected the defendant's argument

20   that intermediate copying is lawful.  977 F.2d at 1518.  The defendant had cited cases that

21   primarily "involved the alleged copying of books, scripts, or literary characters."  *Id.* (listing

22   cases).  The court concluded that those claims of intermediate copying had failed because "the

23   eventual lawsuit alleged infringement *only as to the final work of the defendants*."  *Id.* (emphasis

24   added).

25        Just one year ago, a court in the central district was "unable to locate a single case in which

26

27

28

---

[15] Reetz-Laiolo also asserts that these factual arguments are "unsuited to resolution now."  Opp'n at 9.  But I need not resolve disputed facts to come to this conclusion; I need only conclude that Reetz-Laiolo has failed to allege sufficient facts to state a claim.

26

United States District Court
Northern District of California

the *Sega* "intermediate copying" theory [had] been extended to impose liability based upon the copying of non-software-related work (*e.g.,* a script, book, cartoon, etc.) in the course of creating a new work that is ultimately dissimilar to the plaintiff's work." *Esplanade Prods., Inc. v. Walt Disney Co.*, No. CV1702185MWFJCX, 2017 WL 5635027, at *18 (C.D. Cal. Nov. 8, 2017) (appeal pending). Indeed, intermediate copying is generally limited to cases involving software. *See* Order at 34–35 (citing cases). This distinction makes sense because when copied code is used as a building block to create something new, "bits of code can be found within the programs." *See Madrid v. Chronicle Books*, 209 F. Supp. 2d 1227, 1236 (D. Wyo. 2002). "This is copying." *Id.* With written language, however, "[t]he intermediate copying concept cannot result in copyright infringement without the basic component of substantial similarity." *Id.* "Copying deleted or so disguised as to be unrecognizable is not copying." *See v. Durang*, 711 F.2d 141, 142 (9th Cir. 1983).

Reetz-Laiolo asserts infringement only of the final version of *The Girls*. Because I already determined that there are "few objective similarities, and no substantial ones" between *All Sea* and *The Girls*, he cannot state a claim. *See* Order at 42.

### 3. Vicarious Infringement

Cline and Random House argue that even if Reetz-Laiolo's claims against Cline could proceed, he fails to state a claim against Random House for vicarious infringement because the two did not enter into a publishing agreement until well after Cline had allegedly copied *All Sea*. Cline MTD at 10. To be vicariously liable, a party must have "the right and ability to supervise the infringing conduct" along with a financial interest. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 802 (9th Cir. 2007). Cline and Random House entered into a publishing agreement in October 2014. 4AC ¶ 167. Reetz-Laiolo counters that "Cline necessarily continued to copy from *All Sea* to develop *The Girls* into its published form *after* the sale of the manuscript to Random House." Opp'n at 8.

Of course, the vicarious infringement claim fails because the underlying infringement claim fails. In addition, Reetz-Laiolo's claims that Cline's copying continued after the publishing agreement are just as speculative as the allegations regarding her supposed possession of

United States District Court
Northern District of California

1    subsequent manuscripts.  Accordingly, Reetz-Laiolo's infringement and vicarious infringement

2    allegations are DISMISSED WITH PREJUDICE.

3    **B. Conversion, Civil Theft, and Unjust Enrichment Related to *All Sea***

4         Cline argues that Reetz-Laiolo's conversion, civil theft, and unjust enrichment claims fail

5    because they are preempted by the Copyright Act and because he fails to state a claim.  I agree on

6    both counts.

7         **1. Preemption**

8         State laws are subject to federal preemption if they create "legal or equitable rights that are

9    equivalent to any of the exclusive rights within the scope of copyright as specified in Section

10   106."  17 U.S.C. § 301(a).  "To determine whether a claim falls within the Copyright Act's

11   express preemption provision, [courts] consider whether (1) the work at issue falls within the

12   scope of copyright subject matter, and (2) the law at issue grants rights equivalent to any of the

13   exclusive rights within the scope of copyright."  *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 760

14   (9th Cir. 2015).  "To survive preemption, a state cause of action must assert rights that are

15   qualitatively different from the rights protected by copyright."  *Id.* (internal quotation marks and

16   citation omitted).

17        **a. Conversion and Civil Theft**

18        Reetz-Laiolo argues that his conversion and civil theft claims are not preempted because

19   they contain an additional element—"the right to exclude others" from access to his private

20   manuscripts.[16]  Opp'n at 10–11.  In addition, he asserts that he experienced emotional distress as a

21   result of Cline and Random House's conduct.  Reetz-Laiolo 4AC ¶ 327.

22        In *Goldberg v. Cameron*, a court in this district found that the Copyright Act preempted a

23   conversion claim of a copyrighted movie script and soundtrack.  *Goldberg v. Cameron*, 482 F.

24   Supp. 2d 1136, 1151 (N.D. Cal. 2007).  The plaintiff sought recovery on the grounds that the

---

[16] I noted in the prior Order, "While literal theft is an extra element that involves an action different than those prescribed by the Copyright Act, it is not clear to me whether as a matter of law these conclusions hold true if his copyright claim is limited to Cline's intermediate copying." Order at 42.  Contrary to Reetz-Laiolo's suggestion at the November 14, 2018 hearing, I did not answer that question because his claims lacked allegations about damages.  *Id.* at 42–43.

United States District Court
Northern District of California

defendants' movie and soundtrack had infringed on and misappropriated his copyrighted material. *Id.* at 1142–43.  Under the scope prong, the copyrighted works were clearly within the subject matter of the Copyright Act.  *Id.*  Under the equivalence prong, the court concluded that the state claims had no extra element because they were "based entirely upon the alleged misappropriation of [the plaintiff's] copyrighted works."  *Id.* at 1151.  The court rejected the plaintiff's argument that preemption was inappropriate because the state law claims provided different remedies.  *Id.*; *see also Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1130 (N.D. Cal. 2001) ("[W]here a plaintiff is only seeking damages from a defendant's reproduction of a work—and not the actual return of a physical piece of property—the claim is preempted."); *Ward v. Mitchell*, No. 12-CV-3932 NC, 2013 WL 1758840, at \*5 (N.D. Cal. Apr. 24, 2013) (Cousins, J.) (distinguishing between conversion of tangible property, which is not preempted, and conversion claims seeking damages for distribution of copyrighted material, which are preempted).

Reetz-Laiolo's conversion and civil theft claims are not "qualitatively different from the rights protected by copyright."  *Ryan*, 786 F.3d at 760.  There is no additional element under the conversion and civil theft claims because Reetz-Laiolo does not seek return of a physical piece of property; rather, he seeks "the disgorgement of all profits Defendants derived from Cline's use of the converted manuscripts, including, but not limited to, profits related to the publication of [*The Girls*]."  4AC ¶ 328.  He seeks to vindicate the same set of rights and requests the same relief under his intermediate copying claim.  *See* Reetz-Laiolo 4AC ¶ 375.  These claims are preempted.

### c. Unjust Enrichment

Reetz-Laiolo brings his claim for unjust enrichment against both Cline and Random House as an alternative to his claim of intermediate infringement, and he seeks disgorgement of profits from *The Girls*.  Opp'n at 11; 4AC ¶ 388.  He argues against preemption on the grounds that if I dismiss his claim for intermediate infringement, then "he would be seeking relief that he could not recover under the Copyright Act."  Opp'n at 11.

I agree with Cline and Random House that Reetz-Laiolo essentially conceded that he asserts equivalent rights when he acknowledged that he brings his unjust enrichment claim in the alternative to his intermediate infringement claim.  As to the question of the available remedies,

United States District Court
Northern District of California

29

United States District Court
Northern District of California

Reetz-Laiolo again seeks disgorgement of the profits from *The Girls*.  Even if the remedies were

distinct, a court in this district found preemption appropriate in the face of such a difference

between a conversion claim and a copyright claim, and I see no reason why the result should be

different in the unjust enrichment context.  *See Goldberg*, 482 F. Supp. 2d at 1151.

### 2. Whether Reetz-Laiolo States a Claim

Cline asserts that even if the Copyright Act does not preempt Reetz-Laiolo's conversion,

civil theft, and unjust enrichment claims, he has failed to plausibly allege possession of the stolen

draft of *All Sea*.  Cline MTD at 17.  As noted above, I find that Reetz-Laiolo fails to plausibly

allege that Cline accessed a draft of *All Sea* other than Fadein.doc, which he has already

acknowledged is not relevant to his claims.  *See infra*, Section II.A.1. – Whether Cline Had Access

to *All Sea*.  Without such allegations as to Cline, Reetz-Laiolo cannot plausibly plead that Random

House had access, either.

Even if the Copyright Act did not preempt the conversion, civil theft, and unjust

enrichment claims, I would find that Reetz-Laiolo has failed to state a claim as to all three.  These

claims are DISMISSED WITH PREJUDICE.

### C. Conversion Related to the Refog Records

Reetz-Laiolo, Bernard, and Kiesel bring conversion claims against Cline and Random

House based on the Refog records showing their personal email activity.  Reetz-Laiolo 4AC 391–

93.  Cline moves to dismiss these claims on the grounds that they do not have an ownership

interest in the screenshots, they do not adequately plead damages, and they fail to plausibly plead

that Random House possesses the records.  Cline MTD at 17–20.

In the prior Order, I denied Reetz-Laiolo's motion to dismiss Cline's conversion claim

based on his retention of the Refog screenshots, which were taken on her personal computer and

which log her own activity.  Order at 21.  I noted, "While [Cline] may not claim a right to the

records logging the activity of others on her laptop, from which she gathered the information

necessary to subsequently log into their accounts, any ensuing activity by her still seems to fall

within her claim." *Id.*  In that motion to dismiss, Reetz-Laiolo "urge[d] that it would be

impractical to undergo a massive document review to determine who was using the computer

1    when each screenshot was captured, and then isolate those screenshots over which Cline may have

2    a legitimate interest, which will further exacerbate the intrusions into the privacy of others."

3    Order at 21.

4         To establish a claim for conversion, "a plaintiff must show ownership or right to

5    possession of property, wrongful disposition of the property right[,] and damages." *Kremen v.*

6    *Cohen*, 337 F.3d 1024, 1029 (9th Cir. 2003) (internal quotation marks and citations omitted). The

7    plaintiffs must allege that they had the right to possess the screenshots at the time that the alleged

8    conversion took place.

9         Cline and Random House argue that the plaintiffs have not properly alleged that they had a

10    property interest in the screenshots, which reflect "activity on Cline's personal computer during

11    periods of time that she owned that computer, [and] which were captured by a software Cline

12    installed." Cline MTD at 18. She is "the only party with an ownership interest." *Id.* at 18–19.

13    Reetz-Laiolo, Bernard, and Kiesel argue that they have a property interest in "their computer and

14    personal email activity." Opp'n at 13.

15         In *Ward*, a court in this district dismissed a conversion claim because the plaintiff failed to

16    allege ownership in more than a conclusory fashion. *Ward v. Mitchell*, No. 12-CV-3932 NC, 2013

17    WL 1758840, at *5 (N.D. Cal. Apr. 24, 2013). A musician allegedly agreed to provide musical

18    compositions for three albums that the plaintiff corporation would release, promote, and sell. *Id.*

19    at *1. After the musician released the albums through different corporations, the plaintiff sued for

20    conversion of the original mater recordings. *Id.* The court concluded that while the plaintiff

21    alleged ownership over "all musical compositions, sound recordings, and copyrights" of the three

22    albums, it did not allege ownership of the master recordings themselves. *Id.* at *5 (internal

23    quotation marks omitted).

24         Similarly here, plaintiffs allege ownership over "their computer and personal email

25    activity," but not the physical screenshots. *See* Opp'n at 13. As Cline points out, "the screenshots

26    are not themselves emails, or any other kind of document that Plaintiffs may own." Cline MTD at

27    19. The conversion cause of action does not fit the facts of this case.

28         Even if the plaintiffs properly pleaded their conversion claims as to Cline, they cannot state

a claim as to Random House because their allegations are merely conclusory.  The fourth amended complaint asserts, without supporting facts, that Cline "shared [the Refog] records with and delivered them to Random House."  Reetz-Laiolo ¶ 392; *see id.* ¶ 265.  The plaintiffs argue that from the "common-interest approach" Cline and Random House have taken to the case, including sharing certain settlement communications, it follows that Cline shared the Refog records with Random House.  Opp'n at 14.  But past sharing of relevant settlement communications does not give rise to a plausible inference that Random House possesses or ever has possessed the Refog records.

Because the plaintiffs could not plead an ownership interest by alleging additional facts, I will not grant leave to amend.  The conversion claims are DISMISSED WITH PREJUDICE.

**D. IIED and Tortious Interference Claims**

All three plaintiffs bring IIED claims.  Kiesel and Bernard separately bring tortious interference with prospective economic advantage claims.  Reetz-Laiolo 4AC Counts X, XI, XII.  Cline argues that New York's litigation privilege bars these claims in part and that the plaintiffs have failed to state a claim.  The plaintiffs' IIED claims are based on both Cline's hacking and on the April 2017 letter from counsel for Cline and Random House, but Cline and Random House challenge only the latter basis for the claim.

It is premature to determine whether the litigation privilege protects Cline's and Random House's conduct.  I agree with Cline that the plaintiffs' IIED claims cannot be based on the April 2017 letter from counsel, and I will grant the motion to dismiss the tortious interference claims.

**1. Whether the Litigation Privilege Provides Absolute Immunity**

New York's litigation privilege[17] shields "statements pertinent to a good faith anticipated litigation" but not actions by attorneys "who are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation."  *See Front*, 24 N.Y.3d at 720.  Cline and Random House argue that plaintiffs cannot base their claims on the April 2017 letter from counsel

---

[17] New York rather than California law applies to these claims for the same reasons articulated above.  *See infra*, sections I.B.1 – Whether Claim Constitutes a Strategic Lawsuit Against Public Policy (SLAPP) and I.B.2 – Whether the Litigation Privilege Provides Absolute Immunity.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  or the letters she wrote individually to Kiesel and Bernard making good faith offers of settlement.

2  Bernard and Kiesel counter that the conduct was "an effort to intimidate them and prevent them

3  from pursuing their legitimate claims."  Opp'n at 14–15.

4      According to the fourth amended complaint, the April 2017 letter threatened the Reetz-

5  Laiolo plaintiffs with "baseless claims and reputational harm" in response to their pursuit of

6  legitimate legal claims against her.  Reetz-Laiolo 4AC ¶¶ 349, 354, 359.  It made allegations of a

7  sexual nature in an attempt to humiliate the plaintiffs.[18]  Reetz-Laiolo MTD at 16–18.  It

8  threatened tort claims without a good faith basis, as evidenced by the fact that Cline has not

9  pursued them despite claiming they were worth "potentially millions of dollars in compensatory

10  damages."[19]  Opp'n at 15.  Her threats of significant financial liability," "a host of significant

11  claims," and "reputational injury" show that she was trying to intimidate the Reetz-Laiolo

12  plaintiffs.  Opp'n at 16–17.

13      Cline asserts that she had a good faith basis for including the facts she alleged and for

14  raising the legal claims.  She asserts that she included the allegations of Reetz-Laiolo's infidelity

15  to explain why she had downloaded the Refog software and show that it was not an effort to spy

16  on Bernard and Kiesel.  Cline MTD at 21.  All of her allegations, including those of a sexual

17  nature, bore legitimate relation to legal claims, as evidenced by the fact that the complaint she

18  filed with this court contained all of them.  *Id.*  As the Reetz-Laiolo plaintiffs point out, she did not

19  raise the tort claims against Bernard or Kiesel.

20      I agree with the Reetz-Laiolo plaintiffs that it is too soon to determine whether the threats

21  were "statements pertinent to good faith anticipated litigation" or attempts to "bully, harass, or

22  intimidate . . . by threatening baseless litigation."  *See Front*, 24 N.Y.3d at 720.  As I determined

23  in my prior Order and above, this issue is "better left for resolution at a later stage of the

24  _____

25  [18] Specifically, the letter claimed that Reetz-Laiolo was unfaithful to Cline with both Bernard and

26  Kiesel and asserted that Reetz-Laiolo infected her with a sexually transmitted disease that he had
    contracted from Kiesel.  Reetz-Laiolo 4AC ¶¶ 240–41, 354, 359.

27  [19] Cline uses similar logic in opposition to the motion to dismiss in 17-cv-6866, arguing that
    privilege cannot protect Reetz-Laiolo from liability for the nude photo(s) because he did not

28  include it in his eventual complaint before this court.  The same logic would suggest that the tort
    claims she failed to pursue were improperly threatened.

1   proceedings." Order at 26. That said, I agree with Cline and Random House that the April 2017

2   letter cannot provide the basis for the Reetz-Laiolo plaintiffs' IIED claims.

3   **2. Whether Reetz-Laiolo, Kiesel, and Bernard State a Claim for IIED**

4   Reetz-Laiolo, Bernard, and Kiesel bring claims of intentional or reckless infliction of

5   emotional distress against Cline and Random House for threatening conduct and public

6   humiliation related to the April 2017 letter.[20] Reetz-Laiolo 4AC ¶¶ 354, 359.

7   To state a claim for intentional infliction of emotional distress, a plaintiff must plausibly

8   allege: "(1) extreme and outrageous conduct by the defendant with the intent to cause, or reckless

9   disregard for the probability of causing, emotional distress; (2) suffering of severe or extreme

10   emotional distress by plaintiff; and (3) plaintiff's emotional distress is actually and proximately

11   the result of defendant's outrageous conduct." *Conley v. Roman Catholic Archbishop of San*

12   *Francisco*, 85 Cal. App. 4th 1126, 1133 (2000). To satisfy the first requirement, the conduct at

13   issue "must be so extreme as to exceed all bounds of that usually tolerated in a civilized

14   community." *Id.* (citation omitted). "Generally, conduct will be found to be actionable where the

15   recitation of the facts to an average member of the community would arouse his resentment

16   against the actor, and lead him to exclaim, 'Outrageous!' *Id.* (citations omitted). "The showing of

17   outrageousness required of a plaintiff alleging a claim is high." *Taggart v. Moody's Inv'rs Serv.,*

18   *Inc.*, No. 06 CIV. 3388, 2007 WL 2076980, at *6 (S.D.N.Y. July 17, 2007).

19   Cline argues that the plaintiffs' allegations cannot state a claim for outrageous conduct

20   because the letter included "nothing more than garden variety explanations of the underlying facts

21   directly relevant to the claims." Cline MTD at 25. The plaintiffs counter that the defendants

22   engaged in a "campaign of intimidation" by asserting baseless legal claims and injecting irrelevant

23   allegations of plaintiffs' sexual histories.[21] Opp'n at 16–18.

---

[20] All three plaintiffs also bring IIED claims against Cline for invading their privacy by hacking into their online accounts. My prior Order dismissed Cline's motion to dismiss Reetz-Laiolo's IIED claim based on the hacking, and she does not move on Kiesel's or Bernard's claims. *See* Order at 59–60.

[21] Defendants specifically assert that it was outrageous for Cline to allege that Kiesel transmitted an STD to her through Reetz-Laiolo because "HPV, the STD at issue, occurs in the majority of sexualy active adults and is often asymptomatic." Opp'n at 16–17. Thus, Cline's assertion was

United States District Court
Northern District of California

1    To the extent that the intentional infliction of emotional distress claims are not based on

2    litigation-related activities, the facts alleged are still insufficient to state a claim.  Lawyer-to-

3    lawyer assertions of potential liability cannot form the basis for an IIED claim absent extreme

4    circumstances—for example, including immaterial sexually explicit communications, a nude

5    photograph, and references to erotica sites in a draft complaint.  In her complaints before this

6    court, Cline makes allegations of a toxic relationship that included incidents of domestic violence,

7    frequent infidelity (which Cline believed involved both Kiesel and Bernard), and knowing

8    infection with an STD.[22]  Her domestic violence and IIED claims would seem to make these

9    allegations relevant background; in any event, they cannot state a claim for extreme and

10    outrageous conduct.  *Cf. Taggart v. Moody's Inv'rs Serv., Inc.*, No. 06 CIV. 3388, 2007 WL

11    2076980, at *6 (S.D.N.Y. July 17, 2007) ("[A] plaintiff's claim for IIED cannot arise out of

12    statements made during a judicial or quasi-judicial proceeding where those statements are material

13    and pertinent to the questions involved in the proceedings.") (internal quotation marks omitted).

14    And although Cline and Random House did not bring all the legal claims mentioned in the April

15    2017 letter, they are not so removed from the realm of possibility as to be outrageous.

16    *See Cochran v. Cochran,* 65 Cal. App. 4th 488, 496 (1998) ("[T]he tort does not extend to mere

17    insults, indignities, threats, annoyances, petty oppressions, or other trivialities.") (citation omitted).

18    Because the IIED claims against Random House are based only on the letter, those claims

19    are DISMISSED WITH PREJUDICE.

20    **3. Whether Kiesel and Bernard State a Claim for Tortious Interference**

21    A plaintiff alleging tortious interference with prospective economic advantage must show:

22    (1) the existence of a prospective business relationship containing the probability of
     future economic rewards for plaintiff; (2) knowledge by defendant of the existence
23    of the relationship; (3) intentional acts by defendant designed to disrupt the

24

25    "baseless."  *Id.*

26    [22] Based on the correspondence between Kiesel and Reetz-Laiolo, Cline had reason to believe that
     Kiesel was the source of the STD that Reetz-Laiolo allegedly transmitted to her.  *See* Cline FAC ¶

27    67 (alleging that Cline learned that "Ms. K" had "urged [Reetz-Laiolo] to tell Cline of her possible
     exposure").  I cannot agree with plaintiffs that her "purpose [for] including these thinly veiled

28    allegations was to *reveal* Kiesel's identity and harass and cause her emotional distress, should she
     dare to proceed with seeking any redress from Cline . . . ."  Opp'n at 17.

relationship; (4) actual causation; and, (5) damages to plaintiff proximately caused by defendant's conduct.

*PMC, Inc. v. Saban Entm't, Inc.*, 45 Cal. App. 4th 579, 595 (1996), disapproved of on other grounds in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 n.11 (2003). And the claim requires that the defendant "engaged in an independently wrongful act." *Korea Supply*, 29 Cal. 4th at 1159.

### a. Kiesel's Claims

Cline and Random House argue that Kiesel fails to plausibly plead intent and any wrongful conduct. Cline MTD at 25–26. Instead, Cline and Random House were responding to a letter that Kiesel sent about potential litigation. *Id.* Kiesel counters that Cline and Random House acted with intent and engaged in wrongful conduct when they made threats of "reputational injury" with knowledge that she was on the tenure track, thus causing her to be unable to pursue tenure at the schedule she anticipated. Opp'n at 19–20.

Because intentional interference with prospective economic advantage is not "a wrong in and of itself," a plaintiff must allege facts showing "that the defendant engaged in an independently wrongful act." *Korea Supply*, 29 Cal. 4th at 1158. Improper motive is not enough; rather, the act must be "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159.

Even if the litigation privilege did not ultimately protect this conduct, Kiesel fails to plausibly plead tortious interference because she alleges no facts to show an independently unlawful act by Cline and Random House. Despite asserting in opposition that she "also alleges an 'independently unlawful act'" as required by *Korea Supply*, Kiesel fails to specify such an act. *See* Opp'n at 19–20. Kiesel cannot state a claim for IIED based on the April 2017 letter, and she alleges no other proscribed act. *See infra*, section II.D.2 – Whether Reetz-Laiolo, Kiesel, and Bernard State a Claim for IIED. Kiesel plausibly pleads intent given that Cline and Random House allegedly knew she was on track for tenure and threatened reputational harm. *See Korea Supply*, 29 Cal. 4th at 1154 (requiring for intent that the plaintiff plead the defendants "knew that the interference was certain or substantially certain to occur as a result of [their] action[s]"). But

1 without an unlawful act, Kiesel's tortious interference claim is DISMISSED WITH PREJUDICE.

2     **b. Bernard**

3    Bernard brings a tortious interference claim against Cline on the grounds that her actions

4 interfered with her relationship with Cannard, a friend and employee of Cline's family.  Reetz-

5 Laiolo 4AC ¶ 236.  Cline argues that Bernard's claim fails because she does not identify a

6 "continuing *economic* relationship" or any economic harm, but instead only a mentorship

7 relationship.  Cline MTD at 26.  In opposition, Bernard asserts that she was "deprived of

8 Cannard's guidance as she bought and began to operate her own farm in New York" and

9 "deprived of the opportunity to enjoy the business benefits derived from her relationship with

10 Cannard."  Opp'n at 20–21.

11    Because tortious interference claims cannot be based on speculation alone, the California

12 Supreme Court requires that the plaintiff "prove a business relationship with a specific third party

13 containing 'the probability of future economic benefit to the plaintiff.'"  *Piping Rock Partners,*

14 *Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 980 (N.D. Cal. 2013) (Illston, J.) (quoting

15 *Youst v. Longo*, 43 Cal.3d 64, 71 (1987)).  To show an economic relationship, "the cases generally

16 agree that it must be reasonably probable the prospective economic advantage would have been

17 realized but for defendant's interference."  *Youst v. Longo,* 43 Cal. 3d 64, 71 (1987).  "Allegations

18 that amount to a mere hope for an economic relationship and a desire for future benefit are

19 inadequate to satisfy the pleading requirements of the first element of the tort."  *Id.* (internal

20 quotation marks and citations omitted).

21    Bernard fails to plead any economic relationship with Cannard, and she pleads no more

22 than a "desire" for a future benefit.  She stopped working for Cannard in November 2016, months

23 before his letter in March 2017.  Reetz-Laiolo 4AC ¶¶ 45, 236.  In addition, she began her

24 business in upstate New York, whereas Cannard was based in Petaluma, California.  *Id.* ¶¶ 236–

25 37.  According to Bernard's own opposition, she hoped merely for Cannard's "guidance" in

26 starting a new business.  Opp'n at 20.  These allegations are insufficient.

27 **E. Claims under the Subsection (B) of the Stored Communications Act**

28    In my prior Order, I concluded that the plaintiffs had properly stated a claim under

United States District Court
Northern District of California

1    subsection (A) of the Stored Communications Act.  I also wrote, "In the absence of allegations

2    that the Reetz-Laiolo plaintiffs used their web-based email accounts 'for purposes of backup,'

3    subsection (B) is inapplicable to their claims."  Order at 47.  The plaintiffs put forth allegations

4    under subsection (B) in their fourth amended complaint.

5         Section 2701 of the SCA provides a private cause of action for the "[u]nlawful access to

6    stored communications" when one "intentionally accesses without authorization [or exceeds an

7    authorization to access] a facility through which an electronic communication service is

8    provided . . . and thereby obtains, alters, or prevents authorized access to a wire or electronic

9    communication while it is in electronic storage in such system . . . ."  18 U.S.C. § 2701.  The SCA

10   refers back to the Wiretap Act for definitions, and subsection (B) of the Wiretap Act defines

11   "electronic storage" as:  "any storage of such communication by an electronic communication

12   service for purposes of backup protection of such communication[.]"  18 U.S.C. § 2510.

13        Cline asserts that the fourth amended complaint's subsection (B) claims fail because the

14   plaintiffs have not alleged they "used their web-based email accounts for the purposes of backup"

15   protection.  Cline MTD at 27–29.  Plaintiffs fail to, "for instance, allege that they downloaded the

16   emails onto their personal computers, and left copies on the servers of their web-mail providers as

17   'backups' to the downloaded versions."  *Id.* at 28.

18        In *Theofel*, the Ninth Circuit noted that "the mere fact that a copy *could* serve as a backup

19   does not mean it is stored for that purpose."  *Theofel v. Farey-Jones*, 359 F.3d 1066, 1070 (9th

20   Cir. 2004) (emphasis in original).  "A remote computing service might be the only place a user

21   stores his messages; in that case, the messages are not stored for backup purposes."  *Id.* at 1077;

22   *see also Porters Bldg. Centers, Inc. v. Sprint Lumber*, No. 16-06055-CV-SJ-ODS, 2017 WL

23   4413288, at *8 (W.D. Mo. Oct. 2, 2017) ("An email simply stored on a Gmail server is not stored

24   for backup purposes."); *Jennings v. Jennings*, 401 S.C. 1, 7 (2012) (seeing "no reason to deviate

25   from the plain, everyday meaning of the word 'backup,'" and concluding that emails were not

26   stored for backup protection where there was only one copy).  By writing that "not all remote

27   computing services are also electronic communications services," the court implicitly

28   acknowledged some entities do provide users with both services.  *See Theofel*, 359 F.3d at 1070.

1    Accordingly, it is possible that Gmail and Yahoo! served both functions for the plaintiffs;

2    the question is whether they used the web-based email as backup within the meaning of subsection

3    (B).  They argue that "any copy on any server was created 'for the purposes of backup protection'"

4    because Gmail and Yahoo! Mail maintain copies of users' emails on multiple servers.  Opp'n at

5    22–23; *see* Reetz-Laiolo 4AC ¶ 149.  But the fact that the platforms stored additional copies of

6    emails on *their* servers does not mean that *plaintiffs* were storing the emails Cline accessed for

7    backup protection.  Where providers store messages has no effect on the user experience.

8    Accordingly, if the plaintiffs stored the messages in only one location—their web-based email

9    accounts, which is where Cline allegedly accessed them—then those messages were not stored for

10   backup purposes under subsection (B).  *See Theofel*, 359 F.3d at 1070 ("A remote computing

11   service might be the only place a user stores his messages; in that case, the messages are not stored

12   for backup purposes.").

13   Plaintiffs assert that they "can amend to specify . . . that Bernard and Kiesel each used

14   smartphones that downloaded and stored permanent copies of their emails on their phones."[23]

15   Opp'n at 22; *see Levin v. ImpactOffice LLC*, No. CV 16-2790, 2017 WL 2937938, at *4 (D. Md.

16   July 10, 2017) (concluding that the Gmail emails "could be deemed to be stored on the server 'for

17   purposes of backup protection'" because the plaintiff typically downloaded email messages to her

18   cell phone).  I will allow them to amend for the narrow purpose of alleging that they downloaded

19   copies of their emails and thus used the web-based email as backup.  The claims arising under

20   subsection (B) are DISMISSED WITH LEAVE TO AMEND.

21   **III. MOTIONS TO SEAL**

22   On September 25, 2018, I ordered parties to submit a joint chart specifying what

23   information they wished to remain under seal.  Order on Motions to Seal (17-cv-6867, Dkt. No.

24

25   [23] Cline argues amendment would be futile because Gmail and Yahoo! were providing remote
     computing services ("RCS"), not electronic communication services ("ECS"), thus making section

26   2701 inapplicable.  She cites a case arising under section 2702, which addresses when a provider
     of ECS can divulge the contents of a communication and which provides fewer protections for

27   messages stored by an RCS.  *See Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 987
     (C.D. Cal. 2010).  By contrast, *Theofel* arose under 2701, and in it the Ninth Circuit suggested that

28   a claim could proceed if it stated facts like the ones plaintiffs will raise on amendment.

United States District Court
Northern District of California

95).  The parties submitted the joint chart and supporting declarations on October 9 and 10, 2018.

Declaration of Kyle Roche (17-cv-6867, Dkt. No. 99); Declaration of Elizabeth McNamara (17-

cv-6867, Dkt. No. 100).  They request redactions of information including names of unrelated

third parties, email addresses, personally identifying information, personal financial information,

the dollar figures of settlement offers, and explicit claims regarding the parties' sexual histories.  I

find that their requests are narrowly tailored and based on compelling justifications.  *See* Civ. L. R.

79-5(b); *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

Accordingly, I GRANT the motion to seal.

## CONCLUSION

For the forgoing reasons, Reetz-Laiolo's motion to dismiss is GRANTED WITH

PREJUDICE with respect to the domestic violence claim and DENIED with respect to the

distribution of sexually explicit materials claim.  Cline's and Random House's motions to dismiss

are GRANTED WITH PREJUDICE with respect to the intermediate copying, conversion, civil

theft, and unjust enrichment related to *All Sea*, conversion related to the Refog records, IIED

claims against Random House, and tortious interference claims.  Cline's motion is GRANTED

WITHOUT PREJUDICE with respect to the SCA subsection (B) claims, and plaintiffs may

amend for the limited purpose I articulated.  Because no claims against it survive, Random House

is DISMISSED as a defendant in 17-cv-6867.

**IT IS SO ORDERED.**

Dated: November 19, 2018



William H. Orrick
United States District Judge